# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                )
THOMAS D. BRENNAN               )
                  Plaintiff,    )
                                )
v.                              )          Civil Action No. 05-40034-FDS
                                )
LIFE INSURANCE COMPANY          )
OF NORTH AMERICA                )
                  Defendant.    )
_____)

## DEFENDANT'S MOTION TO COMPEL
## FACSIMILIES DATED JULY 2, 1998 AND AUGUST 24, 1999

Defendant, Life Insurance Company of North America ("LINA"), comes pursuant to

Rule 37 of the Federal Rules of Civil Procedure and hereby moves this Court to Compel Plaintiff

to produce the facsimiles from Plaintiff to Robert Longden, Esq. dated July 2, 1998 and August

24, 1999 because: 1) they are relevant to Plaintiff's claim; and 2) Plaintiff has waived any

privilege that may attach to the requested documents.  Despite good faith attempts by LINA's

counsel to confer with Plaintiff's counsel regarding the production of the July 2, 1998 and

August 24, 1999 facsimiles, Plaintiff has refused to produce them.  See Letter dated February 8,

2007, attached hereto at Exhibit K.

## FACTS

This case involves a claim by Plaintiff for long-term disability benefits under the Mail-

Well Corporation Long Term Disability Plan, Policy No. LK-007945 ("Plan").  Complaint at 4.

Plaintiff became an employee of Mail-Well Corporation ("Mail-Well") as part of the sale of

Plaintiff's interest in Northeastern Envelope Manufacturing Company, Inc. ("Northeastern

Envelope") to Mail-Well in 1999.  Consequently, the negotiation of the sale and the negotiation

of Plaintiff's Employment Agreement occurred simultaneously.

In order to be eligible for benefits under the Plan, the Plaintiff must be an "active, Full-time union-free hourly [or] salaried Employee of the Employer . . . working the regularly scheduled full-time hours, but not less then 35 hours per week."  Plan, attached at Exhibit A, at 3.  Although Plaintiff claims that he was a full-time employee of Mail-Well, the negotiation of the sale and Plaintiff's employment with Mail-Well indicates that Plaintiff was negotiating for a part-time position.

Early in the negotiations, Plaintiff told Mail-Well that he was not seeking a full-time position with Mail-Well.  Facsimile dated July 20, 1998, attached at Exhibit H, at 14.  Similarly, drafts of the Employment Agreement exchanged between Mail-Well and Plaintiff during the negotiation indicate that he was negotiating for a part-time position.  The May 3, 1999 draft sent from Mail-Well's counsel to Plaintiff's counsel provided for the following:

> During the Employment Period, the [Plaintiff] will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of Employer and the Purchasers, and shall refrain from active involvement in any other business or professional activity except on behalf of Employer and/or the Purchasers.

May 3, 1999 Draft Employment Agreement, attached as Exhibit B, at Bates stamped page 7.

The revised version of the Employment Agreement sent from Plaintiff's counsel to Mail-Well reads as follows:

> During the Employment Period, the [Plaintiff] will devote his best efforts to the business of the Employer, and will spend a maximum of two business days per week, chosen in his sole discretion, performing his duties and responsibilities hereunder.

June 3, 1999 Draft Employment Agreement, attached as Exhibit C, at Bates stamped page 17.

Plaintiff's final Employment Agreement provides for the following:

> [Plaintiff] will be expected to devote two (2) days per week to the business of Employer during the Employment Period, which days shall be determined by the Divisional President of Northeastern, and on such days the [Plaintiff] will devote

his best efforts and substantially all of his business and professional time, skill
and attention to the business of Employer."

"3. . . . To the extent permitted under the terms of Employer's benefits plans,
[Plaintiff] will be considered a full-time exempt employee for purposes of
participation in such plans."

Plaintiff's Employment Agreement, attached as Exhibit D, at 1-2.  The Employment Agreement

states that Plaintiff will work for Mail-Well two days per week, which would not constitute full-

time work under the Plan.

On January 23, 2006, LINA served Plaintiff with a Request for Production of

Documents, seeking documents that related to the negotiation of the sale of Northeastern

Envelope to Mail-Well, including the negotiation of Plaintiff's Employment Agreement with

Mail-Well.  Defendant's Second Request for Production of Documents, attached as Exhibit E at

4.  Plaintiff responded to LINA's request for production of documents on March 2, 2006,

allowing LINA's counsel to inspect and copy the law firm's file from the sale of Northeastern

Envelope to Mail-Well.  Plaintiff's Response to Defendant's Second Request for Production of

Documents, attached as Exhibit F at 2-4.  The documents that Plaintiff provided for inspection

and copying included notes of telephone conversations between Plaintiff and his attorney in the

sale, Robert Longden, Esq., as well as correspondence between Plaintiff and Attorney Longden

relating to the sale of Northeastern Envelope and the negotiation of Plaintiff's employment with

Mail-Well.  See e.g., Notes, attached at Exhibit G; Facsimile dated July 20, 1998, attached at

Exhibit H; Facsimile dated July 21, 1998, attached at Exhibit I; Facsimile dated August 10, 1998,

attached at Exhibit J.

Plaintiff withheld only two documents from the file, identifying them as protected by the

attorney-client privilege: 1) a facsimile dated July 2, 1998 from Plaintiff to Robert Longden,

Esq.; and 2) a facsimile dated August 24, 1999 from Plaintiff to Robert Longden, Esq.  Exhibit F

at 6.  Plaintiff's Privilege Log describes the July 2, 1998 facsimile as a "facsimile attaching June 29, 1998 letter of intent to purchase the stock for review and stating Lucille Brennan will draft a power of attorney for Longden."  Exhibit F at 6.  The August 24, 1999 facsimile is described as a "facsimile requesting comments on attached proposal memo to Mahoney."  Exhibit F at 6.

## ARGUMENT

LINA is entitled to "discovery regarding any matter, not privileged, that is relevant to the claim."  Fed. R. Civ. P. 26(b).  Relevant simply means that, "the discovery appears reasonably calculated to lead to the discovery of admissible evidence."  Id.  As explained below: 1) the negotiation of the sale of Northeastern Envelope to Mail-Well, including the negotiation of Plaintiff's employment with Mail-well, is directly relevant to Plaintiff's claim for benefits; and 2) Plaintiff has waived any privilege that may attach to the July 2, 1999 and August 24, 1999 facsimiles.

### A.    The Negotiation Of The Sale Of Northeastern Envelope To Mail-Well Is Relevant To Plaintiff's Claim

The July 2, 1998 and August 24, 1999 facsimiles have to do with the sale of Northeastern Envelope to Mail-Well and are directly relevant to this claim.  In order to be eligible for benefits under the Plan, the Plaintiff must be an "active, Full-time union-free hourly [or] salaried Employee of the Employer . . . working the regularly scheduled full-time hours, but not less then 35 hours per week."  Plan, attached at Exhibit A, at 3.  As set forth below, Plaintiff claims that he was a full-time employee but the evidence suggests otherwise.

As noted above, Plaintiff became an employee of Mail-Well Corporation as part of the sale of Plaintiff's ownership interest in Northeastern Envelope to Mail-Well.  Consequently negotiations over the sale of Northeastern Envelope and Plaintiff's Employment, including his Employment Agreement, occurred simultaneously.  Early in the negotiations, Plaintiff told to

Mail-Well that he was not seeking a full time position with Mail-Well.  Facsimile dated July 20, 1998, attached at Exhibit H, at 14.  Similarly, the negotiation of Plaintiff's Employment Agreement with Mail-Well indicates that he was negotiating for a part-time position, in which case, Plaintiff would not be eligible for benefits under the Plan.  The May 3, 1999 draft sent by counsel to Mail-Well to Plaintiff's counsel provided for the following:

> During the Employment Period, the [Plaintiff] will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of Employer and the Purchasers, and shall refrain from active involvement in any other business or professional activity except on behalf of Employer and/or the Purchasers.

May 3, 1999 Draft Employment Agreement, attached as Exhibit B, at Bates stamped page 7.

The revised version of the Employment Agreement sent from Plaintiff's counsel to Mail-Well reads as follows:

> During the Employment Period, the [Plaintiff] will devote his best efforts to the business of the Employer, and will spend a maximum of two business days per week, chosen in his sole discretion, performing his duties and responsibilities hereunder.

June 3, 1999 Draft Employment Agreement, attached as Exhibit C, at Bates stamped page 17.

Plaintiff's final Employment Agreement provides for the following:

> [Plaintiff] will be expected to devote two (2) days per week to the business of Employer during the Employment Period, which days shall be determined by the Divisional President of Northeastern, and on such days the [Plaintiff] will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of Employer."

> "3. . . . To the extent permitted under the terms of Employer's benefits plans, [Plaintiff] will be considered a full-time exempt employee for purposes of participation in such plans."

Plaintiff's Employment Agreement, attached as Exhibit D, at 1-2.  Contrary to Plaintiff's claims, the final Employment Agreement states that Plaintiff will work for Mail-Well two days per week, which would not constitute full-time work under the Plan.

Because the Plan requires that Plaintiff be a full-time employee to be eligible for benefits and because the evidence suggests that Plaintiff was neither negotiating for, nor working a full-time position, all documents related to the sale of Northeastern Envelope to Mail-Well, including the July 2, 1998 and August 24, 1999 facsimiles, are directly relevant to Plaintiff's claim for benefits.

**B.     Plaintiff Waived Any Privilege That May Attach to The Facsimiles**

The July 2, 1998 and August 24, 1999 facsimiles are relevant to Plaintiff's claim and Plaintiff has waived any privilege that may attach to them.  The First Circuit has explained that the waiver of the attorney-client privilege – whether intentional or inadvertent – "will be deemed to encompass all other communications on the same subject." Texaco Puerto Rico, Inc., et al. v. Department of Consumer Affairs, et al., 60 F.3d 867, 883-84 (1st Cir. 1995); In Re Lernout & Hauspie Securities Litigation, 222 F.R.D. 29, 34-35 (D.Mass. 2004)(relying on Texaco to conclude that if an inadvertent waiver constitutes a waiver of all other communications on the same subject, then an intentional waiver has the same result).  In this case, Plaintiff produced all but two documents from his attorneys' file on the sale of Northeastern Envelope to Mail-Well, including numerous documents that would have otherwise been protected by attorney-client privilege.

Plaintiff waived the attorney-client privilege with respect to communications regarding the sale of Northeastern Envelope, including the negotiation of Plaintiff's Employment Agreement, when he produced notes of telephone conversations between Plaintiff and Attorney Longden, as well as correspondence between Plaintiff and Attorney Longden regarding the sale of Northeastern Envelope and the negotiation of Plaintiff's Employment Agreement.  See e.g., Notes, attached at Exhibit G; Facsimile dated July 20, 1998, attached at Exhibit H; Facsimile

dated July 21, 1998, attached at Exhibit I; Facsimile dated August 10, 1998, attached at Exhibit J. Because Plaintiff waived the attorney-client privilege with respect to communications regarding the sale of Northeastern Envelope to Mail-Well, Plaintiff must produce the July 2, 1998 and August 24, 1999 facsimiles.

The July 2, 1998 and August 24, 1999 facsimiles also constitute communications regarding the sale of Northeastern Envelope and must be produced because Plaintiff waived the attorney-client privilege with respect to these documents. Plaintiff describes the July 2, 1998 facsimile from Plaintiff to Attorney Longden as "attaching June 29, 1998 letter of intent to purchase the stock for review and stating Lucile Brennan will draft a power of attorney for Longden"; and the August 24, 1999 facsimile from Plaintiff to Attorney Longden as "requesting comments on attached proposal to Mahoney." Exhibit F at 6. Significantly, several of the facsimiles from Plaintiff to Attorney Longden that were produced to LINA also attach the June 29, 1998 letter of intent. Exhibit H, I, J. Likewise, both the documents withheld by Plaintiff and the documents produced to LINA, include requests for comments. See e.g. Exhibit J. As such, not only is the subject matter of the withheld documents the same as the documents that were produced, but the substance of the documents appears to be substantially similar. Consequently, Plaintiff has waived the attorney-client privilege with respect to the July 2, 1998 and August 24, 1999 facsimiles and they must be produced.

## CONCLUSION

As set forth above, the July 2, 1998 and August 24, 1999 facsimiles are directly relevant to Plaintiff's claim and Plaintiff has waived the attorney-client privilege with respect to communications having to do with the sale of Northeastern Envelope to Mail-Well, including the

July 2, 1998 and August 24, 1999 facsimiles.  Consequently, the Court must order that the July 2, 1998 and August 24, 1999 letters be produced.

<div style="margin-left:45%">

Respectfully Submitted,

Defendant, Life Insurance Company of
North America,

By its Attorneys:

CREVIER & RYAN, LLP.


/s/Katherine R. Parsons
David B. Crevier, BBO# 557242
Katherine R. Parsons, BBO # 657280
1500 Main Street, Suite 2020
Springfield, MA 01115
Tel:  413-787-2400
Facsimile:  413-781-8235
Email: dcrevier@crevierandryan.com
       kparsons@crevierandryan.com

</div>

## LOCAL RULE 7.1 CERTIFICATION

I certify that the attorneys in this case have conferred and attempted in good faith to resolve or narrow the issues contained in this motion.

<div style="margin-left:45%">

/s/Katherine R. Parsons

</div>

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 27th day of February, 2007.

<div style="margin-left:45%">

/s/Katherine R. Parsons

</div>

# Exhibit A

LIFE INSURANCE COMPANY OF NORTH AMERICA
1601 CHESTNUT STREET
PHILADELPHIA, PA 19192-2235
(800) 732-1603 TDD (800) 552-5744
A STOCK INSURANCE COMPANY

GROUP POLICY

| | |
|---|---|
| **POLICYHOLDER:** | Mail-Well Corporation |
| **POLICY NUMBER:** | LK-007945 |
| **POLICY EFFECTIVE DATE:** | February 24, 1994 |
| **POLICY REWRITE DATE:** | January 1, 2001 |
| **POLICY ANNIVERSARY DATE:** | January 1 |

This Policy is a continuation of and replaces the same numbered policy that became effective February 24, 1994. Any different benefits provided by this Policy become effective on its Rewrite Date shown above. Any different benefits will not affect benefits payable for claims incurred before the Policy Rewrite Date.

This Policy describes the terms and conditions of coverage. It is issued in Colorado and shall be governed by its laws. The Policy goes into effect on the Policy Effective Date, 12:01 a.m. at the Policyholder's address.

In return for the required premium, the Insurance Company and the Policyholder have agreed to all the terms of this Policy.

Robert J. Upton, Secretary

Michael W. Bell, President

TL-004701

O/O v-1

# TABLE OF CONTENTS

SCHEDULE OF BENEFITS .................................................. 3

SCHEDULE OF BENEFITS FOR CLASS 1 ........................... 4

ELIGIBILITY FOR INSURANCE ....................................... 7

EFFECTIVE DATE OF INSURANCE .................................. 7

TERMINATION OF INSURANCE ...................................... 7

CONTINUATION OF INSURANCE .................................... 8

DESCRIPTION OF BENEFITS .......................................... 8

EXCLUSIONS .............................................................. 13

CLAIM PROVISIONS .................................................... 14

ADMINISTRATIVE PROVISIONS .................................... 15

GENERAL PROVISIONS ................................................ 17

DEFINITIONS ............................................................. 18

SCHEDULE OF AFFILIATES .......................................... 21

## SCHEDULE OF BENEFITS

**Premium Due Date**                Premiums are due in arrears on the date coinciding with the day of the Policy
                                    Anniversary Date or the last day of the month, if earlier.

**Participation Requirements**      The greater of 75% of Eligible Employees or a minimum of 10 Employees.

**Classes of Eligible Employees**

Class 1  All active, Full-time union-free hourly and salaried Employees of the Employer and affiliated companies
         working the regularly scheduled full-time hours, but not less than 35 hours per week.

## SCHEDULE OF BENEFITS FOR CLASS 1

**Eligibility Waiting Period**

For Employees hired on or before the Policy Effective Date:     No Waiting Period

For Employees hired after the Policy Effective Date:     First day of the month following 30 continuous days of Active Service

**Definition of Disability/Disabled**

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either:

1.    unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative; or
2.    unable to earn 80% or more of his or her Indexed Covered Earnings.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is either:

1.    unable to perform all the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; or
2.    unable to earn 80% or more of his or her Indexed Covered Earnings.

The Insurance Company will require proof of earnings and continued Disability.

**Definition of Optimum Ability**

1.    for the first 24 months that benefits are payable, the greatest extent of work the Employee is able to do in his or her Regular Occupation;
2.    after 24 months, the greatest extent of work the Employee is able to do in any occupation based on education, training or experience.

The Employee's ability to work is based on the following:

1.    medical evidence submitted by the Employee;
2.    consultation with the Employee's Physician;
3.    evaluation of the Employee's ability to work by not more than three independent experts if required by the Insurance Company; and
4.    an offer of employment that meets the Employee's capacity to do the work is made by an employer.

There is no cost to the Employee for evaluation by an independent expert when required by the Insurance Company to determine Optimum Ability.

The independent expert must be:

1.    licensed, registered or certified as required by the laws of the state in which the evaluation is made; and
2.    acting within the scope of that license, registration or certificate.

**Definition of Covered Earnings**

Covered Earnings means an Employee's annual wage or salary as reported by the Employer for work performed for the Employer as in effect just prior to the date Disability begins.  It includes earnings received from commissions but not bonuses, overtime pay or any other extra compensation. For Employees with less than one year of service, wages are annualized.  Covered Earnings are determined initially on the date an Employee applies for coverage.  A change in amount of Covered Earnings is effective on the date of the change, if the Employer gives us written notice of the change and the required premium is paid.

For Employees who are paid wholly or in part by commissions, Covered Earnings are determined at the beginning of the plan year and are calculated from the prior year's annual base salary (if applicable) plus commissions reported but not including bonuses, overtime pay or any other extra compensation. If the Employee was not employed by the Employer for the entire prior year, commissions will be averaged for the 12 months just prior to the date Disability begins, or the months employed, if less than 12 months.

Any increase in an Employee's Covered Earnings will not be effective during a period of continuous Disability.

| | |
|---|---|
| **Elimination Period** | 180 days |
| **Gross Disability Benefit** | The lesser of 60% of an Employee's monthly Covered Earnings rounded to the nearest dollar or the Maximum Disability Benefit. |
| **Maximum Disability Benefit** | $10,000 per month |
| **Minimum Disability Benefit** | $100 per month |

**Disability Benefit Calculation**

The Monthly Disability Benefit for any month the Employee is Disabled is the Gross Disability Benefit minus Other Income Benefits and the Calculation for Optimum Ability.

The Calculation for Optimum Ability is the earnings the Employee could earn if working at Optimum Ability, minus Disability Earnings.

"Other Income Benefits" means any benefits listed in the Other Income Benefits provision that an Employee receives on his or her own behalf or for dependents, or which the Employee's dependents receive because of the Employee's entitlement to Other Income Benefits.

**Work Incentive Benefit Calculation**

An Employee may work for wage or profit while Disabled. In any month in which the Employee works and a Disability Benefit is payable, the Work Incentive Benefit Calculation applies. It is determined as follows:

1.  For each month during the first 24 months that Disability Benefits are payable, the amount of the Work Incentive Benefit equals (a) minus (b).
    (a) equals (i) minus (ii), but not more than the Gross Disability Benefit shown in the Schedule of Benefits.
        (i)  is 100% of Indexed Covered Earnings.
        (ii) is the sum of Other Income Benefits, including Disability Earnings.
    (b) equals the Calculation for Optimum Ability.

The Calculation for Optimum Ability is the earnings an Employee could earn if working at Optimum Ability, minus Disability Earnings.

2.  After those first 24 months, the amount of benefit to be paid equals (c) minus (d).
    (c) equals the Gross Disability Benefit minus the sum of 50% of Disability Earnings and 100% of the remaining Other Income Benefits.
    (d) equals the Calculation for Optimum Ability.

The Insurance Company will, from time to time, review the Employee's status and will require satisfactory proof of earnings and continued Disability.

No Disability Benefits will be paid, and insurance will end if the Insurance Company determines the Employee is able to work under a Transitional Work Arrangement or other modified work arrangement and the Employee refuses to do so without Good Cause.

**Additional Benefits**

*Survivor Benefit*

        Amount of Benefit:                100% of the sum of the last full Disability Benefit plus any current earnings by which the Disability Benefit was reduced for that month.

        Maximum Benefit Period        A single lump sum payment equal to 3 monthly Survivor Benefits.

**Maximum Benefit Period**

| Age When Disability Begins | Maximum Benefit Period |
|---|---|
| Age 62 or under | The Employee's 65th birthday or the date the 42nd Monthly Benefit is payable, if later. |
| Age 63 | The date the 36th Monthly Benefit is payable. |
| Age 64 | The date the 30th Monthly Benefit is payable. |
| Age 65 | The date the 24th Monthly Benefit is payable. |
| Age 66 | The date the 21st Monthly Benefit is payable. |
| Age 67 | The date the 18th Monthly Benefit is payable. |
| Age 68 | The date the 15th Monthly Benefit is payable. |
| Age 69 or older | The date the 12th Monthly Benefit is payable. |

**Initial Premium Rates**

        $.44 per $100 of Covered Payroll

Covered Payroll for an Employee will mean his or her Covered Earnings for the insurance month prior to the date the determination is made. However, an Employee's Covered Payroll will not include any part of his or her monthly Covered Earnings which exceed $16,667.

TL-004774

6

## ELIGIBILITY FOR INSURANCE

An Employee in one of the Classes of Eligible Employees shown in the Schedule of Benefits is eligible to be insured on the Policy Effective Date, or the day after he or she completes the Eligibility Waiting Period, if later. The Eligibility Waiting Period is the period of time the Employee must be in Active Service to be eligible for coverage. It will be extended by the number of days the Employee is not in Active Service.

Except as noted in the Reinstatement Provision, if an Employee terminates coverage and later wishes to reapply, or if a former Employee is rehired, a new Eligibility Waiting Period must be satisfied. An Employee is not required to satisfy a new Eligibility Waiting Period if insurance ends because he or she is no longer in a Class of Eligible Employees, but continues to be employed and within one year becomes a member of an eligible class.

TL-004710

## EFFECTIVE DATE OF INSURANCE

An Employee who is required to contribute to the cost of this insurance may elect to be insured only by authorizing payroll deduction in a form approved by the Employer and the Insurance Company. The effective date of this insurance depends on the date coverage is elected.

Insurance for an Employee who applies for insurance within 31 days after he or she becomes eligible is effective on the latest of the following dates.
1.    The Policy Effective Date.
2.    The date payroll deduction is authorized.
3.    The date the Insurance Company receives the Employee's completed enrollment form.

If an Employee's enrollment form is received more than 31 days after he or she is eligible for this insurance, the Insurability Requirement must be satisfied before this insurance is effective. If approved, this insurance is effective on the date the Insurance Company agrees in writing to insure the Employee.

If an Employee is not in Active Service on the date insurance would otherwise be effective, it will be effective on the date he or she returns to any occupation for the Employer on a Full-time basis.

TL-004712

## TERMINATION OF INSURANCE

An Employee's coverage will end on the earliest of the following dates:
1.    the date the Employee is eligible for coverage under a plan intended to replace this coverage;
2.    the date the Policy is terminated;
3.    the date the Employee is no longer in an eligible class;
4.    the day after the end of the period for which premiums are paid;
5.    the date the Employee is no longer in Active Service;
6.    the date benefits end for failure to comply with the terms and conditions of the Policy.

Disability Benefits will continue for an Employee receiving Disability Benefits when the Policy terminates, if he or she remains disabled and meets the requirements of the Policy. Any later period of Disability, regardless of cause, that begins when the Employee is eligible under another group disability coverage provided by any employer, will not be covered.

TL-007505.00

## CONTINUATION OF INSURANCE

Disability Insurance continues if an Employee's Active Service ends due to a Disability for which benefits under the Policy are or may become payable. Premiums for the Employee will be waived while Disability Benefits are payable. If the Employee does not return to Active Service, this insurance ends when the Disability ends or when benefits are no longer payable, whichever occurs first.

TL-004716

## DESCRIPTION OF BENEFITS

The following provisions explain the benefits available under the Policy. Please see the Schedule of Benefits for the applicability of these benefits to each class of Insureds.

**Disability Benefits**
The Insurance Company will pay Disability Benefits if an Employee becomes Disabled while covered under this Policy. The Employee must satisfy the Elimination Period, be under the Appropriate Care of a Physician, and meet all the other terms and conditions of the Policy. He or she must provide the Insurance Company, at his or her own expense, satisfactory proof of Disability before benefits will be paid. The Disability Benefit is shown in the Schedule of Benefits.

The Insurance Company will require continued proof of the Employee's Disability for benefits to continue.

**Elimination Period**
The Elimination Period is the period of time an Employee must be continuously Disabled before Disability Benefits are payable. The Elimination Period is shown in the Schedule of Benefits.

A period of Disability is not continuous if separate periods of Disability result from unrelated causes.

**Continuity of Coverage**
The following provisions will apply to any Employee who was insured under a Prior Plan.

The Elimination Period under this Policy will be waived for a Disability which begins while the Employee is insured under this Policy if all of the following conditions are met:
1.    the Disability results from the same or related causes as a Disability for which benefits were payable under the Prior Plan;
2.    benefits are not payable for the Disability under the Prior Plan solely because it is not in effect;
3.    an Elimination Period would not apply to the Disability if the Prior Plan had not ended;
4.    the Employee was in Active Service for more than 14 consecutive days while covered under this Policy; and
5.    the Disability begins within 6 months of the Employee's return to Active Service.

Benefits will be determined based on the lesser of: (1)  the amount of the gross disability benefit under the Prior Plan and any applicable maximums; or (2) those provided by this Policy.

Except for any amount of benefit in excess of a Prior Plan's benefits, the Pre-existing Condition Limitation will not apply to an Employee covered under a Prior Plan who satisfied the pre-existing condition limitation, if any, under that plan. If an Employee, covered under a Prior Plan, did not fully satisfy the pre-existing condition limitation of that plan, credit will be given for any time that was satisfied under the Prior Plan's pre-existing condition limitation.  The Pre-existing Condition Limitation will not apply to any increases in benefits effective on the Policy Rewrite Date for employees who were insured on December 31, 2000  under Policy No. LK-7945 or Policy No. LK-8368 issued to the Policyholder by the Life Insurance Company of North America.

If benefits are payable under the Prior Plan for the Disability, no benefits are payable under this Policy.

8

## Disability Benefit Calculation

The Disability Benefit Calculation is shown in the Schedule of Benefits. Monthly Disability Benefits are based on a 30 day period. They will be prorated if payable for any period less than a month. If an Employee is working while Disabled, the Disability Benefit Calculation will be the Work Incentive Benefit Calculation.

## Work Incentive Benefit Calculation

The Work Incentive Benefit Calculation is shown in the Schedule of Benefits. An Employee may work for wage or profit while Disabled. In any month in which the Employee works and a Disability Benefit is payable, the Work Incentive Benefit Calculation applies.

The Insurance Company will, from time to time, review the Employee's status and will require satisfactory proof of earnings and continued Disability.

## Minimum Benefit

The Insurance Company will pay the Minimum Benefit shown in the Schedule of Benefits despite any reductions made for Other Income Benefits. When Disability Benefits are reduced in order to recover any overpayment, any minimum payment will be applied to any overpayment due to the Insurance Company.

## Other Income Benefits

An Employee for whom Disability Benefits are payable under this Policy may be eligible for benefits from Other Income Benefits. If so, the Insurance Company may reduce the Disability Benefits by the amount of such Other Income Benefits.

Other Income Benefits include:

1. any amounts received (or assumed to be received*) by the Employee or his or her dependents under:
   - the Canada and Quebec Pension Plans;
   - the Railroad Retirement Act;
   - any local, state, provincial or federal government disability or retirement plan or law payable for Injury or Sickness provided as a result of employment with the Employer;
   - any work loss provision in mandatory "No-Fault" auto insurance;
   - any workers' compensation, occupational disease, unemployment compensation law or similar state or federal law payable for Injury or Sickness arising out of work with the Employer, including all permanent and temporary disability benefits. This includes any damages, compromises or settlement paid in place of such benefits, whether or not liability is admitted;

2. any Social Security disability or retirement benefits the Employee or any third party receives (or is assumed to receive*) on his or her own behalf or for his or her dependents; or which his or her dependents receive (or are assumed to receive*) because of his or her entitlement to such benefits;

3. any Retirement Plan benefits funded by the Employer. "Retirement Plan" means any defined benefit or defined contribution plan sponsored or funded by the Employer. It does not include an individual deferred compensation agreement; a profit sharing or any other retirement or savings plan maintained in addition to a defined benefit or other defined contribution pension plan, or any employee savings plan including a thrift, stock option or stock bonus plan, individual retirement account or 401(k) plan;

4. any proceeds payable under any franchise or group insurance or similar plan. If other insurance applies to the same claim for Disability, and contains the same or similar provision for reduction because of other insurance, the Insurance Company will pay for its pro rata share of the total claim. "Pro rata share" means the proportion of the total benefit that the amount payable under one policy, without other insurance, bears to the total benefits under all such policies;

5. any amounts paid because of loss of earnings or earning capacity through settlement, judgment, arbitration or otherwise, where a third party may be liable, regardless of whether liability is determined;

o. any Disability Earnings. If the Work Incentive Benefits Calculation applies to the Employee, the Insurance Company will only reduce the Employee's Disability Benefits by Disability Earnings to the extent provided under the Employee's Work Incentive Benefit Calculation.

Dependents include any person who receives (or is assumed to receive) benefits under any applicable law because of an Employee's entitlement to benefits.

*See the Assumed Receipt of Benefits provision.

*Increases in Other Income Benefits*
Any increase in Other Income Benefits during a period of Disability due to a cost of living adjustment will not be considered in calculating the Employee's Disability Benefits after the first reduction is made for any Other Income Benefits. This section does not apply to any cost of living adjustment for Disability Earnings.

*Lump Sum Payments*
Other Income Benefits or earnings paid in a lump sum will be prorated over the period for which the sum is given. If no time is stated, the lump sum will be prorated over five years.

If no specific allocation of a lump sum payment is made, then the total payment will be an Other Income Benefit.

*Assumed Receipt of Benefits*
The Insurance Company will assume the Employee (and his or her dependents, if applicable) are receiving benefits for which they are eligible from Other Income Benefits. The Insurance Company will reduce the Employee's Disability Benefits by the amount from Other Income Benefits it estimates are payable to the Employee and his or her dependents.

The Insurance Company will waive Assumed Receipt of Benefits, except for Disability Earnings for work the Employee performs while Disability Benefits are payable, if the Employee:

1. provides satisfactory proof of application for Other Income Benefits;
2. signs a Reimbursement Agreement;
3. provides satisfactory proof that all appeals for Other Income Benefits have been made unless the Insurance Company determines that further appeals are not likely to succeed; and
4. submits satisfactory proof that Other Income Benefits were denied.

The Insurance Company will not assume receipt of any pension or retirement benefits that are actuarially reduced according to applicable law, until the Employee actually receives them.

The Insurance Company may limit its waiver of Assumed Receipt of Benefits if:
1. there is a change in factors bearing on the risk assumed, including but not limited to a significant increase in time required by the party responsible for paying the Other Income Benefits to determine whether Other Income Benefits are payable; or
2. any state or Federal law or regulation is amended so that it affects the Insurance Company's benefit obligations.

## Successive Periods of Disability
A separate period of Disability will be considered continuous:
1. if it results from the same or related causes as a prior Disability for which benefits were payable; and
2. if, after receiving Disability Benefits, the Employee returns to work in his Regular Occupation or a Qualified Alternative for less than 6 consecutive months; and
3. if the Employee earns less than 80% of Indexed Covered Earnings during at least one month.

.ny later period of Disability, regardless of cause, that begins when the Employee is eligible for coverage under another group disability plan provided by any employer will not be considered a continuous period of Disability.

For any separate period of disability which is not considered continuous, the Employee must satisfy a new Elimination Period.

# LIMITATIONS

**Mental Illness, Alcoholism and Drug Abuse Limitation**

The Insurance Company will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions.

1. Alcoholism
2. Anxiety disorders
3. Delusional (paranoid) disorders
4. Depressive disorders
5. Drug addiction or abuse
6. Eating disorders
7. Mental illness
8. Somatoform disorders (psychosomatic illness)

If, before reaching his or her lifetime maximum benefit, an Employee is confined in a hospital for more than 14 consecutive days, that period of confinement will not count against his or her lifetime limit. The confinement must be for the Appropriate Care of any of the conditions listed above.

**Pre-Existing Condition Limitation**

The Insurance Company will not pay benefits for any period of Disability caused or contributed to by, or resulting from, a Pre-existing Condition. A "Pre-existing Condition" means any Injury or Sickness for which the Employee incurred expenses, received medical treatment, consulted with a health professional, or took prescribed drugs or medicines, within 3 months immediately preceding the most recent effective date of insurance.

The Pre-existing Condition Limitation will apply to any added benefits or increases in benefits. This limitation will not apply to a period of Disability that begins after an Employee is covered for at least 12 months after his or her most recent effective date of insurance, or the effective date of any added or increased benefits.

## SOCIAL SECURITY ASSISTANCE

The Insurance Company may help the Employee in applying for Social Security Disability Income (SSDI) Benefits, and may require the Employee to file an appeal if it believes a reversal of a prior decision is possible.

The Insurance Company will reduce Disability Benefits by the amount it estimates the Employee will receive, if the Employee refuses to cooperate with or participate in the Social Security Assistance Program.

## RECOVERY OF OVERPAYMENT

The Insurance Company has the right to recover any benefits it has overpaid. The Insurance Company may use any or all of the following to recover an overpayment:

1. request a lump sum payment of the overpaid amount;
2. reduce any amounts payable under this Policy; and/or
3. take any appropriate collection activity available to it.

The Minimum Benefit amount will not apply when Disability Benefits are reduced in order to recover any overpayment.

If an overpayment is due when the Employee dies, any benefits payable under the Policy will be reduced to recover the overpayment.

## ADDITIONAL BENEFITS

### Rehabilitation During a Period of Disability

If the Insurance Company determines that a Disabled Employee is a suitable candidate for rehabilitation, the Insurance Company may require the Employee to participate in a Rehabilitation Plan. The Insurance Company has the sole discretion to approve the Employee's participation in a Rehabilitation Plan and to approve a program as a Rehabilitation Plan.

The Rehabilitation Plan may, at the Insurance Company's discretion, allow for payment of the Employee's medical expense, education expense, moving expense, accommodation expense or family care expense while he or she participates in the program.

If an Employee fails to fully cooperate in all required phases of the Rehabilitation Plan without Good Cause, no Disability Benefits will be paid, and insurance will end.

### Spouse Rehabilitation Benefit

While an Employee is Disabled, his or her Spouse may, at the option of the Insurance Company, be eligible to participate in a Spouse Rehabilitation Plan. To be eligible, the following conditions must be met:

1. the Employee must be continuously Disabled for 12 months;
2. his or her Spouse's earnings must be 60% or less than the Employee's Covered Earnings; and
3. his or her Spouse must be determined by the Insurance Company to be a suitable candidate for rehabilitation.

"Spouse," as used in this provision, means the Employee's lawful Spouse living with him or her on the date the Employee's Disability begins. The Spouse Rehabilitation Plan will end if the Employee's Spouse is no longer living with the Employee.

The Spouse's Rehabilitation Plan may include, at the Insurance Company's discretion, payment of the Spouse's education expense, reasonable job placement expenses and moving expenses. It may also include family care expenses, if necessary, for his or her Spouse to be retrained under the Rehabilitation Plan.

Disability Benefits will be reduced by 50% of his or her Spouse's earnings from participation in the Rehabilitation Plan. If his or her Spouse was working before the Spouse Rehabilitation Plan begins, Disability Benefits will be reduced by 50% of the increase in income that results from his or her Spouse's participation in the Spouse Rehabilitation Plan.

TL-007501.00

### Conversion Privilege for Disability Insurance Benefits

If an Employee's insurance ends because employment with the Employer ends, or an Employee is laid off or on an uninsured leave of absence, he or she may be eligible for conversion insurance.

To be eligible, an Employee must have been insured for Disability Benefits and actively at work for at least 12 straight months. If the Employee makes application for conversion insurance within 31 days after insurance under this Policy ends, conversion insurance will be effective as of the date insurance under this Policy ends. If an Employee makes application more than 31 days after insurance under this Policy ends, the Insurance Company will require the Employee to provide satisfactory evidence of good health at his or her own expense. Conversion insurance will be effective on the date the Insurance Company agrees in writing to insure him or her. An Employee must apply for conversion insurance within 62 days after insurance ends.

The benefits of the conversion plan will be those benefits offered at the time an Employee applies. The premium will be based on the rates in effect for conversion plans at that time.

Conversion insurance is not available if any of the following conditions apply:
1.     the Employee is retired or age 70 or older;
2.     the Employee is not in Active Service because of Disability;
3.     the Policy is canceled for any reason;
4.     the Employee is no longer in a Class of Eligible Employees, but is still employed by the Employer.

TL-007504.00

**Survivor Benefit**

The Insurance Company will pay a Survivor Benefit if an Employee dies while Monthly Benefits are payable. The Employee must have been continuously Disabled before the first benefit is payable. These benefits will be payable for the Maximum Benefit Period for Survivor Benefits.

Benefits will be paid to the Employee's Spouse. If there is no Spouse, benefits will be paid in equal shares to the Employee's surviving Children. If there are no Spouse and no Children, benefits will be paid to the Employee's estate.

"Spouse" means an Employee's lawful spouse. "Children" means an Employee's unmarried children under age 21 who are chiefly dependent upon the Employee for support and maintenance. The term includes a stepchild living with the Employee at the time of his or her death.

TL-005107

## TERMINATION OF DISABILITY BENEFITS

Benefits will end on the earliest of the following dates:
1.     the date the Employee earns 80% or more of his or her Indexed Covered Earnings;
2.     the date the Insurance Company determines he or she is not Disabled;
3.     the end of the Maximum Benefit Period;
4.     the date the Employee dies;
5.     the date the Employee refuses, without Good Cause, to fully cooperate in all required phases of the Rehabilitation Plan;
6.     the date the Employee refuses, without Good Cause, to fully cooperate in a Transitional Work Arrangement;
7.     the date the Employee is no longer receiving Appropriate Care;
8.     the date the Employee fails to cooperate with the Insurance Company in the administration of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

Benefits may be resumed if the Employee begins to cooperate fully in the Rehabilitation Plan or a Transitional Work Arrangement within 30 days of the date benefits terminated.

TL-007502.00

## EXCLUSIONS

The Insurance Company will not pay any Disability Benefits for a Disability that results, directly or indirectly, from:
1.     suicide, attempted suicide, or self-inflicted injury while sane or insane.
2.     war or any act of war, whether or not declared.
3.     terrorism or active participation in a riot.
4.     Injury or Sickness while the Employee is serving on full-time active duty in any armed forces. If the Employee sends proof of service, the Insurance Company will refund pro rata the premium paid to cover the Employee during a period of such service.

5.   commission of a felony.
6.   the revocation, restriction or non-renewal of an Employee's license, permit or certification necessary to perform the duties of his or her occupation unless due solely to Injury or Sickness otherwise covered by the Policy.

In addition, the Insurance Company will not pay Disability Benefits for any period of Disability during which the Employee is incarcerated in a penal or corrections institution.

TL-007503.00

## CLAIM PROVISIONS

### Notice of Claim

Written notice, or notice by any other electronic/telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 31 days after a covered loss occurs or begins or as soon as reasonably possible. If written notice, or notice by any other electronic/telephonic means authorized by the Insurance Company, is not given in that time, the claim will not be invalidated or reduced if it is shown that notice was given as soon as was reasonably possible. Notice can be given at our home office in Philadelphia, Pennsylvania or to our agent. Notice should include the Employer's Name, the Policy Number and the claimant's name and address.

### Claim Forms

When the Insurance Company receives notice of claim, the Insurance Company will send claim forms for filing proof of loss. If claim forms are not sent within 15 days after notice is received by the Insurance Company, the proof requirements will be met by submitting, within the time required under the "Proof of Loss" section, written proof, or proof by any other electronic/telephonic means authorized by the Insurance Company, of the nature and extent of the loss.

### Claimant Cooperation Provision

Failure of a claimant to cooperate with the Insurance Company in the administration of the claim may result in termination of the claim. Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

### Insurance Data

The Employer is required to cooperate with the Insurance Company in the review of claims and applications for coverage. Any information the Insurance Company provides in these areas is confidential and may not be used or released by the Employer if not permitted by applicable privacy laws.

### Proof of Loss

Written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, must be given to the Insurance Company within 90 days after the date of the loss for which a claim is made. If written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, is not given in that 90 day period, the claim will not be invalidated nor reduced if it is shown that it was given as soon as was reasonably possible. In any case, written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, must be given not more than one year after that 90 day period. If written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, is provided outside of these time limits, the claim will be denied. These time limits will not apply while the person making the claim lacks legal capacity.

Written proof, or proof by any other electronic/telephonic means authorized by the Insurance Company, that the loss continues must be furnished to the Insurance Company at intervals required by us. Within 30 days of a request, written proof of continued Disability and Appropriate Care by a Physician must be given to the Insurance Company.

**Time of Payment**
Disability Benefits will be paid at regular intervals of not less frequently than once a month. Any balance, unpaid at the end of any period for which the Insurance Company is liable, will be paid at that time.

**To Whom Payable**
Disability Benefits will be paid to the Employee. If any person to whom benefits are payable is a minor or, in the opinion of the Insurance Company, is not able to give a valid receipt, such payment will be made to his or her legal guardian. However, if no request for payment has been made by the legal guardian, the Insurance Company may, at its option, make payment to the person or institution appearing to have assumed custody and support.

If an Employee dies while any Disability Benefits remain unpaid, the Insurance Company may, at its option, make direct payment to any of the following living relatives of the Employee: spouse, mother, father, children, brothers or sisters; or to the executors or administrators of the Employee's estate. The Insurance Company may reduce the amount payable by any indebtedness due.

Payment in the manner described above will release the Insurance Company from all liability for any payment made.

**Physical Examination and Autopsy**
The Insurance Company, at its expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require. The Insurance Company may, at its expense, require an autopsy unless prohibited by law.

**Legal Actions**
No action at law or in equity may be brought to recover benefits under the Policy less than 60 days after written proof of loss, or proof by any other electronic/telephonic means authorized by the Insurance Company, has been furnished as required by the Policy. No such action shall be brought more than 3 years after the time satisfactory proof of loss is required to be furnished.

**Time Limitations**
If any time limit stated in the Policy for giving notice of claim or proof of loss, or for bringing any action at law or in equity, is less than that permitted by the law of the state in which the Employee lives when the Policy is issued, then the time limit provided in the Policy is extended to agree with the minimum permitted by the law of that state.

**Physician/Patient Relationship**
The Insured will have the right to choose any Physician who is practicing legally. The Insurance Company will in no way disturb the Physician/patient relationship.

TL-004724

## ADMINISTRATIVE PROVISIONS

**Premiums**
The premiums for this Policy will be based on the rates currently in force, the plan and the amount of insurance in effect.

**Changes in Premium Rates**
The premium rates may be changed by the Insurance Company from time to time with at least 31 days advance written notice. No change in rates will be made until 12 months after the Policy Effective Date. An increase in rates will not be made more often than once in a 12 month period. However, the Insurance Company reserves the right to change the rates even during a period for which the rate is guaranteed if any of the following events take place.
1.      The terms of the Policy change.
2.      A division, subsidiary, affiliated company or eligible class is added or deleted from the Policy.
3.      There is a change in the factors bearing on the risk assumed.

4.  Any federal or state law or regulation is amended to the extent it affects the Insurance Company's benefit obligation.

5.  The Insurance Company determines that the Employer has failed to promptly furnish any necessary information requested by the Insurance Company, or has failed to perform any other obligations in relation to the Policy.

If an increase or decrease in rates takes place on a date that is not a Premium Due Date, a pro rata adjustment will apply from the date of the change to the next Premium Due Date.

## Reporting Requirements

The Employer must, upon request, give the Insurance Company any information required to determine who is insured, the amount of insurance in force and any other information needed to administer the plan of insurance.

## Payment of Premium

The first premium is due on the Policy Effective Date. After that, premiums will be due monthly unless the Employer and the Insurance Company agree on some other method of premium payment.

If any premium is not paid when due, the plan will be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

## Notice of Cancellation

The Employer or the Insurance Company may cancel the Policy as of any Premium Due Date by giving 31 days advance written notice. If a premium is not paid when due, the Policy will automatically be canceled as of the Premium Due Date, except as provided in the Policy Grace Period section.

The Insurance Company may cancel the Policy as of any Premium Due Date if the participation requirements are not met.

## Policy Grace Period

A Policy Grace Period of 31 days will be granted for the payment of the required premiums under the Policy. The Policy will be in force during the Policy Grace Period. If the required premiums are not paid during the Policy Grace Period, insurance will end on the last Premium Due Date. The Employer will be liable to the Insurance Company for any unpaid premium for the time the Policy was in force.

## Grace Period for the Insured

If the required premium is not paid on the Premium Due Date, there is a 31 day grace period after each premium due date after the first. If the required premium is not paid during the grace period, insurance will end on the last day for which premium was paid.

## Reinstatement of Insurance

An Employee's insurance may be reinstated if it ends because the Employee is on an unpaid leave of absence.

An Employee's insurance may be reinstated only if reinstatement occurs within 12 weeks from the date insurance ends due to an Employer approved unpaid leave of absence. For insurance to be reinstated the following conditions must be met.

1.  An Employee must be in a Class of Eligible Employees.
2.  The required premium must be paid.
3.  A written request for reinstatement must be received by the Insurance Company within 31 days from the date an Employee returns to Active Service.

Reinstated insurance will be effective on the date the Employee returns to Active Service. If an Employee did not fully satisfy the Eligibility Waiting Period or the Pre-Existing Condition Limitation (if any) before insurance ended due to an unpaid leave of absence, credit will be given for any time that was satisfied.

TL-004720

## GENERAL PROVISIONS

**Entire Contract**
The entire contract will be made up of the Policy, the application of the Employer, a copy of which is attached to the Policy, and the applications, if any, of the Insureds.

**Incontestability**
All statements made by the Employer or by an Insured are representations not warranties. No statement will be used to deny or reduce benefits or as a defense to a claim, unless a copy of the instrument containing the statement has been furnished to the claimant. In the event of death or legal incapacity, the beneficiary or representative must receive the copy.

After two years from an Insured's effective date of insurance, or from the effective date of any added or increased benefits, no such statement will cause insurance to be contested except for fraud or eligibility for coverage.

**Misstatement of Age**
If an Insured's age has been misstated, the Insurance Company will adjust all benefits to the amounts that would have been purchased for the correct age.

**olicy Changes**
No change in the Policy will be valid until approved by an executive officer of the Insurance Company. This approval must be endorsed on, or attached to, the Policy. No agent may change the Policy or waive any of its provisions.

**Workers' Compensation Insurance**
The Policy is not in lieu of and does not affect any requirements for insurance under any Workers' Compensation Insurance Law.

**Certificates**
A certificate of insurance will be delivered to the Employer for delivery to Insureds. Each certificate will list the benefits, conditions and limits of the Policy. It will state to whom benefits will be paid.

**Assignment of Benefits**
The Insurance Company will not be affected by the assignment of an Insured's certificate until the original assignment or a certified copy of the assignment is filed with the Insurance Company. The Insurance Company will not be responsible for the validity or sufficiency of an assignment. An assignment of benefits will operate so long as the assignment remains in force provided insurance under the Policy is in effect. This insurance may not be levied on, attached, garnished, or otherwise taken for a person's debts. This prohibition does not apply where contrary to law.

**Clerical Error**
A person's insurance will not be affected by error or delay in keeping records of insurance under the Policy. If such an error is found, the premium will be adjusted fairly.

**ency**
The Employer and Plan Administrator are agents of the Employee for transactions relating to insurance under the Policy. The Insurance Company is not liable for any of their acts or omissions.

TL-004726

# DEFINITIONS

Please note, certain words used in this document have specific meanings. These terms will be capitalized throughout this document. The definition of any word, if not defined in the text where it is used, may be found either in this Definitions section or in the Schedule of Benefits.

## Active Service

An Employee will be considered in Active Service with the Employer on a day which is one of the Employer's scheduled work days if either of the following conditions are met.

1.    He or she is actively at work. This means the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or at some location to which the Employer's business requires the Employee to travel.

2.    The day is a scheduled holiday, vacation day or period of Employer approved paid leave of absence.

An Employee is considered in Active Service on a day which is not one of the Employer's scheduled work days only if he or she was in Active Service on the preceding scheduled work day.

## Appropriate Care

Appropriate Care means the determination of an accurate and medically supported diagnosis of the Employee's Disability by a Physician, or a plan established by a Physician of ongoing medical treatment and care of the Disability that conforms to generally accepted medical standards, including frequency of treatment and care.

## Consumer Price Index (CPI-W)

The Consumer Price Index for Urban Wage Earners and Clerical Workers published by the U.S. Department of Labor. If the index is discontinued or changed, another nationally published index that is comparable to the CPI-W will be used.

## Disability Earnings

Any wage or salary for any work performed for any Employer during the Employee's Disability, including commissions, bonus, overtime pay or other extra compensation.

## Employee

For eligibility purposes, an Employee is an employee of the Employer in one of the "Classes of Eligible Employees." Otherwise, Employee means an employee of the Employer who is insured under the Policy.

## Employer

The Policyholder and any affiliates or subsidiaries covered under the Policy. The Employer is acting as an agent of the Insured for transactions relating to this insurance. The actions of the Employer shall not be considered the actions of the Insurance Company.

## Full-time

Full-time means the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class.

## Good Cause

A medical reason preventing participation in the Rehabilitation Plan or in a Transitional Work Arrangement. Satisfactory proof of Good Cause must be provided to the Insurance Company.

**Indexed Covered Earnings**
For the first 12 months Monthly Benefits are payable, Indexed Covered Earnings will be equal to Covered Earnings.
After 12 Monthly Benefits are payable, Indexed Covered Earnings will be an Employee's Covered Earnings plus an
increase applied on each anniversary of the date Monthly Benefits became payable. The amount of each increase will
be the lesser of:
1.      10% of the Employee's Indexed Covered Earnings during the preceding year of Disability; or
2.      the rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

**Injury**
Any accidental loss or bodily harm which results directly and independently of all other causes from an Accident.

**Insurability Requirement**
An eligible person will satisfy the Insurability Requirement for an amount of coverage on the day the Insurance
Company agrees in writing to accept him or her as insured for that amount. To determine a person's acceptability for
coverage, the Insurance Company will require evidence of good health and may require it be provided at the
Employee's expense.

**Insurance Company**
The Insurance Company underwriting the Policy is named on the Policy cover page.

**Insured**
A person who is eligible for insurance under the Policy, for whom insurance is elected, the required premium is paid
and coverage is in force under the Policy.

**Physician**
Physician means a licensed doctor practicing within the scope of his or her license and rendering care and treatment to
an Insured that is appropriate for the condition and locality. The term does not include an Employee, an Employee's
spouse, the immediate family (including parents, children, siblings or spouses of any of the foregoing, whether the
relationship derives from blood or marriage), of an Employee or spouse, or a person living in an Employee's
household.

**Prior Plan**
The Prior Plan refers to the plan of insurance providing similar benefits sponsored by the Employer in effect directly
prior to the Policy Effective Date.

**Qualified Alternative**
An occupation that meets all of the conditions that follow:
1.      the material duties of the occupation can be performed by the Employee based on his or her training,
        experience or education;
2.      it is within the same geographic area as the Regular Occupation the Employee holds with the Employer on the
        date the Employee's Disability begins;
3.      a job in that occupation is offered to the Employee by the Employer; and
4.      the wages for that occupation, including commissions and bonus are 80% or more of the Employee's Indexed
        Covered Earnings.

**Regular Occupation**
The occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the
Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market
in the national economy.

**Rehabilitation Plan**

A professionally developed, written plan designed to enable the Employee to return to work. The Rehabilitation Plan will consist of one or more of the following phases:

1.      assessment;

2.      rehabilitation, under which the Insurance Company may provide, arrange or authorize educational, vocational or physical rehabilitation or other appropriate services;

3.      work, which may include modified work, Transitional Work Arrangements, and work on a part-time basis.

**Sickness**

Any physical or mental illness.

**Transitional Work Arrangement**

Work at an occupation for wage or profit offered to the Employee by any employer if all the following conditions are met:

1.      the sum of wages, commissions, bonus and other compensation for that work is 20% or more of the Employee's Indexed Covered Earnings;

2.      at the time the work is offered, the Employee can perform, with or without accommodation, some or all of the material duties of that occupation; and

3.      the Employee is Disabled.

TL-007500.06

## SCHEDULE OF AFFILIATES

The following affiliates are covered under the Policy as of January 1, 2001.

Affiliate Name

       Mail-Well Label
       Mail-Well PrintXcel
       Mail-Well Commercial Printing
       Mail-Well Envelope
       Mail-Well Direct Mail

TL-004776

**LIFE INSURANCE COMPANY OF NORTH AMERICA**
**PHILADELPHIA, PENNSYLVANIA**

We, Mail-Well Corporation, whose main office address is Englewood, CO, hereby apply to the Life Insurance Company of North America for Policy Number LK-007945.

We approve and accept the terms of this Policy.

This application is to be signed in duplicate. One part is to be attached to the Policy; the other part is to be returned to the Life Insurance Company of North America.

This application supersedes any previous application for this Policy.

Mail-Well Corporation
(Full or Corporate Name of Applicant)

Signed at_____    By _____
                                                        (Signature and Title)

On_____    Witness _____
        (To be signed by Licensed Resident Agent where required by law)

TL-004778                    (This Copy Is To Remain Attached To The Policy)

--------------------------------------------------------------------------------

**LIFE INSURANCE COMPANY OF NORTH AMERICA**
**PHILADELPHIA, PENNSYLVANIA**

We, Mail-Well Corporation, whose main office address is Englewood, CO, hereby apply to the Life Insurance Company of North America for Policy Number LK-007945.

We approve and accept the terms of this Policy.

This application is to be signed in duplicate. One part is to be attached to the Policy; the other part is to be returned to the Life Insurance Company of North America.

This application supersedes any previous application for this Policy.

Mail-Well Corporation
(Full or Corporate Name of Applicant)

Signed at_____    By _____
                                                        (Signature and Title)

On_____    Witness _____
        (To be signed by Licensed Resident Agent where required by law)

TL-004778                    (This Copy Is To Be Returned To Us)

# Exhibit B

*The distribute envelope — general* (I)

**ROTHGERBER JOHNSON & LYONS LLP**

ATTORNEYS AT LAW
SUITE 3000
ONE TABOR CENTER
1200 SEVENTEENTH STREET
DENVER, COLORADO 80202-5839
TELEPHONE (303) 623-9000
FAX (303) 623-9222
WWW.ROTHGERBER.COM

COLORADO SPRINGS
SUITE 1100
NORWEST BANK TOWER
90 SOUTH CASCADE
COLORADO SPRINGS, COLORADO 80903
TELEPHONE (719) 386-3000
FAX (719) 386-3070

CHEYENNE
SUITE 210
ONE PIONEER CENTER
2424 PIONEER AVENUE
CHEYENNE, WYOMING 82001
TELEPHONE (307) 636-6242
FAX (307) 636-6945

KATHERINE L. BRYANT
(303) 628-3578
KBRYANT@ROTHGERBER.COM

May 3, 1999

*cc RA*

**VIA FED EX**

Elissa Boisvert, Esq.
Bowditch & Dewey LLP
311 Main Street
Worcester, Massachusetts 01608

Re: Mail-Well/Northeastern Envelope Mfg. Corp.

Dear Ms. Boisvert:

Enclosed please find drafts of the Employment Agreements for Tom Brennan, Jerry Mitchell and Mr. Mitchell's son with respect to the above transaction. Also enclosed is a draft Non-Competition Agreement.

If you have any questions, please call me.

Sincerely,

ROTHGERBER JOHNSON & LYONS LLP

Katherine L. Bryant

enclosure
cc: Mark Zoeller (w/o enclosure)

H:\DWP\F3\31767NE Envelopc\E-Boisvert.wpd

1

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of _____ ___, 1999 (the "Effective Date"), by and between Jerry Mitchell ("Executive") and MAIL-WELL I CORPORATION, a Delaware corporation.

WHEREAS, concurrently with the execution and delivery of this Agreement, pursuant to that certain Stock Purchase Agreement dated ___, 1999 (the "Purchase Agreement") between Mail-Well, Northeastern Envelope Mfg. Corp., a _____ corporation, and NHC Corp., a _____ corporation (together, the "Companies") and the shareholders of the Companies, Mail-Well is acquiring from the Executive, among others, all of the issued and outstanding shares of stock of the Companies; and

WHEREAS, the Purchasers desire the Executive's employment with Mail-Well I Corporation or an affiliated company (collectively hereinafter referred to as "Employer") and the Executive wishes to accept such employment, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein the parties hereto agree as follows:

1.    Employment. Employer hereby agrees to employ Executive, and Executive hereby accepts such employment with Employer, for a term commencing on the Effective Date and terminating as provided under Section 4 (the "Employment Period").

2.    Duties. The Executive will have such title, duties and responsibilities as are assigned or delegated to the Executive by the Board of Directors of Employer and/or the Purchasers (the "Board"), the Chief Executive Officer of the Purchasers (the "Chief Executive Officer") or such other individual or individuals as shall be designated by the Board. During the Employment Period, the Executive will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of the Employer and the Purchasers, and shall refrain from active involvement in any other business or professional activity except on behalf of Employer and/or the Purchasers. The Executive understands and agrees that in the performance of his duties he shall at all times be subject to the control and supervision of the Board and/or the Chief Executive Officer or such other individual or individuals as shall be designated by the Board. The Executive shall comply with the policies, procedures and regulations of Employer and the Purchasers as may be provided or communicated to Executive from time to time during the Employment Period.

3.    Compensation and Benefits.

(a)    Employer will pay Executive a base salary at the rate of [$ 300,000] per annum during the first year of the Employment Period, payable in such installments as is the policy of Employer from time to time with respect to its employees. In addition Executive shall be entitled to participate in Employer's bonus program based on increased profitability as more fully described in Schedule A (Luc Desjardins to discuss with Executive).

2

(b)    Executive will be permitted to participate in such pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans.

4.    <u>Termination of Employment</u>.  The Employment Period, the Executive's compensation and benefits (except as specifically provided under the terms of such benefits) and any and all other rights of the Executive under this Agreement or otherwise as an employee of the Employer will terminate on the earliest to occur of the following events (the "Termination Date")

(a)    At any time the Employer may, in its sole discretion, discharge the Executive for "cause," effective immediately upon providing the Executive with notice of his dismissal.  The only occurrences which shall constitute "cause" within the meaning of this paragraph shall be the following:

(i)    the conviction of the Executive by a court of competent jurisdiction of a crime involving moral turpitude (or the entering of a no-contest or nolo contendere plea by Executive in regard to such crime); or

(ii)    the commission by the Executive of an act of fraud or bad faith upon the Employer; or

(iii)    the willful misappropriation of any funds or property of the Employer by the Executive; or

(iv)    the willful, continued and unreasonable failure by the Executive to perform his duties or obligations under this Agreement; or

(v)    the breach of any material provisions hereof or the engagement by the Executive, without the prior written approval of the Employer, in any activity which would violate the provisions of Section 5 or 6 of this Agreement.

(b)    The death or disability of the Executive; or

(c)    The voluntary termination by Executive of his employment hereunder, with or without cause, which may occur at any time after Employer receives notice from Executive of intent to terminate ("Voluntary Termination");

(d)    The Company may, in its sole discretion, terminate the Executive without "cause," which term is defined in paragraph 4(a) hereof.

(e)    Unless sooner terminated by the Company or the Executive pursuant to other provisions of this Section 4, this Agreement shall terminate on the second anniversary of the Effective date.

3

Upon termination of Executive's employment for any reason, Employer shall have no further obligation to pay salary or any fringe benefits or bonuses to Executive except for Executive's salary and any fringe benefits or bonuses accrued and unpaid through the Termination Date, which amounts shall be payable on the date such payments would have been made but for Executive's termination.

5.    Representation.  Executive represents and warrants to Employer that his execution and delivery of this Agreement does not conflict with, or result in the breach by Executive or violation by Executive of, any other agreement to which Executive is a party or by which Executive is bound.

6.    Remedies.  The parties hereto agree that Employer and the Purchasers would suffer irreparable harm from a breach by Executive of any of the covenants or agreements contained herein. Therefore, in the event of the actual or threatened breach by Executive of any of the provisions of this Agreement, Employer or the Purchasers may, in addition and supplementary to other rights and remedies existing in their favor, and notwithstanding the provisions of Section 10, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any violation of the provisions hereof.

7.    Alternative Dispute Resolution.  In the event of claimed breach of this Agreement by any of the parties hereto, such dispute shall be submitted to alternative resolution in accordance with the terms of this Section.  The party who is alleging that a dispute exists shall send a notice of such dispute to all other parties to this Agreement, setting forth the dispute, the parties involved and the position of such party with respect to the dispute.  The parties to such dispute shall endeavor in good faith to select an alternative dispute resolution service to resolve the dispute and the rules that shall govern the resolution.  If agreement as to the matters detailed in the preceding sentence is not reached within twenty business days of receipt of the notice, then, within ten business days thereafter, counsel for the parties shall mutually select as an arbitrator an attorney practicing in Denver, Colorado, who is experienced in commercial arbitration.  If counsel for the parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected by the American Arbitration Association (the "AAA").  The parties agree to share equally in the cost of conducting the arbitration, provided that the costs, fees (including attorney and expert fees) and other expenses incurred by either party in connection therewith shall remain the obligation of such party.  Any disputes as to the rules for conducting the arbitration shall be resolved by reference to the AAA rules for commercial arbitration by the arbitrator.  The arbitrator shall schedule a hearing on the disputed issues within forty business days after his or her appointment, and the arbitrator shall render his or her decision after the hearing, in writing, as expeditiously as possible, and shall deliver copies of such decision to the parties.  A default judgment may be entered against any party who fails to appear at the arbitration hearing. Such decision and determination shall be final and unappealable and may be filed as a judgment of record in any jurisdiction designated by the successful party.  The parties to this Agreement agree that this Section has been included to rapidly and inexpensively resolve any disputes among them with respect to the matters described above, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters. Notwithstanding the foregoing, the parties hereto will be entitled to seek equitable relief in a court of competent jurisdiction with respect to those matters for which equitable relief is specified in this Agreement and those matters for which equitable relief is appropriate.

4

8.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Employer, the Purchasers, their affiliates and their successors and assigns, and shall be binding upon and inure to the benefit of Executive and his legal representatives and assigns, provided that in no event shall Executive's obligations to perform services for Employer, the Purchasers and their affiliates be delegated or transferred by Executive.  Employer and the Purchasers may assign or transfer their rights hereunder to a successor corporation in the event of merger, consolidation or transfer or sale of all or substantially all of the assets of Employer or the Purchasers or of Employer's or the Purchasers' business.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement and the Purchasers, and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

9.    Modification or Waiver.  No amendment, modification, waiver, termination or cancellation of this Agreement shall be binding or effective for any purpose unless it is made in a writing signed by the party against whom enforcement of such amendment, modification, waiver, termination or cancellation is sought.  No course of dealing between or among the parties to this Agreement shall be deemed to affect or to modify, amend or discharge any provision or term of this Agreement.  No delay on the part of Employer or Executive or the Purchasers in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Employer or Executive or the Purchasers of any such right or remedy shall preclude other or further exercise thereof.  A waiver of right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.

10.    Severability.  Whenever possible each provision and term of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or term of this Agreement shall be held to be prohibited by or invalid under such applicable law, then such provision or term shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provisions or term or the remaining provisions or terms of this Agreement.

11.    Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

12.    Binding Effect.  Each party hereto agrees to be bound by the provisions of this Agreement only upon the Effective Date.

13.    Entire Agreement.  This Agreement (together with all documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

14.    Notices.  Any notices, consents or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class

postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service, or (d) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.

To Employer:        *c/o* Mail-Well, Inc.
                    23 Inverness Way East
                    Englewood, CO 80112
                    Attention: Gerald F. Mahoney, Chairman
                    Fax: (303) 397-7400

To Executive:       To the last home address reflected
                    on the records of Employer

Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

15.    Construction.  The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Agreement.  This Agreement shall not be construed against any party for having drafted it.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

IN WITNESS WHEREOF, the undersigned have executed this Employment Agreement as of the date first above written.

"EMPLOYER":                         MAIL-WELL I CORPORATION

                                    By:_____
                                    Its:_____
                                    Title:_____

"EXECUTIVE":


                                    _____
                                    Jerry Mitchell

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of _____ ___, 1999 (the "Effective Date"), by and between Thomas Brennan ("Executive") and MAIL-WELL I CORPORATION, a Delaware corporation.

WHEREAS, concurrently with the execution and delivery of this Agreement, pursuant to that certain Stock Purchase Agreement dated ___, 1999 (the "Purchase Agreement") between Mail-Well, Northeastern Envelope Mfg. Corp., a _____ corporation, and NHC Corp., a _____ corporation (together, the "Companies") and the shareholders of the Companies, Mail-Well is acquiring from the Executive, among others, all of the issued and outstanding shares of stock of the Companies; and

WHEREAS, the Purchasers desire the Executive's employment with Mail-Well I Corporation or an affiliated company (collectively hereinafter referred to as "Employer") and the Executive wishes to accept such employment, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein the parties hereto agree as follows:

1.      Employment.  Employer hereby agrees to employ Executive, and Executive hereby accepts such employment with Employer, for a term commencing on the Effective Date and terminating as provided under Section 4 (the "Employment Period").

2.      Duties.  The Executive will have such title, duties and responsibilities as are assigned or delegated to the Executive by the Board of Directors of Employer and/or the Purchasers (the "Board"), the Chief Executive Officer of the Purchasers (the "Chief Executive Officer") or such other individual or individuals as shall be designated by the Board.  During the Employment Period, the Executive will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of the Employer and the Purchasers, and shall refrain from active involvement in any other business or professional activity except on behalf of Employer and/or the Purchasers.  The Executive understands and agrees that in the performance of his duties he shall at all times be subject to the control and supervision of the Board and/or the Chief Executive Officer or such other individual or individuals as shall be designated by the Board.  The Executive shall comply with the policies, procedures and regulations of Employer and the Purchasers as may be provided or communicated to Executive from time to time during the Employment Period.

3.      Compensation and Benefits.

(a)      Employer will pay Executive a base salary at the rate of [$ 125,000] per annum during the first year of the Employment Period, payable in such installments as is the policy of Employer from time to time with respect to its employees.  In addition Executive shall be entitled to participate in Employer's bonus program based on increased profitability as more fully described in Schedule A (Luc Desjardins to discuss with Executive).

7

(b)     Executive will be permitted to participate in such pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans.

4.     Termination of Employment.  The Employment Period, the Executive's compensation and benefits (except as specifically provided under the terms of such benefits) and any and all other rights of the Executive under this Agreement or otherwise as an employee of the Employer will terminate on the earliest to occur of the following events (the "Termination Date")

(a)     At any time the Employer may, in its sole discretion, discharge the Executive for "cause," effective immediately upon providing the Executive with notice of his dismissal.  The only occurrences which shall constitute "cause" within the meaning of this paragraph shall be the following:

(i)     the conviction of the Executive by a court of competent jurisdiction of a crime involving moral turpitude (or the entering of a no-contest or nolo contendere plea by Executive in regard to such crime); or

(ii)    the commission by the Executive of an act of fraud or bad faith upon the Employer; or

(iii)   the willful misappropriation of any funds or property of the Employer by the Executive; or

(iv)    the willful, continued and unreasonable failure by the Executive to perform his duties or obligations under this Agreement; or

(v)     the breach of any material provisions hereof or the engagement by the Executive, without the prior written approval of the Employer, in any activity which would violate the provisions of Section 5 or 6 of this Agreement.

(b)     The death or disability of the Executive; or

(c)     The voluntary termination by Executive of his employment hereunder, with or without cause, which may occur at any time after Employer receives notice from Executive of intent to terminate ("Voluntary Termination");

(d)     The Company may, in its sole discretion, terminate the Executive without "cause," which term is defined in paragraph 4(a) hereof.

(e)     Unless sooner terminated by the Company or the Executive pursuant to the other provisions of this Section 4, this Agreement shall terminate on the second anniversary of the Effective date.

Upon termination of Executive's employment for any reason, Employer shall have no further obligation to pay salary or any fringe benefits or bonuses to Executive except for Executive's salary and any fringe benefits or bonuses accrued and unpaid through the Termination Date, which amounts shall be payable on the date such payments would have been made but for Executive's termination.

5.    Representation.  Executive represents and warrants to Employer that his execution and delivery of this Agreement does not conflict with, or result in the breach by Executive or violation by Executive of, any other agreement to which Executive is a party or by which Executive is bound.

6.    Remedies.  The parties hereto agree that Employer and the Purchasers would suffer irreparable harm from a breach by Executive of any of the covenants or agreements contained herein. Therefore, in the event of the actual or threatened breach by Executive of any of the provisions of this Agreement, Employer or the Purchasers may, in addition and supplementary to other rights and remedies existing in their favor, and notwithstanding the provisions of Section 10, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any violation of the provisions hereof.

7.    Alternative Dispute Resolution.  In the event of claimed breach of this Agreement by any of the parties hereto, such dispute shall be submitted to alternative resolution in accordance with the terms of this Section.  The party who is alleging that a dispute exists shall send a notice of such dispute to all other parties to this Agreement, setting forth the dispute, the parties involved and the position of such party with respect to the dispute.  The parties to such dispute shall endeavor in good faith to select an alternative dispute resolution service to resolve the dispute and the rules that shall govern the resolution.  If agreement as to the matters detailed in the preceding sentence is not reached within twenty business days of receipt of the notice, then, within ten business days thereafter, counsel for the parties shall mutually select as an arbitrator an attorney practicing in Denver, Colorado, who is experienced in commercial arbitration.  If counsel for the parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected by the American Arbitration Association (the "AAA").  The parties agree to share equally in the cost of conducting the arbitration, provided that the costs, fees (including attorney and expert fees) and other expenses incurred by either party in connection therewith shall remain the obligation of such party.  Any disputes as to the rules for conducting the arbitration shall be resolved by reference to the AAA rules for commercial arbitration by the arbitrator.  The arbitrator shall schedule a hearing on the disputed issues within forty business days after his or her appointment, and the arbitrator shall render his or her decision after the hearing, in writing, as expeditiously as possible, and shall deliver copies of such decision to the parties.  A default judgment may be entered against any party who fails to appear at the arbitration hearing. Such decision and determination shall be final and unappealable and may be filed as a judgment of record in any jurisdiction designated by the successful party.  The parties to this Agreement agree that this Section has been included to rapidly and inexpensively resolve any disputes among them with respect to the matters described above, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters. Notwithstanding the foregoing, the parties hereto will be entitled to seek equitable relief in a court of competent jurisdiction with respect to those matters for which equitable relief is specified in this Agreement and those matters for which equitable relief is appropriate.

8.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Employer, the Purchasers, their affiliates and their successors and assigns, and shall be binding upon and inure to the benefit of Executive and his legal representatives and assigns, provided that in no event shall Executive's obligations to perform services for Employer, the Purchasers and their affiliates be delegated or transferred by Executive.  Employer and the Purchasers may assign or transfer their rights hereunder to a successor corporation in the event of merger, consolidation or transfer or sale of all or substantially all of the assets of Employer or the Purchasers or of Employer's or the Purchasers' business.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement and the Purchasers, and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

9.    Modification or Waiver.  No amendment, modification, waiver, termination or cancellation of this Agreement shall be binding or effective for any purpose unless it is made in a writing signed by the party against whom enforcement of such amendment, modification, waiver, termination or cancellation is sought.  No course of dealing between or among the parties to this Agreement shall be deemed to affect or to modify, amend or discharge any provision or term of this Agreement.  No delay on the part of Employer or Executive or the Purchasers in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Employer or Executive or the Purchasers of any such right or remedy shall preclude other or further exercise thereof.  A waiver of right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.

10.    Severability.  Whenever possible each provision and term of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or term of this Agreement shall be held to be prohibited by or invalid under such applicable law, then such provision or term shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provisions or term or the remaining provisions or terms of this Agreement.

11.    Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

12.    Binding Effect.  Each party hereto agrees to be bound by the provisions of this Agreement only upon the Effective Date.

13.    Entire Agreement.  This Agreement (together with all documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

14.    Notices.  Any notices, consents or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class

postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service, or (d) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.

To Employer:    *c/o* Mail-Well, Inc.
23 Inverness Way East
Englewood, CO 80112
Attention: Gerald F. Mahoney, Chairman
Fax: (303) 397-7400

To Executive:    To the last home address reflected
on the records of Employer

Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

15.    <u>Construction</u>. The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Agreement. This Agreement shall not be construed against any party for having drafted it. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

IN WITNESS WHEREOF, the undersigned have executed this Employment Agreement as of the date first above written.

*"EMPLOYER":*    MAIL-WELL I CORPORATION

By:_____
Its:_____
Title:_____

*"EXECUTIVE":*

_____
Thomas Brennan

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of _____ ___, 1999 (the "Effective Date"), by and between _____ ("Employee") and MAIL-WELL I CORPORATION, a Delaware corporation.

WHEREAS, concurrently with the execution and delivery of this Agreement, pursuant to that certain Stock Purchase Agreement dated ___, 1999 (the "Purchase Agreement") between Mail-Well, Northeastern Envelope Mfg. Corp., a _____ corporation, and NHC Corp., a _____ corporation (together, the "Companies") and the shareholders of the Companies, Mail-Well is acquiring from the Employee, among others, all of the issued and outstanding shares of stock of the Companies; and

WHEREAS, the Purchasers desire the Employee's employment with Mail-Well I Corporation or an affiliated company (collectively hereinafter referred to as "Employer") and the Employee wishes to accept such employment, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein the parties hereto agree as follows:

1.    Employment. Employer hereby agrees to employ Employee, and Employee hereby accepts such employment with Employer, for a term commencing on the Effective Date and terminating as provided under Section 4 (the "Employment Period").

2.    Duties. The Employee will have such title, duties and responsibilities as are assigned or delegated to the Employee by the Board of Directors of Employer and/or the Purchasers (the "Board"), the Chief Employee Officer of the Purchasers (the "Chief Employee Officer") or such other individual or individuals as shall be designated by the Board. During the Employment Period, the Employee will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of the Employer and the Purchasers, and shall refrain from active involvement in any other business or professional activity except on behalf of Employer and/or the Purchasers. The Employee understands and agrees that in the performance of his duties he shall at all times be subject to the control and supervision of the Board and/or the Chief Employee Officer or such other individual or individuals as shall be designated by the Board. The Employee shall comply with the policies, procedures and regulations of Employer and the Purchasers as may be provided or communicated to Employee from time to time during the Employment Period.

3.    Compensation and Benefits.

(a)    Employer will pay Employee a base salary at the rate of $_____ per annum during the first year of the Employment Period, payable in such installments as is the policy of Employer from time to time with respect to its employees.

12

(b)     Employee will be permitted to participate in such pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Employee is eligible under the terms of those plans.

4.     <u>Termination of Employment</u>.  The Employment Period, the Employee's compensation and benefits (except as specifically provided under the terms of such benefits) and any and all other rights of the Employee under this Agreement or otherwise as an employee of the Employer will terminate on the earliest to occur of the following events (the "Termination Date")

(a)     At any time the Employer may, in its sole discretion, discharge the Employee for "cause," effective immediately upon providing the Employee with notice of his dismissal.  The only occurrences which shall constitute "cause" within the meaning of this paragraph shall be the following:

(i)     the conviction of the Employee by a court of competent jurisdiction of a crime involving moral turpitude (or the entering of a no-contest or nolo contendere plea by Employee in regard to such crime); or

(ii)     the commission by the Employee of an act of fraud or bad faith upon the Employer; or

(iii)     the willful misappropriation of any funds or property of the Employer by the Employee; or

(iv)     the willful, continued and unreasonable failure by the Employee to perform his duties or obligations under this Agreement; or

(v)     the breach of any material provisions hereof or the engagement by the Employee, without the prior written approval of the Employer, in any activity which would violate the provisions of Section 5 or 6 of this Agreement.

(b)     The death or disability of the Employee; or

(c)     The voluntary termination by Employee of his employment hereunder, with or without cause, which may occur at any time after Employer receives notice from Employee of intent to terminate ("Voluntary Termination");

(d)     The Company may, in its sole discretion, terminate the Employee without "cause," which term is defined in paragraph 4(a) hereof.

(e)     Unless sooner terminated by the Company or the Employee pursuant to the other provisions of this Section 4, this Agreement shall terminate on the fifth anniversary of the Effective date.

Upon termination of Employee's employment for any reason, Employer shall have no further obligation to pay salary or any fringe benefits or bonuses to Employee except for Employee's salary and any fringe benefits or bonuses accrued and unpaid through the Termination Date, which amounts shall be payable on the date such payments would have been made but for Employee's termination.

5.    Representation.  Employee represents and warrants to Employer that his execution and delivery of this Agreement does not conflict with, or result in the breach by Employee or violation by Employee of, any other agreement to which Employee is a party or by which Employee is bound.

6.    Remedies.  The parties hereto agree that Employer and the Purchasers would suffer irreparable harm from a breach by Employee of any of the covenants or agreements contained herein. Therefore, in the event of the actual or threatened breach by Employee of any of the provisions of this Agreement, Employer or the Purchasers may, in addition and supplementary to other rights and remedies existing in their favor, and notwithstanding the provisions of Section 10, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any violation of the provisions hereof.

7.    Alternative Dispute Resolution.  In the event of claimed breach of this Agreement by any of the parties hereto, such dispute shall be submitted to alternative resolution in accordance with the terms of this Section.  The party who is alleging that a dispute exists shall send a notice of such dispute to all other parties to this Agreement, setting forth the dispute, the parties involved and the position of such party with respect to the dispute.  The parties to such dispute shall endeavor in good faith to select an alternative dispute resolution service to resolve the dispute and the rules that shall govern the resolution.  If agreement as to the matters detailed in the preceding sentence is not reached within twenty business days of receipt of the notice, then, within ten business days thereafter, counsel for the parties shall mutually select as an arbitrator an attorney practicing in Denver, Colorado, who is experienced in commercial arbitration.  If counsel for the parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected by the American Arbitration Association (the "AAA").  The parties agree to share equally in the cost of conducting the arbitration, provided that the costs, fees (including attorney and expert fees) and other expenses incurred by either party in connection therewith shall remain the obligation of such party.  Any disputes as to the rules for conducting the arbitration shall be resolved by reference to the AAA rules for commercial arbitration by the arbitrator.  The arbitrator shall schedule a hearing on the disputed issues within forty business days after his or her appointment, and the arbitrator shall render his or her decision after the hearing, in writing, as expeditiously as possible, and shall deliver copies of such decision to the parties.  A default judgment may be entered against any party who fails to appear at the arbitration hearing. Such decision and determination shall be final and unappealable and may be filed as a judgment of record in any jurisdiction designated by the successful party.  The parties to this Agreement agree that this Section has been included to rapidly and inexpensively resolve any disputes among them with respect to the matters described above, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters. Notwithstanding the foregoing, the parties hereto will be entitled to seek equitable relief in a court of competent jurisdiction with respect to those matters for which equitable relief is specified in this Agreement and those matters for which equitable relief is appropriate.

8.   Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Employer, the Purchasers, their affiliates and their successors and assigns, and shall be binding upon and inure to the benefit of Employee and his legal representatives and assigns, provided that in no event shall Employee's obligations to perform services for Employer, the Purchasers and their affiliates be delegated or transferred by Employee.  Employer and the Purchasers may assign or transfer their rights hereunder to a successor corporation in the event of merger, consolidation or transfer or sale of all or substantially all of the assets of Employer or the Purchasers or of Employer's or the Purchasers' business.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement and the Purchasers, and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

9.   Modification or Waiver.  No amendment, modification, waiver, termination or cancellation of this Agreement shall be binding or effective for any purpose unless it is made in a writing signed by the party against whom enforcement of such amendment, modification, waiver, termination or cancellation is sought.  No course of dealing between or among the parties to this Agreement shall be deemed to affect or to modify, amend or discharge any provision or term of this Agreement.  No delay on the part of Employer or Employee or the Purchasers in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Employer or Employee or the Purchasers of any such right or remedy shall preclude other or further exercise thereof.  A waiver of right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.

10.   Severability.  Whenever possible each provision and term of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or term of this Agreement shall be held to be prohibited by or invalid under such applicable law, then such provision or term shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provisions or term or the remaining provisions or terms of this Agreement.

11.   Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

12.   Binding Effect.  Each party hereto agrees to be bound by the provisions of this Agreement only upon the Effective Date.

13.   Entire Agreement.  This Agreement (together with all documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

14.   Notices.  Any notices, consents or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class

postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service, or (d) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.

To Employer:       *c/o* Mail-Well, Inc.
                   23 Inverness Way East
                   Englewood, CO 80112
                   Attention: Gerald F. Mahoney, Chairman
                   Fax: (303) 397-7400

To Employee:       To the last home address reflected
                   on the records of Employer

Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

    15.    Construction. The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Agreement. This Agreement shall not be construed against any party for having drafted it. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

    IN WITNESS WHEREOF, the undersigned have executed this Employment Agreement as of the date first above written.

"EMPLOYER":                        MAIL-WELL I CORPORATION


                                   By:_____
                                     Its:_____
                                     Title:_____


"Employee":


                                   _____
                                   _____

# NON-COMPETITION AGREEMENT

THIS NON-COMPETITION AGREEMENT (this "Non-Competition Agreement") is entered into as of _____ __, 1999 (the "Effective Date"), by and between _____ ("Selling Shareholder") and Mail-Well I Corporation, a Delaware corporation ("Mail-Well").

WHEREAS, concurrently with the execution and delivery of this Non-Competition Agreement, pursuant to that certain Stock Purchase Agreement dated as of _____ __, 1999 (the "Purchase Agreement"), by and among Mail-Well, Mail-Well, Inc., a Colorado corporation, Northeastern Envelope Mfg. Corp., a _____ corporation, and NHC Corp., a _____ corporation (the "Companies"), and the shareholders of the Companies, Mail-Well is acquiring from Selling Shareholder, among others, all of the issued and outstanding shares of stock of the Companies; and

WHEREAS, as a condition to and in connection with the Purchase Agreement, Mail-Well has required Selling Shareholder to enter into a covenant not to compete with Mail-Well, its parent or subsidiaries or subsidiaries of its parent including future parents or subsidiaries (collectively, the "Mail-Well Entities"), upon the terms and conditions set forth in this Non-Competition Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein the parties hereto agree as follows:

1.  <u>Non-Compete; Non-Solicitation</u>.

(a)  For purposes of this Non-Competition Agreement:

(i)  "<u>Competition</u>" means the direct or indirect ownership, management (either as an employee or consultant) or control of a Competitive Operation.

(ii)  "<u>Competitive Operation</u>" means any entity that engages in or owns, invests in, manages or controls or provides services to any venture or enterprise engaged in the envelope printing or converting business.

(iii)  "<u>Customer</u>" shall include any individual, organization or entity from whom a Mail-Well Entity or the Companies have received an order or fee for services performed or products produced (including any formal request or submission for proposal) at any time within the twenty-four (24) month period preceding the Effective Date.

(iv)  The "<u>Non-Competition Period</u>" commences on the Effective Date and continues until the latter of the fifth anniversary of the Effective Date or the second anniversary of the Selling Shareholder's separation from employment with a Mail-Well Entity.

17

(v)     "Restricted Area" means the States of New York, New Jersey, Pennsylvania, New Hampshire, Vermont, Connecticut, Rhode Island, Massachusetts, and Maine.

(b)     Selling Shareholder agrees that during the Non-Competition Period, Selling Shareholder shall not, directly or indirectly:

(i)     engage in Competition in the Restricted Area.

(ii)     (A) induce or attempt to induce or aid others in inducing an employee of a Mail-Well Entity to leave the employ of a Mail-Well Entity, or in any way interfere with the relationship between the Mail-Well Entities and their employees, including any former employee of a Mail-Well Entity, or (B) induce or attempt to induce any Customer, vendor, subcontractor or other business relation of a Mail-Well Entity to cease doing business with a Mail-Well Entity, or in any way interfere with the relationship between any Customer, vendor, subcontractor or other business relation and a Mail-Well Entity.

(iii)     (A) introduce any Competitive Operation to past or present Customers, vendors, subcontractors or other business relations of a Mail-Well Entity, (B) solicit business for any Competitive Operation from past, present or prospective Customers, vendors, subcontractors or other business relations of a Mail-Well Entity, or (C) accept employment from any past or present Customer, vendor, subcontractor or other business relation of a Mail-Well Entity, unless such employment shall be unrelated to a Competitive Operation or otherwise expressly permitted pursuant to this Non-Competition Agreement.

(c)     Nothing herein shall prohibit Selling Shareholder from being a passive owner of not more than 5% of the outstanding shares of any class of securities of a Competitive Operation, provided that such securities are traded on a national securities exchange or the NASDAQ National Market System, and provided that Selling Shareholder has no active participation in the business of such Competitive Operation.

(d)     Notwithstanding the prohibitions contained in this Non-Competition Agreement, Selling Shareholder may render services for a noncompetitive division, affiliate or portion of a Competitive Operation so long as no such services are provided by Selling Shareholder to, or used by, any other division, affiliate or portion of such Competitive Operation which is in competition with or may detract from any of the businesses of a Mail-Well Entity.

(e)     If, at the time of enforcement of this Non-Competition Agreement, a court shall hold that the duration, scope, area or other restrictions stated herein are unreasonable under circumstances then existing, the parties agree that the maximum duration, scope, area or other restrictions reasonable under such circumstances shall be substituted for the stated duration, scope, area or other restrictions.

(f)     The Selling Shareholder will, while the covenant under this Non-Competition Agreement is in effect, give notice to Mail-Well, within ten days after accepting any other

employment, of the identity of the Selling Shareholder's employer. Mail-Well may notify such employer that the Selling Shareholder is bound by this Non-Competition Agreement and, at Mail-Well's election, furnish such employer with a copy of this Non-Competition Agreement or relevant portions thereof.

(g)     The covenants made in this Non-Competition Agreement shall constitute a condition precedent to the obligations of the Mail-Well under the Purchase Agreement. Moreover, the existence of any claim or cause of action of Selling Shareholder against Mail-Well, or any of their respective affiliates, whether or not predicated upon the terms of this Non-Competition Agreement, shall not constitute a defense to the enforcement of this covenant.

2.     No Negative Statements.  During the Non-Competition Period and thereafter, Selling Shareholder will not make any disclosure, issue any public statements or otherwise cause to be disclosed any information which is designed, intended or might reasonably be anticipated to have a negative impact or adverse effect on a Mail-Well Entity, or any of its respective directors, officers or employees.

3.     Representation.  Selling Shareholder represents and warrants to Mail-Well that the execution and delivery of this Non-Competition Agreement does not conflict with, or result in the breach by Selling Shareholder or violation by Selling Shareholder of, any other agreement to which Selling Shareholder is a party or by which Selling Shareholder is bound.

4.     Remedies.  The parties hereto agree that Mail-Well would suffer irreparable harm from a breach by Selling Shareholder of any of the covenants or agreements contained herein.  Therefore, in the event of the actual or threatened breach by Selling Shareholder of any of the provisions of this Non-Competition Agreement, Mail-Well may, in addition and supplementary to other rights and remedies existing in their favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any violation of the provisions hereof.

5.     Successors and Assigns.  This Non-Competition Agreement shall be binding upon and inure to the benefit of Mail-Well, its parents, affiliates, successors and assigns, and shall be binding upon Selling Shareholder and Selling Shareholder's legal representatives and assigns. Mail-Well may assign or transfer its rights hereunder to a successor corporation in the event of merger, consolidation or transfer or sale of all or substantially all of the assets of Mail-Well. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Non-Competition Agreement and their respective permitted successors and assigns, any rights or remedies under or by reason of this Non-Competition Agreement.

6.     Modification or Waiver.  No amendment, modification, waiver, termination or cancellation of this Non-Competition Agreement shall be binding or effective for any purpose unless it is made in a writing signed by the party against whom enforcement of such amendment, modification, waiver, termination or cancellation is sought.   No course of dealing between or among the parties

to this Non-Competition Agreement shall be deemed to affect or to modify, amend or discharge any provision or term of this Non-Competition Agreement. No delay on the part of Mail-Well or Selling Shareholder in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Mail-Well or Selling Shareholder of any such right or remedy shall preclude other or further exercise thereof. A waiver of right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.

7.     <u>Severability</u>. Whenever possible each provision and term of this Non-Competition Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or term of this Non-Competition Agreement shall be held to be prohibited by or invalid under such applicable law, then such provision or term shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provision or term or the remaining provisions or terms of this Non-Competition Agreement.

8.     <u>Counterparts</u>. This Non-Competition Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

9.     <u>Entire Agreement</u>. This Non-Competition Agreement (together with all documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

10.     <u>Notices</u>. Any notices, consents or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service, or (d) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.

To Mail-Well:               *c/o* Mail-Well, Inc.
                                      23 Inverness Way East
                                      Englewood, CO 80112
                                      Attention: Roger Wertheimer, General Counsel
                                      Fax: (303) 566-7461

To Selling Shareholder:      To the last address reflected on the records of the Companies, unless otherwise provided in writing to Mail-Well pursuant to this Section 10.

Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day

after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

11.    Construction.  The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Non-Competition Agreement.  This Non-Competition Agreement shall not be construed against any party for having drafted it.  All words used in this Non-Competition Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

    IN WITNESS WHEREOF, the undersigned have executed this Non-Competition Agreement as of the date first above written.

MAIL-WELL I CORPORATION

By:_____

Title:_____

"SELLING SHAREHOLDER":

_____

\\T28\data\D\WP\F5\51767\NE Envelope\A-NonComp99.wpd

21

# Exhibit C

# BOWDITCH & DEWEY, LLP
## ATTORNEYS

311 MAIN STREET
WORCESTER, MA 01608-1552
TELEPHONE (508) 791-3511
FACSIMILE (508) 756-7636
EMAIL: @bowditch.com
www.bowditch.com

June 3, 1999

*VIA FEDERAL EXPRESS*

Mark Zoeller, Esq.
Mail-Well I Corporation
23 Inverness Way East
Suite 160
Englewood, CO 80112

303 - 397 - ~~7442~~
790-8023 (main #)

V. Bruce Thompson
Senior Vice President Corporate Development
Mail-Well I Corporation
23 Inverness Way East
Suite 160
Englewood, CO 80112

Re:    *Acquisition of Northeastern Envelope Mfg. Corp.*

Dear Messrs. Zoeller and Thompson:

Enclosed please find the following documents related to the above-referenced acquisition:

1. Stock Purchase Agreement;
2. Thomas D. Brennan Employment Agreement;
3. Gerald P. Mitchell, Sr. Employment Agreement;
4. Gerald P. Mitchell, Jr. Employment Agreement; and
5. Promissory Note.

Please note that we have drafted the Employment Agreements for Gerry and Tom to include participation in a bonus program as such is available to all similarly situated managers. I understand that Tom Brennan has requested from Mark Zoeller a copy of the current bonus policy and the matrix used in calculating last year's bonuses. Kindly forward that information to me at your earliest convenience.

At the request of Tom Brennan, I have also included the financial statements for the months of March and April for your information.

{J:\clients\bus\n0560\0500\00079736.DOC;1}
METRO WEST OFFICE • 161 WORCESTER ROAD • FRAMINGHAM, MA 01701-9320 • (508) 879-5700 • (617) 431-1697 • FACSIMILE (508) 872-1492

1

Mark Zoeller, Esq.
V. Bruce Thompson
June 3, 1999
Page 2


Please do not hesitate to contact me if you have any questions.  We look forward
to receiving your comments.

Very truly yours,

M. Elissa Boisvert

MEB/pp
Enclosures
cc:    Robert E. Longden, Jr., Esq.
       Thomas D. Brennan
       Gerald P. Mitchell, Sr.

{J:\clients\bus\m0560\0500\00079736.DOC;1}

# STOCK PURCHASE AGREEMENT

by and among

## MAIL-WELL I CORPORATION,
a Delaware corporation,

and

## MAIL-WELL, INC.,
a Colorado corporation,

as Purchasers,

Thomas D. Brennan and Gerald P. Mitchell

as Sellers

and

## NORTHEASTERN ENVELOPE MFG. CORP.

a Massachusetts corporation,

and

## N.H.C. INCORPORATED
a Massachusetts corporation,

as Acquired Companies

~~May~~June __, 1999

# STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of ~~May~~June ___, 1999, by and among MAIL-WELL I CORPORATION, a Delaware corporation ("Purchaser"), MAIL-WELL, INC., a Colorado corporation ("Mail-Well"), NORTHEASTERN ENVELOPE MFG. CORP. ("Northeastern"), a Massachusetts corporation, and N.H.C. INCORPORATED, a Massachusetts corporation ("NHC" and together with Northeastern collectively referred to as the "Companies"), and Thomas D. Brennan and Gerald P. Mitchell (sometimes individually referred to herein as "Shareholder" and collectively as "Shareholders") (the Companies and Shareholders sometimes collectively referred to as "Sellers").

## WITNESSETH:

WHEREAS, the Companies are in the envelope converting and printing business (the "Business"); and

WHEREAS, Shareholders own 33-1/3% of the issued and outstanding capital stock of the NHC (the "Shares") and NHC owns 100% of the issued and outstanding capital stock of Northeastern (the "Northeastern Shares"); and

WHEREAS, Shareholders desire to sell to Purchaser and Purchaser desires to purchase from Shareholders the Shares, upon and subject to the terms, conditions, representations and warranties set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants, representations and warranties made herein and of the mutual benefits to be derived herefrom, Shareholders, the Companies, Purchaser and Mail-Well agree as follows:

## ARTICLE I

## PURCHASE AND SALE

1.1     **Purchase of Shares.**  At the Closing (as defined below), Shareholders shall sell to Purchaser, and Purchaser shall purchase from Shareholders, the Shares for the Purchase Price (as defined below).

**1.2     Purchase Price.** The "Purchase Price" to be paid to the Shareholders shall be One Million Dollars ($1,000,000). The Purchase Price shall be paid to the Shareholders as follows:

(a)     $500,000 in cash at closing to Gerald P. Mitchell; and

(b)     $100,000 in cash at closing to Thomas D. Brennan; and

(c)     $400,000 to Thomas D. Brennan by execution and delivery of a promissory note (the "Note") in the original principal amount of $400,000, in substantially the form of Exhibit A attached hereto and delivered simultaneously herewith which shall be secured by a letter of credit from [BANK] in the form attached hereto as Exhibit B.

**1.3     The Closing.** The closing of the transactions contemplated by this Article I (the "Closing") shall be held at the offices of Bowditch & Dewey, LLP in Worcester, Massachusetts at 9:00 a.m. (local time) on _____, 1999, or at such other place, time and date as may be jointly designated by Purchaser, the Companies and Shareholders (the date on which the Closing takes place, the "Closing Date").

**1.4     Expenses.** Any transfer taxes, stamp duties, filing fees, registration fees, recordation expenses, or other similar taxes, fees, charges or expenses incurred by any party hereto in connection with the transfer of the Shares to Purchaser or in connection with any of the other transactions contemplated by this Agreement shall be borne and paid exclusively by such party.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SHAREHOLDERS

Shareholders represent and warrant to Purchaser as follows:

**2.1     Ownership of Shares.** Shareholders are the owners of 33-1/3% of the outstanding capital stock of NHC. The remaining 66-2/3% of the outstanding capital stock of NHC are owned of record by Fleet Venture Partners I or Fleet Venture Resources, Inc. Each of the Shares to be sold by Shareholders to Purchaser are owned by Shareholders free and clear of any lien, pledge, charge, adverse claim, security interest, encumbrance (including any imposed by law in any jurisdiction), title retention agreement, option or right to purchase of any kind.

**2.2     Title to Shares.** Upon delivery of the certificates representing the Shares to Purchaser hereunder and payment and delivery to Shareholders of the consideration specified herein, Purchaser will acquire valid title thereto, free and clear of any lien, pledge, charge,

{J:\clients\bus\n0566\0500\00076780.DOC;3}{J:\clients\bus\n0566\0500\00076780.DOC;4}

- 2 -

adverse claim, security interest, encumbrance (including any imposed by law in any jurisdiction), title retention agreement, option or right to purchase of any kind, other than (a) any restrictions imposed by applicable securities laws, (b) any liens, pledges, charges, adverse claims, security interests, encumbrances, title retention agreements, options, equities or rights to purchase created by or through Purchaser or any of Purchaser's affiliates.

    **2.3    Authorization.** Shareholders have full right and power to execute and deliver this Agreement and perform its obligations hereunder. This Agreement and all other documents and instruments executed or to be executed by Shareholders pursuant to this Agreement have been, or will have been, duly executed and delivered by Shareholders.

    **2.4    Enforceability.** This Agreement constitutes the valid and legally binding obligation of the Companies and Shareholders, enforceable in accordance with its terms, except as such enforceability may be limited by equitable principles and by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or similar laws relating to or affecting the rights of creditors generally.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER AND MAIL-WELL

    Purchaser and Mail-Well represent and warrant to Shareholders and the Companies as follows:

    **3.1    Organization and Standing.** Mail-Well is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Mail-Well and Purchaser have all requisite corporate power and authority to enter into this Agreement, to carry out the transactions contemplated hereby and to perform their obligations hereunder.

    **3.2    Authorization.** The execution and delivery of this Agreement, and all other agreements, documents and instruments executed or to be executed by Purchaser and/or Mail-Well pursuant to this Agreement (the "Purchaser Related Agreements"), and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all necessary corporate and other action on the part of Purchaser and/or Mail-Well, as applicable. This Agreement and the Purchaser Related Agreements have been, or will have been, at the time of

their respective executions and deliveries, duly executed and delivered by a duly authorized officer of Purchaser and/or Mail-Well, as applicable.

3.3    **Enforceability.**  This Agreement constitutes, and each of the Purchaser Related Agreements when duly executed and delivered will constitute, the valid and legally binding obligations of Purchaser and/or Mail-Well, as applicable, enforceable in accordance with its terms, except as such enforceability may be limited by equitable principles and by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or similar laws relating to or affecting the rights of creditors generally.

3.4    **Compliance with Other Instruments and Laws.**  The execution and delivery of this Agreement, and the Purchaser Related Agreements, and the consummation of the transactions contemplated hereby and thereby, will not conflict with or result in any violation or default under any provision of the Certificate of Incorporation, Articles of Incorporation or Bylaws of Purchaser or Mail-Well, or of any material mortgage, indenture, trust, lease, agreement or other instrument, permit, concession, grant, franchise, license, judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Purchaser or Mail-Well or any of their properties, the result of which (either individually or in the aggregate) will prevent or materially delay the consummation of the transactions contemplated hereby.

3.5    **Governmental Authorizations, Consents.**  No consents, licenses, approvals or authorizations of, and registrations or declarations with, any governmental authority, bureau, agency or commission, or any third party, are required to be obtained or made by Purchaser or Mail-Well in connection with the execution, delivery, performance, validity and enforceability of this Agreement or the Purchaser Related Agreements or Purchaser's acquisition of the Companies pursuant hereto.

3.6    **Litigation.**  To the best of Purchaser's knowledge, no action, suit, proceeding or governmental litigation is pending or threatened, at law or in equity, which seeks to question, delay or prevent the consummation of all or any portion of the transactions contemplated hereby.

3.7    **Securities Act of 1933.**  Purchaser is an "accredited investor" as defined under Rule 501 of Regulation D under the Securities Act of 1933, as amended.

3.8    **Brokers and Finders.**  No person or entity is entitled to any brokerage commissions, finder's fee or like payment from Purchaser isin connection with the transactions contemplated in this Agreement.

**3.9** **Investment Intent.** Purchaser is acquiring the Shares for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act of 1933.

## ARTICLE 4
## COVENANTS OF ALL PARTIES

The parties hereto agree that:

**4.1** **Commercially Reasonable Efforts; Further Assurances.** Subject to the terms and conditions of this Agreement, each party will use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Legal Requirements to consummate the transactions contemplated by this Agreement. Shareholders, the Companies, and Purchaser each agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the transactions contemplated by this Agreement.

For purposes of this Agreement, the term "legal requirement" shall mean any federal, state or local law, statute, ordinance, code, rule, regulation, decree, award, permit, order, franchise, consent or authorization of, any federal, state, local or other governmental body or agency, department, commission, bureau, board, counsel, court, magistrate, panel or instrumentality of the United States, any political subdivision thereof or any state or local governmental authority.

**4.2** **Certain Filings, Etc.** The Companies, Shareholders and Purchaser shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any governmental body, agency, official or authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the transactions contemplated by this Agreement and (b) in taking such actions or making any such filings, in furnishing such information as may be required in connection therewith, and in seeking timely to obtain any such actions, consents, approvals or waivers.

**4.3** **Public Announcements.** The parties agree not to issue any press release or make any public statement with respect to this Agreement or the transactions contemplated hereby prior

to the Closing without the prior consent of Purchaser and Shareholders (which consent shall not be unreasonably withheld or delayed); except to the extent that any party hereto is required by law to make any such disclosure and such party notifies the other parties hereto a reasonable time before making such disclosure of the nature and content of the intended disclosure, and consults with such other parties regarding the nature and content of such disclosure.

4.4     **Employee Benefits.** Purchaser agrees that all employees of the Companies shall be credited with their respective years of service at the Companies for purposes of determining such employee's eligibility to receive benefits.

4.5     **Bonuses.** Notwithstanding any other provisions contained herein, Purchaser agrees that the Companies may pay bonuses to their employees prior to the Closing. The aggregate amount of such bonuses shall not exceed the cash position of the Companies.

## ARTICLE 5
## COMPANIES' AND SHAREHOLDERS' DELIVERIES AT CLOSING

The obligation of Purchaser to purchase the Shares, pay the Purchase Price, and otherwise consummate the transactions to be consummated at the Closing is subject to and expressly conditioned upon the delivery by the Companies and Shareholders to Purchaser of the following (any of which may be waived by Purchaser in whole or in part):

5.1     **Payoff Letters.** Purchaser having received a certificate in the form of a letter (the "Payoff Letters"), executed by Shareholders and an authorized representative of each creditor of the Companies, setting forth the amounts as of the Closing Date of the principal, interest, prepayment fees and penalties due and payable by each Company to each of the creditors holding Debt. "Debt" shall include all long-term, short-term or "line of credit" indebtedness to banks, leasing companies and other third parties, including the current portion thereof, accrued interest thereon, any overdrafts, and the amount of any fees, early retirement or prepayment fees and penalties, and any other amounts due upon the prepayment thereof. "Debt" shall not include any amount included in accounts payable or accrued expenses.

5.2     **No Injunction.** There not being in effect, at the Closing, any injunction or other binding order of any court or other tribunal having jurisdiction over Purchaser that prohibits the consummation of the transactions contemplated in this Agreement.

**5.3    No Material Adverse Effect.** There having been no Material Adverse Effect on the Companies since March 31, 1999.

**5.4    Consents.** All required consents, licenses, approvals, estoppel certificates, releases of encumbrances, acknowledgements of payment in full and authorization having been obtained and delivered to Purchaser.

**5.5    Legal Opinions.** Purchaser having received from counsel to the Companies and Shareholders an opinion in substantially the form of Exhibit C attached hereto.

**5.6    Certificate of Secretary.** Each Company having delivered a certificate, signed by the clerk of such Company, certifying (i) current copies, as amended, of the Articles of Incorporation and Bylaws of such Company and the resolutions of the board of directors of such Company authorizing this Agreement and the transactions contemplated hereby.

**5.7    Non-Compete and Employment Agreements.** Mr. Brennan and Mr. Mitchell having executed a non-compete agreement in the form attached as Exhibit D providing for a covenant not to compete within the envelope industry in the eastern United States for a period of five years from the date of Closing and two years of the date of such Shareholder's termination of employment with Purchaser or its affiliates, whichever is later. Mr. Brennan and Mr. Mitchell having executed employment agreements in the form attached as Exhibit E providing for compensation levels of $300,000 for Mr. Mitchell and $130,000 for Mr. Brennan for a period of three years, with bonus objectives based on growth. In addition, Mr. Mitchell's son, Gerald Mitchell, Jr. executed an employment contract for a five-year period.

**5.8    UCC-3s.** The Companies having delivered UCC-3 Termination Statements for all the secured Debt of the Companies and for debt that previously was repaid but for which UCC filings are of record.

**5.9    No Discovery.** Purchaser not being informed of or otherwise having discovered any matter or matters which would represent a Material Adverse Effect on the Companies.

**5.10    Documentation.** All agreements, documents and instruments incidental to the performance of the transactions contemplated by this Agreement being in a form and substance reasonably satisfactory to Purchaser and its legal counsel and Purchaser having received copies of all documents that they may have reasonably requested in connection with such transactions.

**5.11    Delivery of Certificates and Compliance with Laws.** The certificates representing the Shares having been delivered, with stock powers endorsed in blank, to

Purchaser, and Shareholders having complied with all Legal Requirements with respect to transfer of ownership of the Shares.

**5.12    Due Diligence.** Purchaser having completed a customary due diligence review of the Companies including but not limited to review of the Companies' financial and operating, assets and liabilities, leases, permits, the environmental and other condition of any real property, contracts and agreements, and relationships with customers, suppliers and employees, and the results of such due diligence review being satisfactory to Purchaser in its sole discretion. The methodology and timing of Purchaser due diligence shall be mutually agreed upon by Purchaser and Shareholders.

**5.13    Repayment of Shareholders and Affiliate Debt.** Shareholders have paid or otherwise satisfied the amount of any debt, accounts payable or other liability of such Shareholders to each Company.

**5.14    No Material Diminution.** No assets shown on the most recent Financial Statements with a replacement cost in excess of $10,000 having been destroyed or damaged, and there having been no material diminution in a Companies' fixed assets by sale or other disposition since the date of the most recent Financial Statements.

## ARTICLE 6
## PURCHASER'S DELIVERIES AT CLOSING

The obligation of Shareholders to consummate the transactions that are to be consummated at the Closing is subject to and expressly conditioned upon the delivery by Purchaser to the Shareholders and the Companies as of the Closing Date, of the following:

**6.1    No Injunction.** There not being in effect, at the Closing, any injunction or other binding order of any court or other tribunal having jurisdiction over Shareholders or the Companies that prohibits the consummation of the transactions contemplated by this Agreement.

**6.2    Legal Opinion.** Shareholders have received from counsel to Purchaser an opinion in substantially the form of Exhibit F attached hereto.

**6.3    Documentation.** All agreements, documents and instruments incidental to Purchaser's performance of the transactions contemplated by this Agreement, being in a form and substance reasonably satisfactory to Shareholders and their legal counsel and Shareholders

having received copies of all documents that they may have reasonably requested in connection with such transaction.

## ARTICLE 7
## MISCELLANEOUS

**7.1    Materially.** For purposes of this Agreement, a contract, obligation, liability, transaction, change, breach, encumbrance, proceeding or other matter or event shall not be deemed "material" if the monetary amount involved is less than $10,000, or, if more than one such matter or event, $25,000 in the aggregate. A "Material Adverse Effect" is any adverse effect on the business, operations, assets or financial condition or results of a company unless the effect can reasonably be expected to result in less than a $10,000 effect on the financial condition or results of operation of such company or the effect is due to general changes in the economy or the business of the company.

**7.2    Notices, Etc.** All notices, instructions and other communications given hereunder or in connection herewith shall be in writing. Any such notice, instruction or communication shall be sent either (i) by registered or certified mail, return receipt requested, postage prepaid, or (ii) via a reputable overnight courier service, in each case to the address set forth below. Any such notice, instruction or communication shall be deemed to have been delivered three business days after it is sent postage prepaid, or one business day after it is sent via a reputable nationwide overnight courier service.

If to Purchaser, to:         Mail-Well, Inc.

23 Inverness Way East

Englewood, CO 80112

Attn: Gerald F. Mahoney, Chairman

Tel: (303) 397-7410

Fax: (303) 397-7400

With a copy to:         Mail-Well, Inc.

23 Inverness Way East

Englewood, CO 80112

Attn: Roger Wertheimer, Vice President, General Counsel

Tel: (303) 397-7440

Fax: (303) 566-7461

If to Shareholders or a
Company, to:

Thomas D. Brennan

Gerald P. Mitchell

~~Thomas D. Brennan~~

~~Northeastern Envelope Mfg. Corp.~~

~~1515 Washington Street~~

~~Braintree, MA  02184~~ 17 Timber Lane

Holden, MA  01520

With a copy to:

Robert B. Longden, Jr.

Bowditch & Dewey, LLP

311 Main Street

Worcester, MA 01608

Tel: (508) 926-3419

Fax: (508) 929-3025

Or, in each case, to such other address as may be specified in writing to the other parties.
Any party may give any notice, instruction or communication in connection with this
Agreement using any other means (including personal delivery, telecopy or ordinary mail), but no
such notice, instruction or communication shall be deemed to have been delivered unless and
until it is actually received by the party to whom it was sent.  Any party may change the address
to which notices, instructions or communications are to be delivered by giving the other parties to
this Agreement notice thereof in the manner set forth in this Section 7.2

    7.3    **Assignment.**  The Companies and Shareholders may not assign or otherwise
transfer this Agreement or any rights hereunder to any person or entity, without the prior written
consent of Purchaser.  Subject to the foregoing, this Agreement shall insure to the benefit of and
be binding upon each Shareholder and its successors, personal representatives, heirs, and
permitted assigns.  Notwithstanding the foregoing, this Agreement shall not be terminated by the

death or incapacity of a Shareholder, and if, after the execution hereof, a Shareholder shall die or become incapacitated, this Agreement shall be binding upon the successors and assigns of such Shareholder as if such death or incapacity had not occurred and regardless of notice thereof. Except as expressly permitted by this Section 7.3, Purchaser and Mail-Well shall not voluntarily or by operation of law assign or otherwise transfer this Agreement or any of their rights or obligations hereunder except to any of their parents, subsidiaries or affiliates, without the prior written consent of Shareholders and provided that any permitted assignment or transfer shall not relieve Purchaser or Mail-Well of any of their obligations hereunder.  Purchaser and Mail-Well may assign their rights under this Agreement and under other closing documents without the consent of Shareholders to any financial institution(s) or their affiliates as required pursuant to any existing or future financing arrangements.  In addition, upon foreclosure or sale in lieu of foreclosure or deed by or to any such financial institutions or their affiliates, the warranties, representations, obligations, agreements and indemnities of Shareholders in this Agreement and in other documents contemplated by this Agreements will insure to the benefit of such financial institutions (or their affiliates) or any such purchaser or grantee.  Subject to the foregoing, this Agreement shall insure to the benefit of Purchaser and Mail-Well and their permitted successors and assigns.

7.4    **Entire Agreement, Amendment, Governing Law, Etc.**  This Agreement (together with the Exhibits) embody the entire agreement and understanding among the parties hereto with respect to the subject matter hereof.  This Agreement may be amended, modified, waived, discharged or terminated only by (and any consent hereunder shall be effective only if contained in) an instrument in writing signed by the party against which enforcement of such amendment, modification, waiver, discharge, termination or consent is sought.  This Agreement shall be construed in accordance with and governed by the laws of The Commonwealth of Massachusetts as it applies to contracts to be performed entirely with The Commonwealth of Massachusetts.  No representation or warranty (either express, implied or otherwise) is being made by any party with respect to the subject matter hereof other than as expressly set forth herein.

7.5    **Counterparts.**  This Agreement may be executed in several counterparts, each of which is an original, but all of which shall constitute one instrument.

7.6     **Third Party Rights.**  The parties do not intend to confer any benefit hereunder on any person or entity other than the parties hereto and their respective successors in interest.

7.7     **Exhibits.**  Each of the Exhibits referred to herein and attached hereto is an integral part of this Agreement and is incorporated herein by this reference.

7.8     **Pronouns.**  All pronouns and any variations thereof used in this Agreement shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as appropriate.

7.9     **Authority and Execution.**  Each person executing this Agreement on behalf of a party hereto represents and warrants that he is duly and validly authorized to do so on behalf of such party, with full right and authority to execute this Agreement and to bind such party with respect to all of its obligations hereunder.

7.10     **Severability.**  Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction, as to such jurisdiction, shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.

7.11     **Time of Essence.**  Time is of the essence of this Agreement.

7.12     **Interpretation.**  Each party acknowledges that such party, either directly or through such party's representatives, has participated in the drafting of this Agreement, and any applicable rule of constructions that ambiguities are to be resolved against the drafting party should not be applied in connection with the construction or interpretation of this Agreement.

IN WITNESS WHEREOF, the parties hereto have duly caused this Agreement to be executed as of the date first above written.

PURCHASER

MAIL-WELL I CORPORATION,

a Delaware corporation

By:_____

Name:_____

Title:_____

MAIL-WELL, INC., a Colorado corporation

By:_____

Name: _____

Title:_____

SHAREHOLDERS

_____

Thomas D. Brennan

_____

Gerald P. Mitchell

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of _____, 1999 (the "Effective Date"), by and between Thomas D. Brennan ("Executive") and MAIL-WELL I CORPORATION, a Delaware corporation ("Employer").

WHEREAS, concurrently with the execution and delivery of this Agreement, pursuant to that certain Stock Purchase Agreement dated _____, 1999 (the "Purchase Agreement") between Employer, Mail-Well, Inc., Northeastern Envelope Mfg. Corp., a Massachusetts corporation, and N.H.C. Incorporated ("NHC"), a Massachusetts corporation (together, the "Companies") and the shareholders of NHC, Mail-Well acquired from the Executive, among others, all of the issued and outstanding shares of stock of NHC; and

WHEREAS, the Purchaser desires the Executive's employment with Mail-Well I Corporation or an affiliated company (collectively hereinafter referred to as "Employer") and the Executive wishes to accept such employment, upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein the parties hereto agree as follows:

1.     Employment.  Employer hereby agrees to employ Executive, and Executive hereby accepts such employment with Employer, for a term commencing on the Effective Date and terminating as provided under Section 4 (the "Employment Period").

2.     Duties.  The Executive will have the title Vice President and [insert specific duties and responsibilities] and such other duties and responsibilities as may be reasonably assigned or delegated to the Executive by the Board of Directors of Employer (the "Board"), the Chief Executive Officer of Employer (the "Chief Executive Officer") or such other individual or individuals as shall be designated by the Board.  During the Employment Period, the Executive will devote his best efforts to the business of the Employer, and will spend a maximum of two business days per week, chosen in his sole discretion, performing his duties and responsibilities hereunder.    The Executive understands and agrees that in the performance of his duties he shall at all times be subject to the control and supervision of the Board and/or the Chief Executive Officer or such other individual or individuals as shall be designated by the Board.  The Executive shall only be required to perform his duties and responsibilities hereunder in any location of Employer in [eastern] Massachusetts.  The Executive shall comply with the policies, procedures and regulations of Employer as may be provided or communicated to Executive from time to time during the Employment Period.

3.      Compensation and Benefits.

(a)     Employer will pay Executive a base salary (the "Base Salary") at the rate of $130,000 per annum during the Employment ~~Period, payable in such installments as is the policy of Employer from time to time to time with respect to its employees. In addition Executive shall be entitled to participate in Employer's bonus~~ Period payable weekly. ~~program based on increased profitability as more fully described in Schedule A.~~

(b)     Executive will be permitted to participate in such bonus, pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans.

4.      Termination of Employment.  The Employment Period, the Executive's compensation and benefits (except as specifically provided under the terms of such benefits) and any and all other rights of the Executive under this Agreement or otherwise as an employee of the Employer will terminate on the earliest to occur of the following events (the "Termination Date"):

(a)     At any time the Employer may, in its sole discretion, discharge the Executive for "cause," effective immediately upon providing the Executive with notice of his dismissal.  The only occurrences which shall constitute "cause" within the meaning of this paragraph shall be the following:

(i)     the conviction of the Executive by a court of competent jurisdiction of a crime involving moral turpitude (or the entering of a no-contest or nolo contendere plea by Executive in regard to such crime); or

(ii)    the commission by the Executive of an act of fraud or bad faith upon the Employer; or

(iii)   the willful misappropriation of any funds or property of the Employer by the Executive; or

(iv)    the willful, continued and unreasonable failure by the Executive to perform his duties or obligations under this Agreement; or

(v)     the breach of any material provisions hereof or the engagement by the Executive, without the prior written approval of the Employer, in any activity which would violate the provisions of Section 5 or 6 of this Agreement.

(b)     The voluntary termination by Executive of his employment hereunder, with or without cause, ~~which may occur at any time after Employer receives~~ notice from Executive of intent to terminate ("Voluntary Termination");

(c)    Unless sooner terminated by Employer or the Executive pursuant to the other provisions of this Section 4 or otherwise extended by the written agreement of both parties hereto, this Agreement shall terminate on the third anniversary of the Effective Date.

Upon termination of Executive's employment for any reason, Employer shall have no further obligation to pay salary or any fringe benefits or bonuses to Executive except for Executive's salary and any fringe benefits or bonuses accrued and unpaid through the Termination Date, which amounts shall be payable on the date such payments would have been made but for Executive's termination.

5.    Representation of Executive.    Executive represents and warrants to Employer that his execution and delivery of this Agreement does not conflict with, or result in the breach by Executive or violation by Executive of, any other agreement to which Executive is a party or by which Executive is bound.

6.    Accrued Vacation.    Employer hereby acknowledges that Executive has 45 vacation days accrued as of the date hereof.  Employer agrees that Executive shall have the option to (a) take such vacation days at any time during the term of this Agreement, payable at the daily rate of the Base Salary being paid hereunder at the time taken or (b) sell such vacation days to the Employer in exchange for an amount equal to the number of days being sold times the daily rate of the Base Salary.

7.    Remedies.    The parties hereto agree that Employer would suffer irreparable harm from a breach by Executive of any of the covenants or agreements contained herein. Therefore, in the event of the actual or threatened breach by Executive of any of the provisions of this Agreement, Employer may, in addition and supplementary to other rights and remedies existing in their favor, and notwithstanding the provisions of Section 11, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any violation of the provisions hereof.

8.    Alternative Dispute Resolution.    In the event of claimed breach of this Agreement by any of the parties hereto, such dispute shall be submitted to alternative resolution in accordance with the terms of this Section. The party who is alleging that a dispute exists shall send a notice of such dispute to all other parties to this Agreement, setting forth the dispute, the parties involved and the position of such party with respect to the dispute. The parties to such dispute shall endeavor in good faith to select an alternative dispute resolution service to resolve the dispute and the rules that shall govern the resolution. If agreement as to the matters detailed in the preceding sentence is not reached within twenty business days of receipt of the notice, then, within ten business days thereafter, counsel for the parties shall mutually select as an arbitrator an attorney practicing in Boston, Massachusetts, who is experienced in commercial arbitration. If counsel for the parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected by the American Arbitration Association (the "AAA"). The parties agree to share equally in the cost of conducting the arbitration, provided that the costs, fees

(including attorney and expert fees) and other expenses incurred by either party in connection therewith shall remain the obligation of such party. Any disputes as to the rules for conducting the arbitration shall be resolved by reference to the AAA rules for commercial arbitration by the arbitrator. The arbitrator shall schedule a hearing on the disputed issues within forty business days after his or her appointment, and the arbitrator shall render his or her decision after the hearing, in writing, as expeditiously as possible, and shall deliver copies of such decision to the parties. A default judgment may be entered against any party who fails to appear at the arbitration hearing. Such decision and determination shall be final and unappealable and may be filed as a judgment of record in any jurisdiction designated by the successful party. The parties to this Agreement agree that this Section has been included to rapidly and inexpensively resolve any disputes among them with respect to the matters described above, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters. Notwithstanding the foregoing, the parties hereto will be entitled to seek equitable relief in a court of competent jurisdiction with respect to those matters for which equitable relief is specified in this Agreement and those matters for which equitable relief is appropriate.

9.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of Employer, its affiliates and its successors and assigns, and shall be binding upon and inure to the benefit of Executive and his legal representatives and assigns, provided that in no event shall Executive's obligations to perform services for Employer and its affiliates be delegated or transferred by Executive. Employer may assign or transfer its rights hereunder to a successor corporation in the event of merger, consolidation or transfer or sale of all or substantially all of the assets of Employer or of Employer's business. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement, and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

10.    Modification or Waiver. No amendment, modification, waiver, termination or cancellation of this Agreement shall be binding or effective for any purpose unless it is made in a writing signed by the party against whom enforcement of such amendment, modification, waiver, termination or cancellation is sought. No course of dealing between or among the parties to this Agreement shall be deemed to affect or to modify, amend or discharge any provision or term of this Agreement. No delay on the part of Employer or Executive in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Employer or Executive of any such right or remedy shall preclude other or further exercise thereof. A waiver of right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.

11.    Severability. Whenever possible each provision and term of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or term of this Agreement shall be held to be prohibited by or invalid under such applicable law, then such provision or term shall be ineffective only to the extent of

such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provisions or term or the remaining provisions or terms of this Agreement.

12.    **Counterparts**.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

13.    **Binding Effect**.  Each party hereto agrees to be bound by the provisions of this Agreement only upon the Effective Date.

14.    **Entire Agreement**.  This Agreement (together with all documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

15.    **Notices**.  Any notices, consents or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service, or (d) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.

To Employer:               c/o Mail-Well, Inc.
                          23 Inverness Way East
                          Englewood, CO 801 12
                          Attention: Gerald F. Mahoney, Chairman
                          Fax:  (303) 397-7400

To Executive:              To the last home address reflected
                          on the records of Employer

Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

16.    **Construction**.  The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Agreement.  This Agreement shall not be construed against any party for having drafted it.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

IN WITNESS WHEREOF, the undersigned have executed this Employment Agreement as of the date first above written.

"EMPLOYER":

MAIL-WELL I CORPORATION

By:_____
Its:_____
Title:_____

"EXECUTIVE":

_____
Thomas D. Brennan

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of _____, 1999 (the "Effective Date"), by and between Gerald P. Mitchell, Sr. ("Executive") and MAIL-WELL I CORPORATION, a Delaware corporation ("Employer").

WHEREAS, concurrently with the execution and delivery of this Agreement, pursuant to that certain Stock Purchase Agreement dated _____, 1999 (the "Purchase Agreement") between Employer, Mail-Well, Inc., Northeastern Envelope Mfg. Corp., a Massachusetts corporation, and N.H.C. Incorporated ("NHC"), a Massachusetts corporation (together, the "Companies") and certain shareholders of NHC, Mail-Well acquired from the Executive, among others, 1/3 of the issued and outstanding shares of stock of NHC; and

WHEREAS, the Purchaser desires the Executive's employment with Mail-Well I Corporation or an affiliated company (collectively hereinafter referred to as "Employer") and the Executive wishes to accept such employment, upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein the parties hereto agree as follows:

1. **Employment**. Employer hereby agrees to employ Executive, and Executive hereby accepts such employment with Employer, for a term commencing on the Effective Date and terminating as provided under Section 4 (the "Employment Period").

2. **Duties**. The Executive will have the title President and [insert duties and responsibilities] and such other duties and responsibilities as may be reasonably assigned or delegated to the Executive by the Board of Directors of Employer (the "Board"), the Chief Executive Officer of Employer (the "Chief Executive Officer") or such other individual or individuals as shall be designated by the Board. During the Employment Period, the Executive will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of the Employer [and shall refrain from active involvement in any other business or professional activity except on behalf of Employer]. The Executive understands and agrees that in the performance of his duties he shall at all times be subject to the control and supervision of the Board and/or the Chief Executive Officer or such other individual or individuals as shall be designated by the Board. The Executive shall only be required to perform his duties and responsibilities hereunder in any location of Employer in [eastern] Massachusetts. The Executive shall comply with the policies, procedures and regulations of Employer as may be provided or communicated to Executive from time to time during the Employment Period.

3.    <u>Compensation and Benefits</u>.

(a)    Employer will pay Executive a base salary (the "Base Salary") at the rate of $300,000 per annum during the Employment Period, ~~payable in such installments as is the policy of Employer from time to time with respect to its employees. In addition Executive shall be entitled to participate in Employer's bonus~~ Period payable weekly. ~~program based on increased profitability as more fully described in Schedule A.~~

(b)    Executive will be permitted to participate in such <u>bonus, pension,</u> profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans. Executive shall be credited for his years of service with the Companies for purposes of determining his eligibility for benefits.

(c)    Employer will provide Executive with an automobile ~~of his~~ ~~choice~~comparable to a new Lincoln Town car which will be paid for and maintained at the sole expense of Employer.

4.    <u>Termination of Employment</u>.    The Employment Period, the Executive's compensation and benefits (except as specifically provided under the terms of such benefits) and any and all other rights of the Executive under this Agreement or otherwise as an employee of the Employer will terminate on the earliest to occur of the following events (the "Termination Date"):

(a)    At any time the Employer may, in its sole discretion, discharge the Executive for "cause," effective immediately upon providing the Executive with notice of his dismissal. The only occurrences which shall constitute "cause" within the meaning of this paragraph shall be the following:

(i)    the conviction of the Executive by a court of competent jurisdiction of a crime involving moral turpitude (or the entering of a no-contest or nolo contendere plea by Executive in regard to such crime); or

(ii)    the commission by the Executive of an act of fraud or bad faith upon the Employer; or

(iii)    the willful misappropriation of any funds or property of the Employer by the Executive; or

(iv)    the willful, continued and unreasonable failure by the Executive to perform his duties or obligations under this Agreement; or

(v)    the breach of any material provisions hereof or the engagement by the Executive, without the prior written approval of the Employer, in any activity which would violate the provisions of Section 5 or 6 of this Agreement.

(b)    The voluntary termination by Executive of his employment hereunder, with or without cause, which may occur at any time after Employer receives notice from Executive of intent to terminate ("Voluntary Termination");

(c)    Unless sooner terminated by Employer or the Executive pursuant to the other provisions of this Section 4 or otherwise extended by the written agreement of both parties hereto, this Agreement shall terminate on the third anniversary of the Effective Date.

Upon termination of Executive's employment for any reason, Employer shall have no further obligation to pay salary or any fringe benefits or bonuses to Executive except for Executive's salary and any fringe benefits or bonuses accrued and unpaid through the Termination Date, which amounts shall be payable on the date such payments would have been made but for Executive's termination.

5.    Representation.  Executive represents and warrants to Employer that his execution and delivery of this Agreement does not conflict with, or result in the breach by Executive or violation by Executive of, any other agreement to which Executive is a party or by which Executive is bound.

6.    Accrued Vacation.  Employer hereby acknowledges that Executive has 65 vacation days accrued as of the date hereof.  Employer agrees that Executive shall have the option to (a) take such vacation days at any time during the term of this Agreement, payable at the daily rate of Base Salary or (b) sell such vacation days to the Employer in exchange for an amount equal to the number of days being sold times the daily rate of the Base Salary.

7.    Remedies.  The parties hereto agree that Employer would suffer irreparable harm from a breach by Executive of any of the covenants or agreements contained herein. Therefore, in the event of the actual or threatened breach by Executive of any of the provisions of this Agreement, Employer may, in addition and supplementary to other rights and remedies existing in their favor, and notwithstanding the provisions of Section 11, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any violation of the provisions hereof.

8.    Alternative Dispute Resolution.  In the event of claimed breach of this Agreement by any of the parties hereto, such dispute shall be submitted to alternative resolution in accordance with the terms of this Section.  The party who is alleging that a dispute exists shall send a notice of such dispute to all other parties to this Agreement, setting forth the dispute, the parties involved and the position of such party with respect to the dispute.  The parties to such dispute shall endeavor in good faith to select an alternative dispute resolution service to resolve the dispute and the rules that shall govern the resolution.  If agreement as to the matters detailed in the preceding sentence is not reached within twenty business days of receipt of the notice, then, within ten business days thereafter, counsel for the parties shall mutually select as an arbitrator an attorney

practicing in Boston, Massachusetts, who is experienced in commercial arbitration. If counsel for the parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected by the American Arbitration Association (the "AAA"). The parties agree to share equally in the cost of conducting the arbitration, provided that the costs, fees (including attorney and expert fees) and other expenses incurred by either party in connection therewith shall remain the obligation of such party. Any disputes as to the rules for conducting the arbitration shall be resolved by reference to the AAA rules for commercial arbitration by the arbitrator. The arbitrator shall schedule a hearing on the disputed issues within forty business days after his or her appointment, and the arbitrator shall render his or her decision after the hearing, in writing, as expeditiously as possible, and shall deliver copies of such decision to the parties. A default judgment may be entered against any party who fails to appear at the arbitration hearing. Such decision and determination shall be final and unappealable and may be filed as a judgment of record in any jurisdiction designated by the successful party. The parties to this Agreement agree that this Section has been included to rapidly and inexpensively resolve any disputes among them with respect to the matters described above, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters. Notwithstanding the foregoing, the parties hereto will be entitled to seek equitable relief in a court of competent jurisdiction with respect to those matters for which equitable relief is specified in this Agreement and those matters for which equitable relief is appropriate.

9.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Employer, its affiliates and its successors and assigns, and shall be binding upon and inure to the benefit of Executive and his legal representatives and assigns, provided that in no event shall Executive's obligations to perform services for Employer and its affiliates be delegated or transferred by Executive. Employer may assign or transfer its rights hereunder to a successor corporation in the event of merger, consolidation or transfer or sale of all or substantially all of the assets of Employer or of Employer's business. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement, and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

10.    Modification or Waiver.  No amendment, modification, waiver, termination or cancellation of this Agreement shall be binding or effective for any purpose unless it is made in a writing signed by the party against whom enforcement of such amendment, modification, waiver, termination or cancellation is sought. No course of dealing between or among the parties to this Agreement shall be deemed to affect or to modify, amend or discharge any provision or term of this Agreement. No delay on the part of Employer or Executive in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Employer or Executive of any such right or remedy shall preclude other or further exercise thereof. A waiver of right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.

11.    _Severability._  Whenever possible each provision and term of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or term of this Agreement shall be held to be prohibited by or invalid under such applicable law, then such provision or term shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provisions or term or the remaining provisions or terms of this Agreement.

12.    _Counterparts._  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

13.    _Binding Effect._  Each party hereto agrees to be bound by the provisions of this Agreement only upon the Effective Date.

14.    _Entire Agreement._  This Agreement (together with all documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof

15.    _Notices._  Any notices, consents or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service, or (d) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.

|                   |                                           |
|-------------------|-------------------------------------------|
| To Employer:      | c/o Mail-Well, Inc.                       |
|                   | 23 Inverness Way East                     |
|                   | Englewood, CO 801 12                      |
|                   | Attention: Gerald F. Mahoney, Chairman    |
|                   | Fax: (303) 397-7400                       |
|                   |                                           |
| To Executive:     | To the last home address reflected        |
|                   | on the records of Employer                |

Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

16.    _Construction._  The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Agreement.  This

Agreement shall not be construed against any party for having drafted it. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

IN WITNESS WHEREOF, the undersigned have executed this Employment Agreement as of the date first above written.

"EMPLOYER":

MAIL-WELL I CORPORATION

By: _____
Its: _____
Title: _____

"EXECUTIVE":

_____
Gerald Mitchell

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of _____, 1999 (the "Effective Date"), by and between Gerald P. Mitchell, Jr. ("Employee") and MAIL-WELL I CORPORATION, a Delaware corporation ("Employer").

WHEREAS, concurrently with the execution and delivery of this Agreement, pursuant to that certain Stock Purchase Agreement dated _____, 1999 (the "Purchase Agreement") between Employer, Mail-Well, Inc., Northeastern Envelope Mfg. Corp. ("Northeastern"), a Massachusetts corporation, and N.H.C. Incorporated ("NHC"), a Massachusetts corporation (together, the "Companies") and certain shareholders of NHC, Mail-Well acquired 1/3 of the issued and outstanding shares of stock of NHC; and

WHEREAS, Employee has been employed by Northeastern; and

WHEREAS, the Purchaser desires the Employee's employment with Mail-Well I Corporation or an affiliated company (collectively hereinafter referred to as "Employer") and the Employee wishes to accept such employment, upon the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein the parties hereto agree as follows:

1.    _Employment_. Employer hereby agrees to employ Employee, and Employee hereby accepts such employment with Employer, for a term commencing on the Effective Date and terminating as provided under Section 4 (the "Employment Period").

2.    _Duties_. The Employee will have such title, duties and responsibilities as are assigned or delegated to the Employee by the Board of Directors of Employer (the "Board"), the Chief Executive Officer of Employer (the "Chief Executive Officer") or such other individual or individuals as shall be designated by the Board. During the Employment Period, the Employee will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of the Employer [and shall refrain from active involvement in any other business or professional activity except on behalf of Employer]. The Employee understands and agrees that in the performance of his duties he shall at all times be subject to the control and supervision of the Board and/or the Chief Executive Officer or such other individual or individuals as shall be designated by the Board. The Employee shall comply with the policies, procedures and regulations of Employer as may be provided or communicated to Employee from time to time during the Employment Period.

3.    Compensation and Benefits.

(a)    Employer will pay Employee at the rate of $7.75 per hour during the first year of the Employment Period, payable in such installments and regular increases (including but not limited to the annual increases given to employees in December of each year) as is the policy of Employer from time to time with respect to its employees.

(b)    Employee will be permitted to participate in such bonus, pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Employee is eligible under the terms of those plans.

4.    Termination of Employment.  The Employment Period, the Employee's compensation and benefits (except as specifically provided under the terms of such benefits) and any and all other rights of the Employee under this Agreement or otherwise as an employee of the Employer will terminate on the earliest to occur of the following events (the "Termination Date"):

(a)    At any time the Employer may, in its sole discretion, discharge the Employee for "cause," effective immediately upon providing the Employee with notice of his dismissal. The only occurrences which shall constitute "cause" within the meaning of this paragraph shall be the following:

(i)    the conviction of the Employee by a court of competent jurisdiction of a crime involving moral turpitude (or the entering of a no-contest or nolo contendere plea by Employee in regard to such crime); or

(ii)    the commission by the Employee of an act of fraud or bad faith upon the Employer; or

(iii)    the willful misappropriation of any funds or property of the Employer by the Employee; or

(iv)    the willful, continued and unreasonable failure by the Employee to perform his duties or obligations under this Agreement; or

(v)    the breach of any material provisions hereof or the engagement by the Employee, without the prior written approval of the Employer, in any activity which would violate the provisions of Section 5 or 6 of this Agreement.

(b)    The voluntary termination by Employee of his employment hereunder, with or without cause, which may occur at any time after Employer receives notice from Employee of intent to terminate ("Voluntary Termination");

(c)    Unless sooner terminated by Employer or the Employee pursuant to the other provisions of this Section 4, this Agreement shall terminate on the fifth anniversary of the Effective Date.

Upon termination of Employee's employment for any reason, Employer shall have no further obligation to pay salary or any fringe benefits or bonuses to Employee except for Employee's salary and any fringe benefits or bonuses accrued and unpaid through the Termination Date, which amounts shall be payable on the date such payments would have been made but for Employee's termination.

5.    Representation.  Employee represents and warrants to Employer that his execution and delivery of this Agreement does not conflict with, or result in the breach by Employee or violation by Employee of, any other agreement to which Employee is a party or by which Employee is bound.

6.    Covenants.  Notwithstanding any other provision of this Agreement, Employer covenants and agrees that it will maintain Employee as its employee for so long as Employee's performance remains satisfactory.

6.7.    Remedies.  The parties hereto agree that Employer would suffer irreparable harm from a breach by Employee of any of the covenants or agreements contained herein. Therefore, in the event of the actual or threatened breach by Employee of any of the provisions of this Agreement, Employer may, in addition and supplementary to other rights and remedies existing in their favor, and notwithstanding the provisions of Section 10, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any violation of the provisions hereof.

7.8.    Alternative Dispute Resolution.  In the event of claimed breach of this Agreement by any of the parties hereto, such dispute shall be submitted to alternative resolution in accordance with the terms of this Section. The party who is alleging that a dispute exists shall send a notice of such dispute to all other parties to this Agreement, setting forth the dispute, the parties involved and the position of such party with respect to the dispute. The parties to such dispute shall endeavor in good faith to select an alternative dispute resolution service to resolve the dispute and the rules that shall govern the resolution. If agreement as to the matters detailed in the preceding sentence is not reached within twenty business days of receipt of the notice, then, within ten business days thereafter, counsel for the parties shall mutually select as an arbitrator an attorney practicing in Boston, Massachusetts, who is experienced in commercial arbitration. If counsel for the parties are unable to agree upon the selection of the arbitrator, the arbitrator shall be selected by the American Arbitration Association (the "AAA"). The parties agree to share equally in the cost of conducting the arbitration, provided that the costs, fees (including attorney and expert fees) and other expenses incurred by either party in connection therewith shall remain the obligation of such party. Any disputes as to the rules for conducting the arbitration shall be resolved by reference to the AAA rules for commercial arbitration by the arbitrator. The arbitrator shall schedule a hearing on the

disputed issues within forty business days after his or her appointment, and the arbitrator shall render his or her decision after the hearing, in writing, as expeditiously as possible, and shall deliver copies of such decision to the parties. A default judgment may be entered against any party who fails to appear at the arbitration hearing. Such decision and determination shall be final and unappealable and may be filed as a judgment of record in any jurisdiction designated by the successful party. The parties to this Agreement agree that this Section has been included to rapidly and inexpensively resolve any disputes among them with respect to the matters described above, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters. Notwithstanding the foregoing, the parties hereto will be entitled to seek equitable relief in a court of competent jurisdiction with respect to those matters for which equitable relief is specified in this Agreement and those matters for which equitable relief is appropriate.

8.9.    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of Employer, its affiliates and its successors and assigns, and shall be binding upon and inure to the benefit of Employee and his legal representatives and assigns, provided that in no event shall Employee's obligations to perform services for Employer and its affiliates be delegated or transferred by Employee. Employer may assign or transfer its rights hereunder to a successor corporation in the event of merger, consolidation or transfer or sale of all or substantially all of the assets of Employer or of Employer's business. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement, and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

9.10.    Modification or Waiver.  No amendment, modification, waiver, termination or cancellation of this Agreement shall be binding or effective for any purpose unless it is made in a writing signed by the party against whom enforcement of such amendment, modification, waiver, termination or cancellation is sought. No course of dealing between or among the parties to this Agreement shall be deemed to affect or to modify, amend or discharge any provision or term of this Agreement. No delay on the part of Employer or Employee in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Employer or Employee of any such right or remedy shall preclude other or further exercise thereof. A waiver of right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.

10.11.    Severability.  Whenever possible each provision and term of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or term of this Agreement shall be held to be prohibited by or invalid under such applicable law, then such provision or term shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provisions or term or the remaining provisions or terms of this Agreement.

~~11.~~12. Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

~~12.~~13. Binding Effect. Each party hereto agrees to be bound by the provisions of this Agreement only upon the Effective Date.

~~13.~~14. Entire Agreement. This Agreement (together with all documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof

~~14.~~15. Notices. Any notices, consents or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service, or (d) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.

To Employer:           c/o Mail-Well, Inc.
                       23 Inverness Way East
                       Englewood, CO 801 12
                       Attention: Gerald F. Mahoney, Chairman
                       Fax: (303) 397-7400

To Employee:           To the last home address reflected
                       on the records of Employer

Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

~~15.~~16.        Construction. The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Agreement. This Agreement shall not be construed against any party for having drafted it. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

IN WITNESS WHEREOF, the undersigned have executed this Employment Agreement as of the date first above written.

"EMPLOYER":                              MAIL-WELL I CORPORATION


By:_____
Its:_____
Title:_____


"EMPLOYEE":



_____
Gerald Mitchell, Jr.

<u>PROMISSORY NOTE</u>

$400,000                                                                June __, 1999
                                                                Worcester, Massachusetts

FOR VALUE RECEIVED, Mail-Well I Corporation, a Delaware corporation (referred to as the "Borrower") hereby promises to pay to Thomas D. Brennan (hereinafter referred to as the "Payee"), at the address of the Payee in Holden, Massachusetts, the principal sum of Four Hundred Thousand and 00/100 Dollars ($400,000.00) or such part thereof as then remains unpaid and to pay interest from the date hereof on the whole amount of said principal sum remaining from time to time unpaid at the rate of _____ percent (_%) per annum until the principal hereof shall have been paid in full.

The Borrower agrees to pay monthlyfour installments of principal in equalmonthly payments of $_____. Interest shall be calculated upon the unpaid balance of principal on the basis of a 360-day year for each day of the year such balance of principal is actually outstanding and shall be payable in monthly installments together with payments of principal.payments of $100,000 on the sixth, twelfth, eighteenth and twenty-fourth month anniversaries of this Note.

This Note may be prepaid at any time, as a whole or in part, without premium or penalty. Such payments shall be credited first to any interest due and then to the remainder of the principal.

This Note is secured by a letter of credit issued by [Bank] in the form attached hereto as Exhibit A.

___ Presentment, demand, notice of dishonor, and protest and all or any other conditions precedent to the collection and enforcement of this Note are hereby waived by all makers, sureties, guarantors and endorsers and their successors and assigns.

Sureties, guarantors and endorsers authorize Payee and Borrower, without notice or demand and without affecting their liability hereunder, from time to time to: (a) renew, extend, accelerate or otherwise change the time for payment of, or otherwise change the terms of this Note or any part thereof, including increase or decrease of the rate of interest thereon; (b) take and hold security for the payment of this note, and exchange, enforce, waive and release any such security; (c) apply such security and direct the order or manner of sale thereof as Payee in his discretion may determine; and (d) release or substitute any one or more endorsers, guarantors or sureties of the Note.

Sureties, guarantors and endorsers waive any right to require Payee to: (a) proceed against Borrower; (b) proceed against or exhaust any security held from Borrower; or (c) pursue any other remedy in Payee's power whatsoever. Sureties, guarantors and endorsers waive any defense arising from any disability or other defense of Borrower or from the cessation from any cause whatsoever of the liability of Borrower. Until all obligations to Payee hereunder shall have been paid or satisfied in full, even though such obligation is in excess of sureties', guarantors',

and endorsers' liability hereunder, sureties, guarantors and endorsers shall have no right of subrogation, and waive any right to enforce any remedy which Payee now have or may hereafter have against Borrower, and waive any benefit of, and any right to participate in any security now or hereafter held by Payee.

In the event of its default Borrower shall pay all reasonable costs and expenses incurred by or on behalf of Payee in connection with Payee's exercise of any or all of its rights and remedies under this Note, including, without limitation, reasonable attorneys' fees.

No delay or admission on the part of the Payee in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. A waiver of any right hereunder by Payee shall not be effective unless in writing and signed by said Payee. A waiver on any one occasion shall not be considered a bar to or waiver of any right and remedy of any future occasion.

The Borrower acknowledges receipt of a copy of this Note.

The laws of The Commonwealth of Massachusetts shall govern the formation, interpretation and enforcement of this Note and all rights, duties and interests created, incurred or arising pursuant to or in connection with this Note.

EXECUTED as a sealed instrument this ____ day of June, 1999.

MAIL-WELL I CORPORATION, INC.

By:_____
Its President

Signed in the presence of:

_____

# Exhibit D

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of October 18, 1999 (the "Effective Date"), by and between Thomas Brennan ("Executive") and MAIL-WELL I CORPORATION, a Delaware corporation ("Purchaser" or "Employer").

WHEREAS, concurrently with the execution and delivery of this Agreement, pursuant to that certain Stock Purchase Agreement dated October 18, 1999 (the "Purchase Agreement") between Purchaser, its parent company, Mail-Well, Inc. and Executive, as shareholder of NHC Corp., a Massachusetts corporation ("NHC"), Mail-Well is acquiring from the Executive, among others, 33-1/3% of the issued and outstanding shares of stock of NHC, parent company of Northeastern Envelope Manufacturing, Inc. ("Northeastern"); and

WHEREAS, Purchaser desires to continue Executive's employment with Northeastern and the Executive wishes to continue such employment, upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and agreements set forth herein the parties hereto agree as follows:

1.      <u>Employment</u>. Employer hereby agrees to employ Executive, and Executive hereby accepts such employment with Employer, for a term commencing on the Effective Date and terminating as provided under Section 4 (the "Employment Period").

2.      <u>Duties</u>. The Executive will have the title of Divisional Vice President, Northeastern Envelope, with such duties and responsibilities as are assigned or delegated to the Executive by the Board of Directors of Employer (the "Board"), the Chief Executive Officer of Purchaser (the "Chief Executive Officer"), the CEO of Purchaser's Envelope Division (the "CEO"), or such other individual or individuals as shall be designated by the Board, the Chief Executive or the CEO. Executive will be expected to devote two (2) days per week to the business of Employer during the Employment Period, which days shall be determined by the Divisional President of Northeastern, and on such days the Executive will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of the Employer. Executive shall be employed at Northeastern's present facility located at 1515 Washington Street, Braintree, MA, or such other location as the business of Northeastern may be moved within the greater Boston metropolitan area. The Executive understands and agrees that in the performance of his duties he shall at all times be subject to the control and supervision of the CEO or such other individual or individuals as shall be designated by Chief Executive Officer or the Board. The Executive shall comply with the policies, procedures and regulations of Employer as may be provided or communicated to Executive from time to time during the Employment Period.

3.      <u>Compensation and Benefits</u>.

        (a)     Employer will pay Executive a base salary at the rate of $75,000 per annum during the Employment Period, payable in such installments as is the policy of Employer from time

to time with respect to its employees. In addition Executive shall be entitled to participate in Employer's bonus program based on increased profitability as may be instituted and amended from time to time by Employer. To the extent permitted under the terms of Employer's benefit plans, Executive will be considered a full-time exempt employee for purposes of participation in such plans. Executive will be credited with his years of service with Northeastern for purposes of determining eligibility under Employer's benefit plans.

(b)    Executive will be permitted to participate in such pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans.

4.    <u>Termination of Employment</u>. The Employment Period, the Executive's compensation and benefits (except as specifically provided under the terms of such benefits) and any and all other rights of the Executive under this Agreement or otherwise as an employee of the Employer will terminate on the earliest to occur of the following events (the "Termination Date")

(a)    At any time the Employer may, in its sole discretion, discharge the Executive for "cause," effective immediately upon providing the Executive with notice of his dismissal. The only occurrences which shall constitute "cause" within the meaning of this paragraph shall be the following:

(i)    the conviction of the Executive by a court of competent jurisdiction of a crime involving moral turpitude (or the entering of a no-contest or nolo contendere plea by Executive in regard to such crime); or

(ii)    the commission by the Executive of an act of fraud or bad faith upon the Employer; or

(iii)    the willful misappropriation of any funds or property of the Employer by the Executive; or

(iv)    the willful, continued and unreasonable failure by the Executive to perform his duties or obligations under this Agreement; or

(v)    the breach of any material provisions hereof or the engagement by the Executive, without the prior written approval of the Employer, in any activity which would violate the provisions of that certain Non-Competition Agreement by and between Executive and Purchaser of even date herewith.

(b)    The death or disability of the Executive; or

(c)    The voluntary termination by Executive of his employment hereunder, with or without cause, which may occur at any time after Employer receives notice from Executive of intent to terminate ("Voluntary Termination");

NortheasternEnv\L:\NortheasternEnv\A-Employ Brennan 2.wpd

- 2 -

(d)    The Company may, in its sole discretion, terminate the Executive without "cause," which term is defined in paragraph 4(a) hereof ("Involuntary Termination").

(e)    Unless sooner terminated by the Company or the Executive pursuant to the other provisions of this Section 4, this Agreement shall terminate on the second anniversary of the Effective date ("Expiration").

Upon termination of Executive's employment for any reason other than Involuntary Termination, Employer shall have no further obligation to pay salary or any fringe benefits or bonuses to Executive except for Executive's salary and any fringe benefits or bonuses accrued and unpaid through the Termination Date, which amounts shall be payable on the date such payments would have been made but for Executive's termination. In the event of Involuntary Termination, Employer shall have no obligation to the Executive other than to pay any salary, fringe benefits or bonuses that are accrued and unpaid through the Termination Date, and the salary and the value of health benefits otherwise payable to the Executive by the Employer for the period between the Termination Date and Expiration (as if the Involuntary Termination had not occurred) as provided under this Agreement. All payments of salary, fringe benefits and/or bonuses by the Employer to the Executive upon termination of the Employment Period for any reason shall be subject to Employer's right to obtain from the Executive a full and complete release, waiver and/or agreement not to sue in such form as is satisfactory to the Employer.

5.    Representation.  Executive represents and warrants to Employer that his execution and delivery of this Agreement does not conflict with, or result in the breach by Executive or violation by Executive of, any other agreement to which Executive is a party or by which Executive is bound.

6.    Remedies.  The parties hereto agree that Employer and the Purchasers would suffer irreparable harm from a breach by Executive of any of the covenants or agreements contained herein. Therefore, in the event of the actual or threatened breach by Executive of any of the provisions of this Agreement, Employer or the Purchasers may, in addition and supplementary to other rights and remedies existing in their favor, and notwithstanding the provisions of Section 10, apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any violation of the provisions hereof.

7.    Alternative Dispute Resolution.  In the event of claimed breach of this Agreement by any of the parties hereto, such dispute shall be submitted to alternative resolution in accordance with the terms of this Section. The party who is alleging that a dispute exists shall send a notice of such dispute to all other parties to this Agreement, setting forth the dispute, the parties involved and the position of such party with respect to the dispute. The parties to such dispute shall endeavor in good faith to select an alternative dispute resolution service to resolve the dispute and the rules that shall govern the resolution. If agreement as to the matters detailed in the preceding sentence is not reached within twenty business days of receipt of the notice, then, within ten business days thereafter, counsel for the parties shall mutually select as an arbitrator an attorney practicing in Denver, Colorado, who is experienced in commercial arbitration. If counsel for the parties are

NortheasternEnv\L:\NortheasternEnv\A-Employ Brennan 2.wpd

unable to agree upon the selection of the arbitrator, the arbitrator shall be selected by the American Arbitration Association (the "AAA"). The parties agree to share equally in the cost of conducting the arbitration, provided that the costs, fees (including attorney and expert fees) and other expenses incurred by either party in connection therewith shall remain the obligation of such party. Any disputes as to the rules for conducting the arbitration shall be resolved by reference to the AAA rules for commercial arbitration by the arbitrator. The arbitrator shall schedule a hearing on the disputed issues within forty business days after his or her appointment, and the arbitrator shall render his or her decision after the hearing, in writing, as expeditiously as possible, and shall deliver copies of such decision to the parties. A default judgment may be entered against any party who fails to appear at the arbitration hearing. Such decision and determination shall be final and unappealable and may be filed as a judgment of record in any jurisdiction designated by the successful party. The parties to this Agreement agree that this Section has been included to rapidly and inexpensively resolve any disputes among them with respect to the matters described above, and that this Section shall be grounds for dismissal of any court action commenced by any party with respect to a dispute arising out of such matters. Notwithstanding the foregoing, the parties hereto will be entitled to seek equitable relief in a court of competent jurisdiction with respect to those matters for which equitable relief is specified in this Agreement and those matters for which equitable relief is appropriate.

8.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of Employer, the Purchasers, their affiliates and their successors and assigns, and shall be binding upon and inure to the benefit of Executive and his legal representatives and assigns, provided that in no event shall Executive's obligations to perform services for Employer, the Purchasers and their affiliates be delegated or transferred by Executive. Employer and the Purchasers may assign or transfer their rights hereunder to a successor corporation in the event of merger, consolidation or transfer or sale of all or substantially all of the assets of Employer or the Purchasers or of Employer's or the Purchasers' business. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties to this Agreement and the Purchasers, and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

9.    <u>Modification or Waiver</u>.  No amendment, modification, waiver, termination or cancellation of this Agreement shall be binding or effective for any purpose unless it is made in a writing signed by the party against whom enforcement of such amendment, modification, waiver, termination or cancellation is sought. No course of dealing between or among the parties to this Agreement shall be deemed to affect or to modify, amend or discharge any provision or term of this Agreement. No delay on the part of Employer or Executive or the Purchasers in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Employer or Executive or the Purchasers of any such right or remedy shall preclude other or further exercise thereof. A waiver of right or remedy on any one occasion shall not be construed as a bar to or waiver of any such right or remedy on any other occasion.

10.    <u>Severability</u>.  Whenever possible each provision and term of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision or term of this Agreement shall be held to be prohibited by or invalid under such applicable law, then such provision or term shall be ineffective only to the extent of such prohibition or invalidity,

NortheasternEnv\L:\NortheasternEnv\A-Employ Brennan 2.wpd

without invalidating or affecting in any manner whatsoever the remainder of such provisions or term or the remaining provisions or terms of this Agreement.

11.    Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

12.    Binding Effect.  Each party hereto agrees to be bound by the provisions of this Agreement only upon the Effective Date.

13.    Entire Agreement. This Agreement (together with all documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and undertakings, both written and oral, among the parties with respect to the subject matter hereof.

14.    Notices.  Any notices, consents or other communication required to be sent or given hereunder by any of the parties shall in every case be in writing and shall be deemed properly served if (a) delivered personally, (b) sent by registered or certified mail, in all such cases with first class postage prepaid, return receipt requested, (c) delivered by a recognized overnight courier service, or (d) sent by facsimile transmission to the parties at the addresses as set forth below or at such other addresses as may be furnished in writing.

<div style="margin-left: 2em;">

To Employer:        *c/o* Mail-Well, Inc.
                    23 Inverness Way East
                    Englewood, CO 80112
                    Attention: General Counsel
                    Fax: (303) 566-7461

To Executive:       To the last home address reflected
                    on the records of Employer

</div>

Date of service of such notice shall be (w) the date such notice is personally delivered, (x) three business days after the date of mailing if sent by certified or registered mail, (y) one business day after date of delivery to the overnight courier if sent by overnight courier or (z) the next succeeding business day after transmission by facsimile.

15.    Construction.  The parties understand and acknowledge that they have each been represented by (or have had the opportunity to be represented by) counsel in connection with the preparation, execution and delivery of this Agreement.  This Agreement shall not be construed against any party for having drafted it. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

IN WITNESS WHEREOF, the undersigned have executed this Employment Agreement as of the date first above written.

EMPLOYER:                          MAIL-WELL I CORPORATION

                                   By: _____
                                        Roger Wertheimer
                                        Title: Vice President-General Counsel

EXECUTIVE:

                                   _____
                                   Thomas Brennan

# Exhibit E

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THOMAS D. BRENNAN | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-40034-FDS |
| | ) | |
| LIFE INSURANCE COMPANY | ) | |
| OF NORTH AMERICA | ) | |
| Defendant. | ) | |

## DEFENDANT LIFE INSURANCE COMPANY OF NORTH AMERICA'S SECOND REQUEST FOR PRODUCTION OF DOCUMENTS TO THE PLAINTIFF

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, the Defendant, Life Insurance Company of North America ("Defendant"), hereby requests that the Plaintiff, Thomas D. Brennan, produce the documents set forth below, within 30 days of service, to Defendant's counsel at the Offices of Crevier & Ryan, LLP, 1500 Main Street, Suite 2020, Springfield, Massachusetts 01115.

## DEFINITIONS

1. The term **"Plaintiff"** and **"you"** and/or **"your"** refers to the Plaintiff in this action, Thomas D. Brennan, and any agents, counsel, representatives, or other persons acting on Plaintiff's behalf.

2. The term **"Defendant"** refers to the defendants in this case, Life Insurance Company of North America and its respective agents, trustees, beneficiaries, officers, directors, employees, counsel, representatives, or other persons acting on its behalf.

3. The term **"Mail-Well"** refers to both Mail–Well 1 Corporation and its parent corporation, Mail-Well Corporation, and their respective parent(s), subsidiaries, affiliates,

1

predecessors, successors and assigns, officers, directors, employees, counsel, representatives or other persons acting on its behalf.

4.     The term **"Northeastern Envelope"** refers to Northeastern Envelope Manufacturing Corp. a/k/a Northeastern Envelope Manufacturing, Inc. and its parent corporation NHC Corp. and their parent(s), subsidiaries, affiliates, predecessors, successors and assigns, officers, directors, employees, counsel, representatives or other persons acting on its behalf.

5.     The term **"person"** shall mean and include a natural person, an individual, partnership, firm, corporation, or any other kind of business or legal entity, its agents, counsel, representatives, or other individuals acting on behalf of such entity or individual.

6.     The term **"communication(s)"** means any statement or statements made by a person or any utterance heard by a person whether in person, by telephone, on an answering machine or otherwise.

7.     The term **"document(s)"** means any physical object containing written or printed material or a physical image or sound, including but not limited to correspondence, memoranda, diaries, appointment calendars, reports, notes of meetings or telephone conversations, listings, summaries, computer printouts or handwritten or typed drafts of any of the above, recorded, graphic, photographic matter and sound reproductions, however produced or reproduced.

8.     The term **"medical service provider"** means doctors, hospitals, nurses, mental health practitioners, psychiatrists, psychologists, physical therapists, hospitals, radiologists, x-ray technicians, and any other person providing medical services.

9.     The terms **"relate"** means relates to, pertains to, concerns, consists of, refers to, reflects

on, shows or in any other way is logically or factually connected with, the matter discussed.

10.     The terms **"professional care and treatment"** means any care or treatment provided by doctors, hospitals, nurses, mental health practitioners, psychiatrists, psychologists, physical therapists, hospitals, and/or any other person providing medical services.

## INSTRUCTIONS

1.      With respect to any document which you withhold on a claim of privilege, provide a statement signed by an attorney representing you setting forth as to each document withheld:

   a.   The name of the sender of the document;

   b.   The name of the author of the document;

   c.   The name of the persons to whom the document was sent and those who actually received it;

   d.   The date of the document;

   e.   A general description of the subject matter of the document.

   f.   The statute, rule or decision, which is claimed to give rise to the privilege.

2.      If any request calls for the production of documents no longer in existence or no longer in your possession, identify as to each such document the information requested in subparagraphs a) through e) of the preceding paragraph and further identify the last known custodian and the last known location of any such document, and state the reason such document is no longer in existence or in your possession.

3.      If Plaintiff possesses numerous copies of a document responsive to a request, all varying copies must be produced, including all copies with hand or type written notes.

3

4.  In producing documents pursuant to this request, you should indicate the specific requests in response to which each document or group of documents is being produced.

## DOCUMENT REQUESTS

1.  All documents that relate to the Plaintiff's Employment Agreement with Mail-Well, entered into as of October 18, 1999, including without limitation any drafts, notes, addenda, or exhibits.

2.  All documents that relate to the Stock Purchase Agreement between NHC Corp. and Mail-Well, Inc. dated on or about October 18, 1999, including without limitation all documents that relate to any consideration paid or to be paid to Plaintiff by any party, and/or were signed by Plaintiff, and/or reference Plaintiff.

3.  All documents that relate to all forms of compensation that Plaintiff received from Northeastern Envelope from January 1, 1995 to the present, including without limitation, federal tax returns and W-2 forms for each year.

4.  All employment agreements between Plaintiff and any other person or entity from 1990 to the present, including without limitation Northeastern Envelope.

5.  All expense reimbursement forms or requests submitted by Plaintiff to Northeastern Envelope and/or Mail-Well from 1999 to the present.

6.  All severance plans in which Plaintiff participated since 1999 including without limitation the "Severance Plan Employees" referenced in the August 1, 2001 Letter from Mail-Well to Plaintiff stated that Brennan was terminated by Mail Well I Corporation on May 30, 2001 and that he is entitled to 15 weeks pay consistent with the "Severance Plan Employees."

4

Respectfully Submitted,

Defendant Life Insurance Company
of North America,

By its Attorneys,

CREVIER & RYAN, LLP.

David B. Crevier, BBO# 5557242
Katherine R. Parsons, BBO # 657280
1500 Main Street, Suite 2020
Springfield, MA 01115-5727
Tel:  413-787-2400
Facsimile:  413-781-8235
Email: dcrevier@crevierandryan.com
        kparsons@crevieranryan.com

## CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the foregoing on all counsel of record, by first class U.S. Mail, postage prepaid, said service having taken place this 23 day of January 2005.

# Exhibit F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  05-40034-FDS

|                                        |     |
|----------------------------------------|-----|
| THOMAS D. BRENNAN,                     | )   |
|       Plaintiff, | )   |
|                                        | )   |
| v.                                     | )   |
|                                        | )   |
| LIFE INSURANCE COMPANY                 | )   |
| OF NORTH AMERICA,                      | )   |
|       Defendant. | )   |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S SECOND
## REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Federal Rules of Civil Procedure 33, Plaintiff Thomas D. Brennan ("Plaintiff") hereby responds to Defendant's Second Request for Production of Documents as follows:

### GENERAL OBJECTIONS

1.     Plaintiff objects to each and every request to the extent that it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.

2.     Plaintiff objects to each and every request to the extent that it purports to establish a continuing duty to supplement, or seeks to impose a duty beyond those imposed by the Federal Rules of Civil Procedure.

3.     Each of the General objections shall be deemed to apply to each of Defendant's separate requests, even if a response or further objection is otherwise provided.

### RESPONSES

Request No. 1

All documents that relate to the Plaintiff's Employment Agreement with Mail-Well, entered into as of October 18, 1999, including without limitation any drafts, notes, addenda, or exhibits.

Response No. 1

Plaintiff objects to this request on the grounds that it is ambiguous, overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and impermissibly invades the attorney-client privilege and the work product doctrine. Plaintiff further objects to Request No. 1 on the ground that the Employment Agreement requested here has already been produced or is already in the possession of Defendant as part of Gerald P. Mitchell's deposition. Without waiving these objections, Plaintiff will make available for inspection the non-privileged portion of his attorney's file relating to the subject matter of this request.

Request No. 2

All documents that relate to the Stock Purchase Agreement between NHC Corp. and Mail-Well, Inc. dated on or about October 18, 1999, including without limitation all documents that relate to any consideration paid or to be paid to Plaintiff by any party, and/or were signed by Plaintiff, and/or reference Plaintiff.

Response No. 2

Plaintiff objects to this request on the grounds that it is ambiguous, overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and impermissibly invades the attorney-client privilege and the work product doctrine. Plaintiff further objects to Request No. 2 on the ground that the Stock Purchase Agreement requested here has already been produced or is already in the possession of Defendant as part of Gerald P. Mitchell's deposition. Without waiving these objections, Plaintiff will make available for inspection the non-privileged portion of his attorney's file relating to the subject matter of this request.

Request No. 3

All documents that relate to all forms of compensation that Plaintiff received from Northeastern Envelope from January 1, 1995 to the present, including without limitation, federal tax returns and W-2 forms for each year.

Response No. 3

Plaintiff objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence, overbroad, unduly burdensome, and unreasonably invasive of the privacy rights of Lucille Brennan, Plaintiff's wife. Without waiving these objections, Plaintiff will agree to produce W-2 Forms for himself for the years in question.

Request No. 4

All employment agreements between Plaintiff and any other person or entity from 1990 to the present, including without limitation Northeastern Envelope.

Response No. 4

Plaintiff objects to this request on the ground that the Employment Agreement with Northeastern Envelope requested in Request No. 1, which is subsumed in this request, has already been produced or already in the possession of Defendant as part of Gerald P. Mitchell's deposition. Plaintiff further objects to Request No. 4 on the ground that the specified time period is overbroad and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, after a diligent search, Plaintiff agrees that a request for such documents since January 4, 1955, is reasonable, and that after a diligent search he has not found any other responsive documents.

Request No. 5

All expense reimbursement forms or requests submitted by Plaintiff to Northeastern Envelope and/or Mail-Well from 1999 to the present.

3

Response No. 5

Plaintiff objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence, overbroad, and unduly burdensome. Without waiving these objections, after a diligent search, Plaintiff states that he has not found any such responsive documents.

Request No. 6

All severance plans in which Plaintiff participated since 1999 including without limitation the "Severance Plan Employees" referenced in the August 1, 2001 Letter from Mail-Well to Plaintiff stated that Brennan was terminated by Mail Well I Corporation on May 30, 2001 and that he is entitled to 15 weeks pay consistent with the "Severance Plan Employees."

Response No. 6

Plaintiff will agree to produce a document entitled "Agreement, Release & Waiver," dated August 1, 2001. After a diligent search, Plaintiff states that he has not found any other responsive documents.

Respectfully submitted,
THOMAS D. BRENNAN
By his Attorney,

George A. Balko III, Esquire, BBO # 548872
BOWDITCH & DEWEY, LLP
311 Main Street, P.O. Box 15156
Worcester, MA  01615-0156
(508) 791-3511
gbalko@bowditch.com

Dated:  March __, 2006

4

## **CERTIFICATE OF SERVICE**

I, George A. Balko III, hereby certify that I have this 2nd day of March 2006 served by hand delivery to opposing counsel Plaintiff's Response to Defendant's Second Request for Production of Documents.


_____
George A. Balko III

5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-40034-FDS

THOMAS D. BRENNAN,  )
                    Plaintiff,  )
                                )
v.                              )    LIST OF PRIVILEGED DOCUMENTS
                                )
LIFE INSURANCE COMPANY          )
OF NORTH AMERICA,               )
                    Defendant.  )

| Date | Author(s) | Recipient(s) | Description | Privilege Asserted |
|------|-----------|--------------|-------------|---------------------|
| July 2, 1998 | Thomas Brennan | Robert Longden (Bowditch & Dewey) | Facsimile attaching June 29, 1998 letter of intent to purchase the stock for review and stating Lucille Brennan will draft a power of attorney for Longden. | Attorney/Client |
| August 24, 1999 | Thomas Brennan | Robert Longden (Bowditch & Dewey) | Facsimile requesting comments on attached proposal memo to Mahoney. | Attorney/Client |

Respectfully submitted,
THOMAS D. BRENNAN
By his Attorney,

George A. Balko III, Esquire, BBO # 548872
BOWDITCH & DEWEY, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511
gbalko@bowditch.com

Dated: March 2, 2006

{Client Files\LIT\021859\0100\00666576.DOC;1}

## **CERTIFICATE OF SERVICE**

    I, George A. Balko III, hereby certify that I have this 2nd day of March 2006 served by hand delivery to opposing counsel Plaintiff's List of Privilege Documents.

George A. Balko III

# Exhibit G

10/11/99 Review of 10/7/99 changes to SPA & Exhibit [illegible] Non-Compete & [illegible] [illegible] Note

1.) SPA - p. 24 - [illegible] issue

Pay off letter?
Comfort letter?

10/11/99 TC To [illegible]

1/ NO [illegible] for Jerry's son
2/ Terms employment agreement [illegible]
(iii) 2 - reflect 2 days per week
(ii) Continued full time employee for all benefits (including vacation & employee [illegible] programs.

(iii) delete 4(d)
(iv) [illegible] employ at Westin credited for purposes of [illegible] & benefits — credit for all years at Westin

3. Jerry — same comment — also two years — need to agree side letter agreement.

P4

4. Non-Compete —
(d)(1)(a)(ii) — "provide services to [illegible] 500 [illegible] Jerry
(b) to (ii) & (iii) [illegible] 3 years & [illegible] leave & go to [illegible] & [illegible] outside purchasing — will he be able to work [illegible]
Make that Clear

10/6/99    Meeting of Tim & Jerome

1) Delivered Steel Cliff both TF & Jerry

2) Sheldon Papers — Tim will copy & by Monday

3) W/ regard to health insurance for Zoeller
   That Jerry will have by Sept in every t
   _____ health insurance "— W-W
   will not pay full of Tim & Jerry's
   health insurance — will pay for that job
   that they normally pay for for the 9 glass +
   Tim & Jerry will pay the rest.

BSL  4) ~~Explain~~ Put in writing what agreement is
   (is where two & feel that Tim & Jerry not
   resp for it) — What happens if accrued vacation too

   ~~Tim Explain Cost~~
   5) ~~Men Come to~~ weekdays

Ask on     ~~40K~~ not sure to well fin w/ get too a
Monday.   full time glass ( health, life etc.
   40K eighty + hours

   6) Record Chng to Second AILF LOC's
   If Tim & Jerry & Jerry after Jerry & take Zoeller
   Jerry need _____ _____ original.

# Exhibit H



**NORTHEASTERN
ENVELOPE MFG. CORP.**
1515 WASHINGTON STREET
BRAINTREE, MA 02184

NOTIFIED
JUL 2 0 1998
*1200 nium*

DATE _7/20/98_    TIME _1100 HRS._  ☐ A.M.  ☐ P.M.    NUMBER OF PAGES
(Including Cover Letter): _____

NOTE: If you did not receive all of the pages or if you have a question, please call the verifying number (below).

| TO: BoB Longden | FROM: Tom Brennan |
|---|---|
| CO. NAME  B + D | NAME |
| ADDRESS | SUBJECT |
| ATTENTION | FAX NO.  (617) 843-4743 |
| FAX NO.  508-756-7636 | VERIFYING NO.  (617) 843-4900 |

# FAX Transmission

REMARKS:

BoB –
Please see Attached letter from Colo. + my response.
F.Y.I.

Regards,
Tom

P.S.

49.    .49!    49?!

HA – HA – HA.

# FAX

| | |
|---|---|
| **Date** | 6-3-.98 |
| **Number of pages including cover sheet** | 11 |

**TO:** _Lucy Brennan_

**Phone**

**Fax Phone**   508-791- 1201

**FROM:**   Kevin R. Howley
Mail-Well
23 Inverness Way East,
Ste 160
Englewood, CO  80112

**Phone**       303-768-7391
**Fax Phone**  303-397-7401

**CC:**

**REMARKS:**   ☐ Urgent   ☐ For your review   ☐ Reply ASAP   ☐ Please Comment

Sorry this didn't get out yesterday.

We have attempted to address most of the questions raised by Tom + Rory.

Please call with any further questions. We are very excited about this opportunity.

# Mail-Well

■ 23 Inverness Way East, Suite 150
Englewood, Colorado 80112
(303) 788-7391  (303) 397-7401 Fax

■
**Kevin R. Hensley**
*Vice-President - Treasurer*

June 29, 1998

Ms. Lucy Brennan
C/O Fletcher, Tilton and Whipple
370 Main Street
Worcester, MA 01608

Mr. Jerry Mitchell
C/O Ms. Lucy Brennan

Mr. Rory Smith
Fleet Venture
50 Kennedy Plaza
Providence, RI 02903

Dear Friends:

Mail-Well, Inc. is pleased to submit this letter of intent to purchase the stock of Northeastern Envelope Mfg. Corp. and NHC Corp. (the "Company"). This letter does not constitute a binding agreement except with respect to paragraphs 9 and 12. Mail-Well, Inc. or one of its subsidiaries (the "Buyer") will purchase all of the issued and outstanding common stock of the Company (the "Shares") as follows:

1.  Transaction

    The Shares will be purchased on the date of closing at the price specified below, excluding cash.

2.  Purchase Price

    The purchase price will be $3,800,000 payable to the Shareholders of the Company (the "Sellers") in cash or in Mail-Well, Inc. common stock at closing. In the event that the Shareholders choose to receive some or all of the proceeds in Mail-Well, Inc. common stock, the price of such stock shall be based on the average closing price for the five (5) days prior to closing date.

June 29, 1998
Page 2

3.   Cash Distributions/Price Adjustments

The Sellers agree that the working capital of the Company at closing shall equal the average monthly working capital of the Company for the twelve (12) month period ending May 31, 1998, calculated as current assets minus current liabilities. Cash, the current portion of Debt, as defined below, and income tax related receivables and payables will be excluded from the calculation. In the event that the working capital at closing is less than such average, the Buyer shall be entitled to a dollar-for-dollar reduction in the purchase price in the amount of such difference. In the event that the working capital is greater than such average, the Sellers shall be entitled to receive the amount of the difference in cash as additional purchase price.

The Sellers will guarantee the accounts receivables sold. Any amounts in excess of the accrual for bad debt as of the closing date that remain uncollected by the Buyer 150 days after closing may be turned back to the Sellers for collection, with a corresponding offset from the escrow (described in paragraph 5 below).

A complete physical inventory will be taken by the Sellers and observed by the Buyer immediately preceding the closing. Inventory will be valued at FIFO in accordance with generally accepted accounting principals applied on a consistent basis. The Sellers will guarantee that the closing date inventory will have been realized or has retained its value, net of any accrual for obsolete or overvalued inventory, within one-hundred twenty (120) days of closing, with a corresponding offset from escrow for any shortfall.

If there is a disagreement on the calculation of working capital, the net realized value of the accounts receivable or the net realized value of the closing date inventory, the contract will provide that the independent accountants for each company will try to settle this disagreement. If this is not possible, then an independent accounting firm will act as arbitrator to settle the final amounts.

4.   Debt

The Sellers shall deliver the Company to the Buyer free and clear of all Debt, and all other security interests, liens or encumbrances of any kind. In the alternative, Buyer may pay or otherwise discharge some or all of the Debt at closing, and deduct the amount of such Debt from the purchase price to be paid to Sellers at closing. "Debt" shall be defined to include any and all monies owed to banks, leasing companies, or the like, whether short-term, long-term or characterized as "line of credit" debt, and including any and all overdrafts and/or prepayment penalties of any kind. Debt shall not include the ordinary accounts payable of the Company included in working capital.

June 29, 1998
Page 3

5.    <u>Escrow</u>

There will be an interest bearing escrow totaling $300,000 to secure the above price adjustments, as well as the representations, warranties and indemnities in the contract. An amount not to exceed $50,000 of the escrow shall be released to the Sellers upon final resolution of the working capital, inventory and accounts receivables, as discussed above. The remaining escrow, after settlement of any other open issues, will be paid to the Sellers on the second anniversary of the closing date.

6.    <u>Non-Competition Agreements/Employment Agreements</u>

Sellers, except for Fleet Venture, will sign a Non-Competition Agreement with the Buyer to cover the printing industry in the United States, which shall commence upon the closing date and shall terminate on the latter of five (5) years after the closing date or two (2) years following their respective separation of employment with the Buyer. Messrs. Jerry Mitchell and Tom Brennan will receive employment agreements at their 1997 compensation levels for a period of three years.

7.    <u>Purchase Conditions</u>

This offer is contingent upon the following conditions being satisfied within a due diligence period to begin after the execution of this Letter of Intent by Sellers and Buyer.

    a.    The Buyer's complete satisfaction with customary due diligence, including but not limited to review of the Company's financial and operating records — its assets and liabilities, technological threats to its business, its leases, permits, licenses, environmental reporting, contracts and agreements, its customer and supplier relationships, and continuity of its key employees after closing. The methodology and timing of Buyer's due diligence shall be mutually agreed upon by the Buyer and Sellers.

    b.    Sellers complying with the provisions of any local laws with respect to transfer of ownership of the Shares.

    c.    Final approval by the Board of Directors of Buyer.

June 29, 1998
Page 4

8.    Certain Conditions Precedent

In addition to other conditions of a type customarily provided for in a transaction of this nature, the Buyer's obligation to consummate the transaction described herein will be subject to the following conditions:

    a.   Sellers shall provide Buyer with all information in their possession regarding the environmental condition of the Company's plant site.

    b.   Up to the closing date there shall have been no material adverse change in the assets, business or prospects of the Company from that reflected in the most recent financial statements provided to Buyer. In addition, no assets of the Company having a replacement cost in excess of $10,000 shall have been destroyed or damaged, nor will there be any material diminution in the fixed assets by sale or other disposition as of the date of the most recent financial statements provided to Buyer.

    c.   There will be no dividend paid or change in compensation for the owners or other key employees since the date of the most recent financial statements provided to Buyer, other than in the ordinary course of business. For purposes of this paragraph, Buyer and Sellers acknowledge that the Company normally pays bonuses and gives salary increases. Sellers agree that such salary increases shall not exceed the Company's current wage scale or predate normal review time periods for any individual and that total bonuses shall be consistent with past practices.

    d.   The Sellers agree to operate the Company in a customary and usual manner through Closing, including maintaining normal levels of receivables, inventory, and accounts payable.

9.    Exclusivity Period

In consideration of the time and expense required by the Buyer to satisfy the conditions necessary to close this transaction, it is agreed that the Buyer shall have an exclusive option to purchase the Shares of the Company on the terms contained in this Letter of Intent for a period of 60 days. During this period, the Sellers agree not to discuss in any manner the sale of the Company with any third party. At the end of this period, both parties may mutually agree to extend this Exclusivity Period based on the then status of this transaction.

June 29, 1998
Page 5

10.    Contract

A formal purchase agreement shall supersede this Letter of Intent. This purchase agreement will contain all the usual and customary representations, warranties and indemnifications, including but not limited to indemnification for claims arising out of any pre-closing events, and all liabilities of the Company, except those expressly assumed by the Buyer in the purchase agreement. Closing shall take place as promptly as practical following the execution of the purchase agreement.

11.    Expenses of the Parties

Buyer and Sellers shall each be responsible for their own expenses.

12.    Other Matters

Since the Buyer is a public company, it will become necessary that a press release be made with regard to this acquisition. The Buyer shall control the content and timing of any such press release, although Buyer will review the content of such press release with the Sellers before it is released. In no event will the press release be made public before the signing of a definitive purchase agreement.

Sincerely,

Mail-Well, Inc.


By _____
        Kevin R. Howley
        Vice President, Treasurer

Agreed this ____ day of _____ ____, 1998

_____

By _____

H:/Howley/Neenwll-intent.doc

June ~~1,~~ 22, 1998

Ms. Lucy Brennan
C/O Fletcher, Tilton and Whipple
370 Main Street
Worcester, MA 01608

Mr. Jerry Mitchell
C/O Ms. Lucy Brennan

Mr. Rory Smith
Fleet Venture
50 Kennedy Plaza
Providence, RI 02903

Dear Friends:

Mail-Well, Inc. is pleased to submit this letter of intent to purchase the stock of Northeastern Envelope Mfg. Corp. and NHC Corp. (the "Company"). This letter does not constitute a binding agreement except with respect to paragraphs 9 and 12. Mail-Well, Inc. or one of its subsidiaries (the "Buyer") will purchase all of the issued and outstanding common stock of the Company (the "Shares") as follows:

1.    Transaction

The Shares will be purchased on the date of closing at the price specified below, excluding cash.

2.    Purchase Price

The purchase price will be $3,800,000 payable to the Shareholders of the Company (the "Sellers") in cash or in Mail-Well, Inc. common stock at closing. In the event that the Shareholders choose to receive some or all of the proceeds in Mail-Well, Inc. common stock, the price of such stock shall be based on the average closing price for the five (5) days prior to closing date.

June 1.29, 1998
Page 2

3.    Cash Distributions/Price Adjustments

The Sellers agree that the working capital of the Company at closing shall equal the average monthly working capital of the Company for the twelve (12) month period ending May 31, 1998, calculated as current assets minus current liabilities. Cash, the current portion of Debt, as defined below, and income tax related receivables and payables will be excluded from the calculation. In the event that the working capital at closing is less than such average, the Buyer shall be entitled to a dollar-for-dollar reduction in the purchase price in the amount of such difference. In the event that the working capital is greater than such average, the Sellers shall be entitled to receive the amount of the difference in cash as additional purchase price.

The Sellers will guarantee the accounts receivables sold. Any amounts in excess of the accrual for bad debt as of the closing date that remain uncollected by the Buyer 120 150 days after closing may be turned back to the Sellers for collection, with a corresponding offset from the escrow (described in paragraph 5 below).

A complete physical inventory will be taken by the Sellers and observed by the Buyer immediately following preceding the closing. Inventory will be valued at FIFO in accordance with generally accepted accounting principals applied on a consistent basis. The Sellers will guarantee that the closing date inventory will have been realized or has retained its value, net of any accrual for obsolete or overvalued inventory, within ninety (90) one-hundred twenty (120) days of closing, with a corresponding offset from escrow for any shortfall.

If there is a disagreement on the calculation of working capital, the net realized value of the accounts receivable or the net realized value of the closing date inventory, the contract will provide that the independent accountants for each company will try to settle this disagreement. If this is not possible, then an independent accounting firm will act as arbitrator to settle the final amounts.

4.    Debt

The Sellers shall deliver the Company to the Buyer free and clear of all Debt, and all other security interests, liens or encumbrances of any kind. In the alternative, Buyer may pay or otherwise discharge some or all of the Debt at closing, and deduct the amount of such Debt from the purchase price to be paid to Sellers at closing. "Debt" shall be defined to include any and all monies owed to banks, leasing companies, or the like, whether short-term, long-term or characterized as "line of credit" debt, and including any and all overdrafts and/or

June 1, 29, 1998
Page 3

prepayment penalties of any kind. Debt shall not include the ordinary accounts payable of the Company included in working capital.

5. Escrow

There will be an interest bearing escrow totaling $380,000 $300,000 to secure the above price adjustments, as well as the representations, warranties and indemnities in the contract. An amount not to exceed $100,000 $50,000 of the escrow shall be released to the Sellers upon final resolution of the working capital, inventory and accounts receivables, as discussed above. The remaining escrow, after settlement of any other open issues, will be paid to the Sellers on the second anniversary of the closing date.

6. Non-Competition Agreements/Employment Agreements

Sellers, except for Fleet Venture, will sign a Non-Competition Agreement with the Buyer to cover the printing industry in the United States, which shall commence upon the closing date and shall terminate on the latter of five (5) years after the closing date or two (2) years following their respective separation of employment with the Buyer. Messrs. Jerry Mitchell and Tom Brennan will receive employment agreements at their 1997 compensation levels for a period of three years.

7. Purchase Conditions

This offer is contingent upon the following conditions being satisfied within a due diligence period to begin after the execution of this Letter of Intent by Sellers and Buyer.

   a. The Buyer's complete satisfaction with customary due diligence, including but not limited to review of the Company's financial and operating records — its assets and liabilities, technological threats to its business, its leases, permits, licenses, environmental reporting, contracts and agreements, its customer and supplier relationships, and continuity of its key employees after closing. The methodology and timing of Buyer's due diligence shall be mutually agreed upon by the Buyer and Sellers.

   b. Sellers complying with the provisions of any local laws with respect to transfer of ownership of the Shares.

   e. Final approval by the Board of Directors of Buyer.

June 1, 29, 1998
Page 4

8.    **Certain Conditions Precedent**

In addition to other conditions of a type customarily provided for in a transaction of this nature, the Buyer's obligation to consummate the transaction described herein will be subject to the following conditions:

    a.    Sellers shall provide Buyer with all information in their possession regarding the environmental condition of the Company's plant site.

    b.    Up to the closing date there shall have been no material adverse change in the assets, business or prospects of the Company from that reflected in the most recent financial statements provided to Buyer.  In addition, no assets of the Company having a replacement cost in excess of $10,000 shall have been destroyed or damaged, nor will there be any material diminution in the fixed assets by sale or other disposition as of the date of the most recent financial statements provided to Buyer.

    c.    There will be no dividend paid or change in compensation for the owners or other key employees since the date of the most recent financial statements provided to Buyer, other than in the ordinary course of business. For purposes of this paragraph, Buyer and Sellers acknowledge that the Company normally pays bonuses and gives salary increases.  Sellers agree that such salary increases shall not exceed the Company's current wage scale or predate normal review time periods for any individual and that total bonuses shall be consistent with past practices.

    d.    The Sellers agree to operate the Company in a customary and usual manner through Closing, including maintaining normal levels of receivables, inventory, and accounts payable.

9.    **Exclusivity Period**

In consideration of the time and expense required by the Buyer to satisfy the conditions necessary to close this transaction, it is agreed that the Buyer shall have an exclusive option to purchase the Shares of the Company on the terms contained in this Letter of Intent for a period of 60 days.  During this period, the Sellers agree not to discuss in any manner the sale of the Company with any third party.  At the end of this period, both parties may mutually agree to extend this Exclusivity Period based on the then status of this transaction.

June 1-29, 1998
Page 5

10.    Contract

A formal purchase agreement shall supersede this Letter of Intent. This purchase agreement will contain all the usual and customary representations, warranties and indemnifications, including but not limited to indemnification for claims arising out of any pre-closing events, and all liabilities of the Company, except those expressly assumed by the Buyer in the purchase agreement. Closing shall take place as promptly as practical following the execution of the purchase agreement.

11.    Expenses of the Parties

Buyer and Sellers shall each be responsible for their own expenses. ~~The cost of any government filings will be shared equally between the Buyers and Sellers.~~

12.    Other Matters

Since the Buyer is a public company, it will become necessary that a press release be made with regard to this acquisition. The Buyer shall control the content and timing of any such press release, although Buyer will review the content of such press release with the Sellers before it is ~~released.~~ released. In no event will the press release be made public before the signing of a definitive purchase agreement.

Sincerely.

Mail-Well, Inc.

By _____
     Kevin R. Howley
     Vice President, Treasurer

Agreed this ____ day of _____, 1998

_____

By _____



**NORTHEASTERN
ENVELOPE MFG. CORP.**
1515 WASHINGTON STREET
BRAINTREE, MA 02184

DATE 7/16/98    TIME 4:50    ☐ A.M. ☑ P.M.    NUMBER OF PAGES (Including Cover Letter): 3

NOTE: If you did not receive all of the pages or if you have a question, please call the verifying number (below).

**TO:** Kevin Howley, V.P.    **FROM:** Tom Brennan

CO. NAME  Mailwell    NAME

ADDRESS    SUBJECT

ATTENTION    FAX NO.    (617) 843-4743

FAX NO.  303-397-7401    VERIFYING NO.    (617) 843-4900

# FAX Transmission

REMARKS:  Kevin -

PLEASE SEE ATTACHED PROPOSED ALTERATIONS TO THE LETTER OF INTENT OF 6/29/98.

PLEASE CALL ME WITH YOUR COMMENTS. I WILL BE AT 781-843-4900 UNTIL 7PM TONIGHT. IF I DON'T HEAR FROM YOU TODAY, I WILL CALL YOU TOMORROW.

BEST REGARDS,
Tom

*Hawley*
*on*
*7/17/98*     *wceeB twoDtg — out on Monday*

PROPOSED AMENDMENTS TO LETTER OF INTENT OF 6/29/98.

PARAGRAPH 3 CASH DISTRIBUTIONS

IN SUB PARAGRAPH 3, DELETE ALL AFTER SECOND SENTENCE; ADD:

" SELLERS AND BUYER WILL AGREE ON INVENTORY VALUE PRIOR TO
CLOSE."

THIS IS A ONE PLANT OPERTION WITH INVENTORY RUNNING WELL BELOW
$1.5 MILLION  GENERALLY; MUCH OF THAT IS RAW MATERIAL, AND ADDITIONAL
AMOUNTS ARE FINISHED GOODS FOR WHICH THE CUSTOMER HAS ALREADY
PAID.
WHEN WE BOUGHT THE COMPANY IN 1985, WE AGREED ON INVENTORY
VALUES AT THE CLOSE. YOUR TEAM SHOULD HAVE NO TROUBLE DETERMINING
INVENTORY VALUES, AND THERE IS NO REASON WE SHOULD DELAY
REACHING AGREEMENT ON THOSE VALUES. IF YOU HAVE A PROBLEM
WITH ANY OF OUR INVENTORY VALUES, WE SHOULD RESOLVE IT
AS PART OF THE CLOSE.

PARAGRAPH 6 NON-COMPETITION AGREEMENT

THE FINAL SENTENCE SHOULD READ:

" MESSRS. JERRY MITCHELL AND TOM BRENNAN WILL RECEIVE EMPLOYMENT
AGREEMENTS FOR A PERIOD OF FIVE YEARS. THEIR BASE ANNUAL SALARY WILL
BE AT THEIR 1997 TOTAL COMPENSATION ( I.E., MR MITCHELL AT $300,000,
MR. BRENNAN AT $125,000.) ANY ADDITIONAL RAISES OR BONUSES WILL BE
ADDRESSED IN THEIR CONTRACTS."

YOU SHOULD KEEP IN MIND THAT MR.BRENNAN HAS OTHER BUSINESS INTERESTS
AND IS NOT AND WILL NOT BE INVOLVED WITH NORTHEASTERN ENVELOPE
ON A FULL TIME BASIS.

ALSO, MR.MITCHELL WOULD LIKE TO MODIFY THE POST EMPLOYMENT
NON-COMPETITION CLAUSE. HIS CONCERN IS THAT HE WILL BE 67 YEARS
OLD AT THE CONCLUSION OF HIS EMPLOYMENT AGREEMENT, AND IF A
DISASTER SHOULD BEFALL HIS FAMILY, HE HAS TO BE ABLE TO PROVIDE
FOR THEM.

ALSO, AS I HAVE MENTIONED TO YOU AND MR.MAHONEY PREVIOUSLY, MR. MITCHELL
WILL REQUIRE SOME ASSURANCE ON THE CONTINUED EMPLOYMENT FOR THE
LONG TERM OF HIS SON, WHO IS LEARNING DISABLED AND IS EMPLOYED
BY NORTHEASTERN ENVELOPE IN A MAINTENANCE POSITION.

PARAGRAPH 8 CERTAIN CONDITIONS PRECEDENT

ADD SUB PARAGRAPHS AS FOLLOWS:

"E. ALL NECESSARY THIRD PARTY APPROVALS SHALL HAVE BEEN OBTAINED."

"F. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED ELSEWHERE
IN THIS LETTER,BONUSES FOR ANY EMPLOYEES OF NORTHEASTERN ENVELOPE,
CONSISTENT WITH PRIOR LEVELS AND ON A PRO RATA BASIS FOR LESS THAN

A FULL  FISCAL YEAR, MAY BE APPROVED AND PAID PRIOR TO THE CLOSE."

"G .IF EMPOLYMENT AGREEMENTS ARE NOT EXECUTED BETWEEN EITHER
MR. MITCHELL OR MR.BRENNAN AND MAILWELL, SELLERS ARE RELEASED
FROM ANY REQUIREMENT TO PROCEED WITH THE CONTEMPLATED
TRANSACTION."

# Exhibit I

**NORTHEASTERN
ENVELOPE MFG. CORP.**
1515 WASHINGTON STREET
BRAINTREE, MA 02184

NOTIFIED

JUL 21 1998

BY: Cook Kim

DATE __7/21/98__ TIME __1745__ ☐ A.M. ☐ P.M.

NUMBER OF PAGES
(Including Cover Letter): __14__

NOTE: If you did not receive all of the pages or if you have a question, please call the verifying number (below).

TO: Bob Longden

CO. NAME B+D

ADDRESS

ATTENTION

FAX NO. 508-756-7636

FROM: Tom Brennan

NAME

SUBJECT

FAX NO. (617) 843-4743

VERIFYING NO. (617) 843-4900

# FAX Transmission

REMARKS: See Attached - Just received.

Tom

**FLETCHER, TILTON & WHIPPLE, P.C.**
370 Main Street, 12th Floor
Worcester, MA 01608

Telephone:   (508) 798-8621
Facsimile:   (508) 791-1201

## FACSIMILE COVER SHEET

Date: _7/21/98_

TO:                                    FROM: _LBB_

NAME: _Thomas Brennan_       CLIENT CODE: _____

COMPANY: _Northeastern Envelope_ Time Transmitted: _____

CITY/STATE: _____            By: _____

TELECOPIER NUMBER: _781-843-4243_

BUSINESS TELEPHONE: _2_

We are sending a total of _13_ pages, including this cover
sheet. If you do not receive the indicated pages, please call
us at (508) 798-8621 as soon as possible so that we can check
it for you.

COMMENTS:

_Confidential_

THE INFORMATION CONTAINED IN THIS FAX MESSAGE IS INTENDED ONLY
FOR THE PERSONAL AND CONFIDENTIAL USE OF THE DESIGNATED
RECIPIENTS NAMED ABOVE. THIS MESSAGE MAY BE AN ATTORNEY-CLIENT
COMMUNICATION AND AS SUCH IS PRIVILEGED AND CONFIDENTIAL. IF
THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR AN
AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT,
YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN
ERROR AND THAT ANY REVIEW, DISSEMINATION, DISTRIBUTION, OR
COPYING OF THIS MESSAGE IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US
IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL TO US BY
MAIL. THANK YOU.

# FAX

| | |
|---|---|
| | **Date** 7-21-98 |
| | **Number of pages including cover sheet** |

**TO:** Lucy Brennan

**Phone**

**Fax Phone** 508-791-1201

**FROM:** Kevin R. Howley

Mail-Well

23 Inverness Way East, Ste 160

Englewood, CO 80112

**Phone** 303-768-7391

**Fax Phone** 303-397-7401

**CC:**

**REMARKS:** ☐ Urgent  ☐ For your review  ☐ Reply ASAP  ☐ Please Comment

Attached please find the letter of intent. Please notice
that the employment agreement term length is
three years. We recognize that, as part of
negotiating that agreement, will need to develop a
mechanism for retaining key people beyond that
period of the company wants to retain them.

# Mail-Well

22 Inverness Way East, Suite 160
Englewood, Colorado 80112
(303) 788-7391  (303) 397-7401 Fax

Kevin R. Nowley
Vice-President - Treasurer

July 21, 1998

Ms. Lucy Brennan
C/O Fletcher, Tilton and Whipple
370 Main Street
Worcester, MA 01608

Mr. Jerry Mitchell
C/O Ms. Lucy Brennan

Mr. Rory Smith
Fleet Venture
50 Kennedy Plaza
Providence, RI 02903

Dear Sirs and Madam:

Mail-Well, Inc. is pleased to submit this letter of intent to purchase the stock of Northeastern Envelope Mfg. Corp. and NHC Corp. (the "Company"). This letter does not constitute a binding agreement except with respect to paragraphs 9 and 12. Mail-Well, Inc. or one of its subsidiaries (the "Buyer") will purchase all of the issued and outstanding common stock of the Company (the "Shares") as follows:

1.     Transaction

       The Shares will be purchased on the date of closing at the price specified below, excluding cash.

2.     Purchase Price

       The purchase price will be $3,800,000 payable to the Shareholders of the Company (the "Sellers") in cash or in Mail-Well, Inc. common stock at closing. In the event that the Shareholders choose to receive some or all of the proceeds in Mail-Well, Inc. common stock, the price of such stock shall be based on the average closing price for the five (5) days prior to closing date.

July 21, 1998
Page 2

3.    **Cash Distributions/Price Adjustments**

The Sellers agree that the working capital of the Company at closing shall equal the average monthly working capital of the Company for the twelve (12) month period ending June 30, 1998, calculated as current assets minus current liabilities. Cash, the current portion of Debt, as defined below, and income tax related receivables and payables will be excluded from the calculation. In the event that the working capital at closing is less than such average, the Buyer shall be entitled to a dollar-for-dollar reduction in the purchase price in the amount of such difference. In the event that the working capital is greater than such average, the Sellers shall be entitled to receive the amount of the difference in cash as additional purchase price.

A complete physical inventory will be taken by the Sellers and observed by the Buyer immediately preceding the closing. Appropriate reserves for bad debt and inventory will be established by Sellers before closing and will be included in the working capital calculation.

If there is a disagreement on the calculation of working capital, the contract will provide that the independent accountants for each company will try to settle this disagreement. If this is not possible, then an independent accounting firm will act as arbitrator to settle the final amounts.

4.    **Debt**

The Sellers shall deliver the Company to the Buyer free and clear of all Debt, and all other security interests, liens or encumbrances of any kind. In the alternative, Buyer may pay or otherwise discharge some or all of the Debt at closing, and deduct the amount of such Debt from the purchase price to be paid to Sellers at closing. "Debt" shall be defined to include any and all monies owed to banks, leasing companies, or the like, whether short-term, long-term or characterized as "line of credit" debt, and including any and all overdrafts and/or prepayment penalties of any kind. Debt shall not include the ordinary accounts payable of the Company included in working capital.

5.    **Escrow**

There will be an interest bearing escrow totaling $300,000 to secure the above price adjustments, as well as the representations, warranties and indemnities in the contract. An amount not to exceed $50,000 of the escrow shall be released to the Sellers upon final resolution of the working capital, as discussed above. The remaining escrow, after settlement of any other open issues, will be paid to the Sellers on the second anniversary of the closing date.

July 21, 1998
Page 3

6.    <u>Non-Competition Agreements/Employment Agreements</u>

Sellers, except for Fleet Venture and Mr. Tom Brennan, will sign a Non-Competition Agreement with the Buyer to cover the printing industry in the Eastern United States, which shall commence upon the closing date and shall terminate on the latter of five (5) years after the closing date or two (2) years following their respective separation of employment with the Buyer. Messrs. Jerry Mitchell and Tom Brennan will receive employment agreements at their 1997 compensation levels for a period of three years, with bonus objectives that are based on growth. Mr. Mitchell's son will receive a reasonable employment contract for a five-year period.

7.    <u>Purchase Conditions</u>

This offer is contingent upon the following conditions being satisfied within a due diligence period to begin after the execution of this Letter of Intent by Sellers and Buyer.

   a.    The Buyer's complete satisfaction with customary due diligence, including but not limited to review of the Company's financial and operating records -- its assets and liabilities, technological threats to its business, its leases, permits, licenses, environmental reporting, contracts and agreements, its customer and supplier relationships, and continuity of its key employees after closing   The methodology and timing of Buyer's due diligence shall be mutually agreed upon by the Buyer and Sellers.

   b.    Sellers complying with the provisions of any local laws with respect to transfer of ownership of the Shares.

   c.    Final approval by the Board of Directors of Buyer.

8.    <u>Certain Conditions Precedent</u>

In addition to other conditions of a type customarily provided for in a transaction of this nature, the Buyer's obligation to consummate the transaction described herein will be subject to the following conditions:

   a.    Sellers shall provide Buyer with all information in their possession regarding the environmental condition of the Company's plant site.

July 21, 1998
Page 4

    b. Up to the closing date there shall have been no material adverse change in the assets, business or prospects of the Company from that reflected in the most recent financial statements provided to Buyer. In addition, no assets of the Company having a replacement cost in excess of $10,000 shall have been destroyed or damaged, nor will there be any material diminution in the fixed assets by sale or other disposition as of the date of the most recent financial statements provided to Buyer.

    c. There will be no dividend paid or change in compensation for the owners or other key employees since the date of the most recent financial statements provided to Buyer, other than in the ordinary course of business. For purposes of this paragraph, Buyer and Sellers acknowledge that the Company normally pays bonuses and gives salary increases. Sellers agree that such salary increases shall not exceed the Company's current wage scale or predate normal review time periods for any individual and that total bonuses shall be consistent with past practices.

    d. The Sellers agree to operate the Company in a customary and usual manner through Closing, including maintaining normal levels of receivables, inventory, and accounts payable.

    e. All necessary third party approvals shall have been obtained.

    f. Notwithstanding anything to the contrary contained elsewhere in this letter, bonuses for any employees of Northeastern Envelope, consistent with prior levels and on a pro-rata basis for less than a full fiscal year, may be approved and either paid prior to closing or accrued for in the working capital.

    g. If employment agreements are not executed between either Mr. Mitchell or Mr. Brennan, Sellers are released from any requirement to proceed with this transaction.

9.    **Exclusivity Period**

In consideration of the time and expense required by the Buyer to satisfy the conditions necessary to close this transaction, it is agreed that the Buyer shall have an exclusive option to purchase the Shares of the Company on the terms contained in this Letter of Intent for a period of 60 days. During this period, the Sellers agree not to discuss in any manner the sale of the Company with any third party. At the end of this period, both parties may mutually agree to extend this Exclusivity Period based on the then status of this transaction.

July 21, 1998
Page 5

10. **Contract**

A formal purchase agreement shall supersede this Letter of Intent. This purchase agreement will contain all the usual and customary representations, warranties and indemnifications, including but not limited to indemnification for claims arising out of any pre-closing events, and all liabilities of the Company, except those expressly assumed by the Buyer in the purchase agreement. Closing shall take place as promptly as practical following the execution of the purchase agreement.

11. **Expenses of the Parties**

Buyer and Sellers shall each be responsible for their own expenses.

12. **Other Matters**

Since the Buyer is a public company, it will become necessary that a press release be made with regard to this acquisition. The Buyer shall control the content and timing of any such press release, although Buyer will review the content of such press release with the Sellers before it is released. In no event will the press release be made public before the signing of a definitive purchase agreement.

Sincerely,

Mail-Well, Inc.

By _____

Kevin R. Howley
Vice President, Treasurer

Agreed this ____ day of _____, 1998

_____

By _____

H:\Howley\Nxxrwl-inxnt.doc

JUL 21  98 11:42 FR MAIL-WELL EXEC OFC   303 397 7400 TO 915007911201      P.07/12

~~June 29~~ July 21, 1998


Ms. Lucy Brennan
C/O Fletcher, Tilton and Whipple
370 Main Street
Worcester, MA 01608

Mr. Jerry Mitchell
C/O Ms. Lucy Brennan

Mr. Rory Smith
Fleet Venture
50 Kennedy Plaza
Providence, RI 02903


Dear ~~Friends:~~ Sirs and Madam:

Mail-Well, Inc. is pleased to submit this letter of intent to purchase the stock of Northeastern Envelope Mfg. Corp. and NHC Corp. (the "Company"). This letter does not constitute a binding agreement except with respect to paragraphs 9 and 12. Mail-Well, Inc. or one of its subsidiaries (the "Buyer") will purchase all of the issued and outstanding common stock of the Company (the "Shares") as follows:

1.    Transaction

      The Shares will be purchased on the date of closing at the price specified below, excluding cash.

2.    Purchase Price

      The purchase price will be $3,800,000 payable to the Shareholders of the Company (the "Sellers") in cash or in Mail-Well, Inc. common stock at closing. In the event that the Shareholders choose to receive some or all of the proceeds in Mail-Well, Inc. common stock, the price of such stock shall be based on the average closing price for the five (5) days prior to closing date.

~~June 29~~ July 21, 1998
Page 2

3.  **Cash Distributions/Price Adjustments**

The Sellers agree that the working capital of the Company at closing shall equal the average monthly working capital of the Company for the twelve (12) month period ending ~~May 31~~ June 30, 1998, calculated as current assets minus current liabilities. Cash, the current portion of Debt, as defined below, and income tax related receivables and payables will be excluded from the calculation. In the event that the working capital at closing is less than such average, the Buyer shall be entitled to a dollar-for-dollar reduction in the purchase price in the amount of such difference. In the event that the working capital is greater than such average, the Sellers shall be entitled to receive the amount of the difference in cash as additional purchase price.

~~The Sellers will guarantee the accounts receivables sold. Any amounts in excess of the accrual for bad debt as of the closing date that remain uncollected by the Buyer 150 days after closing may be turned back to the Sellers for collection, with a corresponding offset from the escrow (described in paragraph 5 below).~~

A complete physical inventory will be taken by the Sellers and observed by the Buyer immediately preceding the closing. ~~Inventory will be valued at FIFO in accordance with generally accepted accounting principals applied on a consistent basis. The Sellers will guarantee that the closing date inventory will have been realized.~~ Appropriate reserves for bad debt and inventory will be established by Sellers before closing and will be included in the working capital calculation. ~~or has retained its value, nor of any accrual for obsolete or overvalued inventory, within one hundred twenty (120) days of closing, with a corresponding offset from escrow for any shortfall.~~

If there is a disagreement on the calculation of working capital, ~~the net realized value of the accounts receivable or the net realized value of the closing date inventory,~~ the contract will provide that the independent accountants for each company will try to settle this disagreement. If this is not possible, then an independent accounting firm will act as arbitrator to settle the final amounts.

4.  **Debt**

The Sellers shall deliver the Company to the Buyer free and clear of all Debt, and all other security interests, liens or encumbrances of any kind. In the alternative, Buyer may pay or otherwise discharge some or all of the Debt at closing, and deduct the amount of such Debt from the purchase price to be paid to Sellers at closing. "Debt" shall be defined to include any and all monies owed to banks, leasing companies, or the like, whether short-term, long-term or characterized as "line of credit" debt, and including any and all overdrafts and/or

~~June 29~~ July 21, 1998
Page 3

prepayment penalties of any kind. Debt shall not include the ordinary accounts payable of the Company included in working capital.

5.    Escrow

There will be an interest bearing escrow totaling $300,000 to secure the above price adjustments, as well as the representations, warranties and indemnities in the contract. An amount not to exceed $50,000 of the escrow shall be released to the Sellers upon final resolution of the working capital, ~~inventory and accounts receivables~~, as discussed above. The remaining escrow, after settlement of any other open issues, will be paid to the Sellers on the second anniversary of the closing date.

*why not more*

6.    Non-Competition Agreements/Employment Agreements

Sellers, except for Fleet Venture and Mr. Tom Brennan, will sign a Non-Competition Agreement with the Buyer to cover the printing industry in the Eastern United States, which shall commence upon the closing date and shall terminate on the latter of five (5) years after the closing date or two (2) years following their respective separation of employment with the Buyer. Messrs. Jerry Mitchell and Tom Brennan will receive employment agreements at their 1997 compensation levels for a period of three years, with bonus objectives that are based on growth. Mr. Mitchell's son will receive a reasonable employment contract for a five-year period.

7.    Purchase Conditions

This offer is contingent upon the following conditions being satisfied within a due diligence period to begin after the execution of this Letter of Intent by Sellers and Buyer.

  a.  The Buyer's complete satisfaction with customary due diligence, including but not limited to review of the Company's financial and operating records. — its assets and liabilities, technological threats to its business, its leases, permits, licenses, environmental reporting, contracts and agreements, its customer and supplier relationships, and continuity of its key employees after closing The methodology and timing of Buyer's due diligence shall be mutually agreed upon by the Buyer and Sellers.

  b.  Sellers complying with the provisions of any local laws with respect to transfer of ownership of the Shares.

  c.  Final approval by the Board of Directors of Buyer.

~~June 29,~~ July 21, 1998
Page 4

8.   **Certain Conditions Precedent**

In addition to other conditions of a type customarily provided for in a transaction of this nature, the Buyer's obligation to consummate the transaction described herein will be subject to the following conditions:

    a.   Sellers shall provide Buyer with all information in their possession regarding the environmental condition of the Company's plant site.

    b.   Up to the closing date there shall have been no material adverse change in the assets, business or prospects of the Company from that reflected in the most recent financial statements provided to Buyer.  In addition, no assets of the Company having a replacement cost in excess of $10,000 shall have been destroyed or damaged, nor will there be any material diminution in the fixed assets by sale or other disposition as of the date of the most recent financial statements provided to Buyer.

    c.   There will be no dividend paid or change in compensation for the owners or other key employees since the date of the most recent financial statements provided to Buyer, other than in the ordinary course of business. For purposes of this paragraph, Buyer and Sellers acknowledge that the Company normally pays bonuses and gives salary increases.  Sellers agree that such salary increases shall not exceed the Company's current wage scale or predate normal review time periods for any individual and that total bonuses shall be consistent with past practices.

    d.   ~~d.~~ The Sellers agree to operate the Company in a customary and usual manner through Closing, including maintaining normal levels of receivables, inventory, and accounts payable.

    e.   All necessary third party approvals shall have been obtained.

    f.   Notwithstanding anything to the contrary contained elsewhere in this letter, bonuses for any employees of Northeastern Envelope, consistent with prior levels and on a pro-rata basis for less than a full fiscal year, may be approved and either paid prior to closing or accrued for in the working capital.

*Fleet agreed*

# Exhibit J

AUG. 1 0 1998

**NORTHEASTERN
ENVELOPE MFG. CORP.**
1515 WASHINGTON STREET
BRAINTREE, MA 02184

DATE __8/10/98__ TIME _____ ☐ A.M. ☐ P.M.    NUMBER OF PAGES (including Cover Letter): __7__

NOTE: If you did not receive all of the pages or if you have a question, please call the verifying number (below).

TO: _Bob Loyden_    FROM: _Tom Brennan_

| CO. NAME | NAME |
| --- | --- |
| ADDRESS | SUBJECT |
| ATTENTION | FAX NO.   (617) 843-4743 |
| FAX NO.   508-756-7636 | VERIFYING NO.   (617) 843-4900 |

# FAX Transmission

REMARKS: Bob —

Hi — Please call me as soon as possible in the Attached.

Thanks.

Tom

## Mail-Well

- 23 Inverness Way East, Ste.160
  Englewood, Colorado 80112
  (303) 566-7471    (303) 768-7380 Fax

**Timothy Gilbert**
*Assistant Treasurer*

August 3, 1998

Ms. Lucy Brennan
C/O Fletcher, Tilton and Whipple
370 Main Street
Worcester, MA  01608

Mr. Jerry Mitchell
C/O Ms. Lucy Brennan

Mr. Rory Smith
Fleet Venture
50 Kennedy Plaza
Providence, RI  02903

Dear Sirs and Madam:

Attached please find a letter of intent to purchase the stock of Northeastern Envelope Mfg. Corp and NHC Corp.  The purchase price will be $3.8 million.

We believe the letter is consistent with your expectations and we look forward to completing this transaction.

Sincerely,

Timothy D. Gilbert
Assistant Treasurer

## Mail-Well

■ 23 Inverness Way East, Suite160
Englewood, Colorado 80112
(303) 790-8023

July 30, 1998

Ms. Lucy Brennan
C/O Fletcher, Tilton and Whipple
370 Main Street
Worcester, MA  01608

Mr. Jerry Mitchell
C/O Ms. Lucy Brennan

Mr. Rory Smith
Fleet Venture
50 Kennedy Plaza
Providence, RI  02903

Dear Sirs and Madam:

Mail-Well, Inc. is pleased to submit this letter of intent to purchase the stock of Northeastern Envelope Mfg. Corp. and NHC Corp. (the "Company"). This letter does not constitute a binding agreement except with respect to paragraphs 9 and 12. Mail-Well, Inc. or one of its subsidiaries (the "Buyer") will purchase all of the issued and outstanding common stock of the Company (the "Shares") as follows:

1.     <u>Transaction</u>

    The Shares will be purchased on the date of closing at the price specified below, excluding cash.

2.     <u>Purchase Price</u>

    The purchase price will be $3,800,000 payable to the Shareholders of the Company (the "Sellers") in cash or in Mail-Well, Inc. common stock at closing.  In the event that the Shareholders choose to receive some or all of the proceeds in Mail-Well, Inc. common stock, the price of such stock shall be based on the average closing price for the five (5) days prior to closing date.

July 30, 1998
Page 2

3.    Cash Distributions/Price Adjustments

The Sellers agree that the working capital of the Company at closing shall equal the average monthly working capital of the Company for the twelve (12) month period ending June 30, 1998, calculated as current assets minus current liabilities.  Cash, the current portion of Debt, as defined below, and income tax related receivables and payables will be excluded from the calculation.  In the event that the working capital at closing is less than such average, the Buyer shall be entitled to a dollar-for-dollar reduction in the purchase price in the amount of such difference.  In the event that the working capital is greater than such average, the Sellers shall be entitled to receive the amount of the difference in cash as additional purchase price.

A complete physical inventory will be taken by the Sellers and observed by the Buyer immediately preceding the closing.  Appropriate reserves for bad debt and inventory will be established by Sellers before closing and will be included in the working capital calculation.

If there is a disagreement on the calculation of working capital, the contract will provide that the independent accountants for each company will try to settle this disagreement.  If this is not possible, then an independent accounting firm will act as arbitrator to settle the final amounts.

4.    Debt

The Sellers shall deliver the Company to the Buyer free and clear of all Debt, and all other security interests, liens or encumbrances of any kind.  In the alternative, Buyer may pay or otherwise discharge some or all of the Debt at closing, and deduct the amount of such Debt from the purchase price to be paid to Sellers at closing.  "Debt" shall be defined to include any and all monies owed to banks, leasing companies, or the like, whether short-term, long-term or characterized as "line of credit" debt, and including any and all overdrafts and/or prepayment penalties of any kind.  Debt shall not include the ordinary accounts payable of the Company included in working capital.

5.    Escrow

There will be an interest bearing escrow totaling $300,000 to secure the above price adjustments, as well as the representations, warranties and indemnities in the contract.  An amount not to exceed $50,000 of the escrow shall be released to the Sellers upon final resolution of the working capital, as discussed above.  The remaining escrow, after settlement of any other open issues, will be paid to the Sellers on the second anniversary of the closing date.

July 30, 1998
Page 3

6.    <u>Non-Competition Agreements/Employment Agreements</u>

Lucy Brennan, Tom Brennan, and Jerry Mitchell will sign a Non-Competition Agreement with the Buyer to cover the printing industry in the Eastern United States, which shall commence upon the closing date and shall terminate on the latter of five (5) years after the closing date or two (2) years following their respective separation of employment with the Buyer. Messrs. Jerry Mitchell and Tom Brennan will receive employment agreements at their 1997 compensation levels of $300,000 for Messr. Mitchell and $125,000 for Messr. Brennan for a period of three years, with bonus objectives that are based on growth. Mr. Mitchell's son will receive a reasonable employment contract for a five-year period.

7.    <u>Purchase Conditions</u>

This offer is contingent upon the following conditions being satisfied within a due diligence period to begin after the execution of this Letter of Intent by Sellers and Buyer.

    a.  The Buyer's complete satisfaction with customary due diligence, including but not limited to review of the Company's financial and operating records – its assets and liabilities, technological threats to its business, its leases, permits, licenses, environmental reporting, contracts and agreements, its customer and supplier relationships, and continuity of its key employees after closing. The methodology and timing of Buyer's due diligence shall be mutually agreed upon by the Buyer and Sellers.

    b.  Sellers complying with the provisions of any local laws with respect to transfer of ownership of the Shares.

    c.  Final approval by the Board of Directors of Buyer.

8.    <u>Certain Conditions Precedent</u>

In addition to other conditions of a type customarily provided for in a transaction of this nature, the Buyer's obligation to consummate the transaction described herein will be subject to the following conditions:

    a.  Sellers shall provide Buyer with all information in their possession regarding the environmental condition of the Company's plant site.

    b.  Up to the closing date there shall have been no material adverse change in the assets, business or prospects of the Company from that reflected in the most recent financial statements provided to Buyer. In addition, no assets of the Company having a replacement cost in excess of $10,000 shall have been destroyed or damaged, nor will there be any material diminution in the fixed

July 30, 1998
Page 4

assets by sale or other disposition as of the date of the most recent financial statements provided to Buyer.

c.  There will be no dividend paid or change in compensation for the owners or other key employees since the date of the most recent financial statements provided to Buyer, other than in the ordinary course of business. For purposes of this paragraph, Buyer and Sellers acknowledge that the Company normally pays bonuses and gives salary increases. Sellers agree that such salary increases shall not exceed the Company's current wage scale or predate normal review time periods for any individual and that total bonuses shall be consistent with past practices.

d.  The Sellers agree to operate the Company in a customary and usual manner through Closing, including maintaining normal levels of receivables, inventory, and accounts payable.

e.  All necessary third party approvals shall have been obtained.

f.  Notwithstanding anything to the contrary contained elsewhere in this letter, bonuses for any employees of Northeastern Envelope, consistent with prior levels and on a pro-rata basis for less than a full fiscal year, may be approved and either paid prior to closing or accrued for in the working capital.

g.  If employment agreements are not executed between either Mr. Mitchell or Mr. Brennan, Sellers are released from any requirement to proceed with this transaction.

9.    <u>Exclusivity Period</u>

In consideration of the time and expense required by the Buyer to satisfy the conditions necessary to close this transaction, it is agreed that the Buyer shall have an exclusive option to purchase the Shares of the Company on the terms contained in this Letter of Intent for a period of 60 days. During this period, the Sellers agree not to discuss in any manner the sale of the Company with any third party. At the end of this period, both parties may mutually agree to extend this Exclusivity Period based on the then status of this transaction.

10.    <u>Contract</u>

A formal purchase agreement shall supersede this Letter of Intent. This purchase agreement will contain all the usual and customary representations, warranties and indemnifications, including but not limited to indemnification for claims arising out of any pre-closing events, and all liabilities of the Company, except those expressly assumed by the Buyer in the

# Exhibit K

# CREVIER & RYAN, LLP

ATTORNEYS AT LAW

TOWER SQUARE
1500 MAIN STREET, SUITE 2020
SPRINGFIELD, MASSACHUSETTS 01115-5727

TELEPHONE (413) 787-2400

FAX (413) 781-8235

**David B. Crevier \***
**Michael P. Ryan**
**Katherine R. Parsons ♦◊**

\* Also admitted in NY
♦ Also admitted in RI
◊ Also admitted in CT

February 8, 2007

George A. Balko, III, Esq.
Bowditch & Dewey, LLP.
311 Main Street, P.O. Box 15156
Worcester, MA 01608-0156

Re:     Thomas D. Brennan v. Life Insurance Company of North America
        U.S. District Court Civil Action No. 05-40034-FDS

Dear Attorney Balko:

As you know, in response to Defendant's request for production of documents, Mr. Brennan produced the majority of Attorney Longden's file relating to the sale of NHC Stock to MailWell I Corporation in 1999. Mr. Brennan withheld two documents from production, a July 2, 1998 facsimile from Mr. Brennan to Attorney Longden and an August 24, 1999 facsimile from Mr. Brennan to Attorney Longden, identifying them as protected by the attorney-client privilege. The documents Mr. Brennan did produce included notes of telephone conversations between Mr. Brennan and Mr. Longden, as well as other correspondence between Mr. Brennan and Mr. Longden. As explained below, the production of these documents constitutes a waiver of the attorney-client privilege and the July 2, 1998 and August 24, 1999 facsimiles must be produced.

The First Circuit has explained that the waiver of the attorney-client privilege – whether intentional or inadvertent – "will be deemed to encompass all other communications on the same subject." Texaco Puerto Rico, Inc., et al. v. Department of Consumer Affairs, et al., 60 F.3d 867, 883-84 (1st Cir. 1995); In Re Lernout & Hauspie Securities Litigation, 222 F.R.D. 29, 34-35 (D.Mass. 2004)(relying on Texaco to conclude that if an inadvertent waiver constitutes a waiver of all other communications on the same subject, then an intentional waiver has the same result). In this case, the July 2, 1998 and August 24, 1999 facsimiles clearly have to do with the sale of NHC stock to MailWell, the same subject of the disclosed documents. Consequently, Mr. Brennan has waived the attorney-client privilege with respect to the July 2, 1998 and August 24, 1999 facsimiles and they must be produced.

Please produce these documents by February 16, 2007. Thank you.

Very truly yours,

Katherine R. Parsons