UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS D. BRENNAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 05-40034-FDS |
| | ) | George A. Balko III |
| LIFE INSURANCE COMPANY | ) | BBO No. 548872 |
| OF NORTH AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S REQUEST FOR FINDINGS OF FACT

NOW COMES the Plaintiff, Thomas D. Brennan ("Brennan"), and respectfully submits

the following and requests this Honorable Court to make the following Findings of Fact.

Plaintiff also respectfully requests that he be given leave, at the conclusion of the trial, to file

Supplemental Requests for Findings of Fact as appropriate to conform to the evidence presented

at trial.

1.      Plaintiff Thomas D. Brennan ("Brennan") brought this action to obtain Long

Term Disability benefits due him from Life Insurance Company of North America ("LINA")

since November 2001.

2.      On July 12, 1985, N.H.C. Corporation ("N.H.C.") was incorporated in the

Commonwealth of Massachusetts. At this time, Brennan served as N.H.C.'s president.

3.      On September 13, 1985, N.H.C. acquired the stock of Northeastern Envelope

Manufacturing Corporation and North American Envelope Company (collectively

"Northeastern").

4.      Following this acquisition, Northeastern became a subsidiary of N.H.C.

5.      At the time of N.H.C.'s acquisition of Northeastern's stock, Gerald Mitchell ("Mitchell") became president and Brennan became the vice president of Northeastern.

6.      Brennan remained as president of the parent company N.H.C. at this time.

7.      In November 1993, while vice president of N.H.C. and Northeastern, Brennan, with additional investors, acquired Noreast Fresh, Inc. ("NE Fresh").

8.      Brennan was president of NE Fresh until February 1996, at which time he ceased all management duties.

9.      NE Fresh was sold in November 1997, and Brennan had no further association with the entity.

10.     In or about 1997, the Northeastern shareholders felt the business climate would better serve Northeastern if they sold it to a larger entity, and began soliciting companies, including Mail-Well Corporation ("Mail-Well").

11.     Mitchell assumed the presidency of N.H.C. in January 1998.  At the same time, Brennan took the position of vice president of N.H.C.

12.     On June 29, 1998, Mail-Well forwarded a Letter of Intent to purchase the stock of N.H.C. and Northeastern to its stockholders.

13.     At that time, Lucille Brennan, Brennan's wife, and Mitchell jointly owned 33-1/3% of N.H.C. stock and N.H.C. owned 100% of the issued and outstanding capital stock of Northeastern.  The other shares of N.H.C. stock were owned by outside venture capitalists.

14.     On October 15, 1999, Lucille Brennan transferred her shares of N.H.C. stock to Brennan.

2

15.     A Stock Purchase Agreement was signed by Brennan, Mitchell, and Mail-Well ("Stock Purchase Agreement"), and the buyout of N.H.C. and Northeastern by Mail-Well was completed on October 18, 1999.

16.     A separate stock purchase agreement with the capital venture partners of their ownership interests in N.H.C. was negotiated separately and confidentially.

17.     Pursuant to the Stock Purchase Agreement, Mitchell was to receive $500,000 in cash at closing and a Promissory Note in the amount of $380,000 for a term of two years.

18.     Brennan was to receive $100,000 in cash at closing and two Promissory Notes; one in the amount of $140,000 for a term of two years and a second in the amount of $400,000 for a term of two years.

19.     Although Brennan and Mitchell owned the same amount of stock, there were tax benefits to Mail-Well to structure their portions of the Stock Purchase Agreement differently.

20.     Mail-Well does not have any records that reflect why Brennan's and Mitchell's stock sales were structured as they were.

21.     After N.H.C. and Northeastern were sold, Mitchell became the divisional president of Mail-Well's Northeastern Division and Brennan became its divisional vice president.

22.     The "Northeastern Division" was, in all material respects, what had previously been Northeastern Envelope.

23.     Brennan and Mitchell negotiated separately with Mail-Well to determine their salaries.

24.     Brennan and Mitchell entered into separately negotiated Employment Agreements with Mail-Well on or about October 18, 1999.

25.    As president of the Mail-Well Northeastern Division, Mitchell received yearly compensation of $171,600.

26.    Mitchell's 1998 W-2 tax return in connection with his employment at Northeastern showed income of $303,896.11, including salary and bonuses.

27.    Prior to the sale of Northeastern and N.H.C. to Mail-Well, Brennan's base annual salary, exclusive of any bonus, was approximately $66,000.00.

28.    Brennan's 1998 W-2 from Northeastern reflected income of $128,051.41, including salary and bonuses.

29.    After the sale of Northeastern and N.H.C. to Mail-Well, Brennan's base salary as vice president of Mail-Well's Northeastern Division was $75,000 annually.

30.    Brennan did not want to commit all of his business and professional time and attention to Mail-Well, even though he did not have an interest in any other business at the time he negotiated his Employment Agreement.  Nonetheless, he wanted to maintain flexibility for future opportunities to invest or become involved in another venture if such a situation arose.

31.    Pursuant to the terms of Brennan's Employment Agreement with Mail-Well, he was required to spend two days a week physically at the Mail-Well Northeastern Division's facility at 1515 Washington Street, Braintree, Massachusetts (the "Braintree Facility").

32.    Brennan's Employment Agreement did not restrict the number of hours Brennan would work for Mail-Well.

33.    Brennan's Employment Agreement did not address where Brennan could perform his duties when not at the Braintree Facility.

4

34.    While employed by Mail-Well, Brennan was subject to the control and supervision of the Chief Executive Officer ("CEO") of Mail-Well, or such other individual or individuals designated by the CEO or Mail-Well Board of Directors.

35.    Paul Reilly, Mail-Well's then CEO, never directly controlled or supervised Brennan's work.  Brennan reported solely to Mitchell, who directed all of Brennan's work activities.

36.    Mitchell's responsibilities included Mail-Well's Northeastern Division's overall operation, sales, personnel, and manufacturing and the ultimate responsibility for the finances of the Northeastern Division.

37.    Brennan was a salaried employee of Mail-Well and was not entitled to overtime.

38.    Brennan did not submit time sheets to Mail-Well.

39.    At all times relevant hereto, all of Brennan's pay stubs reflect that he worked a 40-hour week.

40.    Brennan's job responsibilities at Mail-Well included the oversight of all accounting, human resources, benefits, safety committee, selected personnel, banking, insurance, and tax matters; the coordination of these issues with corporate headquarters; business strategy; and special projects.  He was expected to be a leader and to analyze, anticipate, and solve problems at the plant.

41.    From 1985 through the buy-out of Northeastern and N.H.C. by Mail-Well, Brennan worked at least 40 hours a week, usually spending at least three days a week at the Braintree Facility and working from home the remainder of the time.

42.    After Northeastern and N.H.C. were sold, Brennan continued working both at home and at the Braintree Facility.

5

43.     Brennan devoted about the same amount of time after the acquisition to working for Mail-Well as he devoted to Northeastern before the acquisition.

44.     During his employment at Mail-Well, rather than the three days per week he had previously worked there, Brennan spent two days a week at the Braintree Facility.

45.     After Mail-Well's purchase of N.H.C. and Northeastern Envelope, Brennan spent more than two days a week at the Braintree Facility whenever it was necessary.

46.     Brennan's primary focus for both Northeastern and Mail-Well was to make as much money as possible for each company.

47.     Brennan performed basically the same job functions after the buy-out by Mail-Well that he did before.

48.     The majority of Brennan's job efforts did not have to be performed at the Braintree Facility.

49.     While working from home, Brennan performed business operation and financial analysis, prepared financial and production reports, spoke to clients and suppliers, and kept regular, daily contact with Mitchell concerning matters affecting Northeastern Envelope and Mail-Well's Northeastern Division.

50.     As such, from the time Brennan and Mitchell first acquired Northeastern until Brennan's last work day at Mail-Well, Mitchell authorized Brennan to work wherever he was most efficient, including his home.

51.     Around the time of the Stock Purchase Agreement, Brennan and Mitchell discussed and agreed that Brennan would work from home three days a week.

52.     There was no one at Northeastern or at Mail-Well other than Mitchell who had the knowledge and experience to evaluate what Brennan was doing.  No one else at Mail-Well,

6

including its CEO, was ever involved in supervising Brennan's duties, performance or hours worked.

53.     Mail-Well did not maintain and does not possess any documentation or information related to how many days or hours a week Brennan worked. Mail-Well officially only wanted to know if the business was performing and the managers were meeting their responsibilities.

54.     Over the course of his employment, Mitchell usually spoke to Brennan at least once a day, sometimes several times a day. Mitchell would make calls to and receive work-related calls from Brennan while Brennan was working from home.

55.     Besides Brennan, only Mitchell knew the time Brennan spent accomplishing his employment responsibilities.

56.     After the sale of Northeastern Envelope to Mail-Well, Brennan worked sixteen or more hours per week at the plant.

57.     Mitchell was on the phone with Brennan every day, sometimes several times a day. From their conversations and from Brennan's work product, Mitchell knew that Brennan was working on and tending to things that needed to be done; e.g., analyzing business activities and finances.

58.     After the sale to Mail-Well, Mitchell frequently would ask Brennan to analyze productivity of sales and anything else that had to do with the integral operations of the company.

59.     Mitchell was intimately familiar with the kind of work that went into getting the work product that Brennan was returning to him.

60.    Mitchell could tell that Brennan was working at least forty hours a week based on knowing what needed to be done to produce the work product Brennan presented each week.

61.    While other people at Mail-Well may have known some of the work Brennan generated, none had direct knowledge of exactly what Brennan had to do other than Brennan and Mitchell.

62.    There was no other Mail-Well employee who spoke with Brennan as much or as thoroughly as Mitchell.

63.    Other than fund raising or bank relations, Brennan's other duties after the sale to Mail-Well were essentially the same as they were before the sale.  That continued until he finished working at Mail-Well.

64.    Before the sale to Mail-Well in October 1999, Brennan would sometimes be at the Braintree Facility six days a week; other weeks he would be there five days per week, and never less than three days per week.  Frequently, Brennan would be at the Braintree Facility late into the evenings.

65.    Mitchell had the authority to direct Brennan's work and where he performed that work.

66.    In exercising his authority to supervise Brennan, Mitchell allowed him to work at home.

67.    In exercising his authority to supervise Brennan, Mitchell directed Brennan to work when and where Brennan determined would be the most effective to produce the required work product and to make the company profitable.  Mitchell gave Brennan the authority to decide when and where he needed to work, and they jointly decided that it was most effective for him to work at home on certain projects.

8

68.    It was a necessary element of Brennan's work to be as efficient as he could be and as effective in making Northeastern Manufacturing profitable, both before and after the sale to Mail-Well.

69.    Until Brennan stopped working on May 29, 2001, he regularly worked at least a 40-hour week, and sometimes more.

70.    Brennan gave written reports on virtually everything he was involved in, including but not limited to:  employee performance, safety, productivity, maintenance, employee problems, customer relations, financial analysis, and financial relations with other divisions of Mail-Well, customers, banks, etc.

71.    Brennan's analysis of productivity was usually oral and could be given as frequently as daily.  Brennan reviewed written production reports every day.

72.    LINA is a member of the CIGNA Group of Insurance Companies ("CIGNA").

73.    Mail-Well offered at all relevant times a long-term disability plan to its employees that was issued by LINA.

74.    LINA or CIGNA drafted the Group Long-Term Disability Income Policy for Salaried Employees that Mail-Well offered to its employees (the "Plan").

75.    Mail-Well served as the Plan Administrator.

76.    As Plan Administrator, Mail-Well provided plan information to its employees, maintained employee information and screened applicants for benefits eligibility.

77.    On or about March 28, 2000, Mail-Well solicited and accepted Brennan's application for enrollment in long-term disability benefits offered by Mail-Well, which coverage began on April 1, 2000.

78.     On or about November 14, 2000, Mail-Well again solicited and accepted Brennan's application for re-enrollment in its long-term disability policy plan, which was effective January 1, 2001.

79.     Brennan has a long history of significant work efforts.

80.     Brennan obtained his first employment at 12 years old showing movies on weekends.

81.     Brennan began high school at age 12 and graduated at 16 from Hoboken High School in New Jersey.  While attending high school, he worked announcing basketball games and did extensive work in electrical and audiovisual areas for performances held in the school auditorium.  This stage work occurred one to three times a year for a couple of months at a time.

82.     Brennan matriculated Stonehill College at age 16 in 1967.  However, he ran out of money and returned to Hoboken.

83.     Brennan obtained a job on the New York Stock Exchange in early 1968 as a page. He was promoted from the brokerage floor to the bond room.  After a short while, he took and passed a test and became a reporter.  After that time he was promoted to bond specialist and worked for a year in that capacity.

84.     On his 18th birthday Brennan volunteered for the Army draft.  He entered service at Ft. Dix with several hundred recruits.  Nine months latter, due to his diligence, he was one of only five of the 200 in his enrollment group promoted to Sergeant.

85.     After his discharge in the Army in January 1971, Brennan returned to Stonehill College.  During the 3½-year-time at Stonehill, he worked eight hours in a warehouse, five days a week.  He got up at 5:00 a.m. each day, went to school, went to work, and studied on the weekends.  He graduated *summa cum laude* from Stonehill College in 1974.

{Client Files\LIT\021859\0100\PLD\00950194.DOC;4}

86.    Due to his high grades, Brennan received an academic scholarship to the

University of Notre Dame.  He earned a masters degree in Government and International Studies,

completing a two-year program in one year.

87.    After graduating from Notre Dame, he worked for a short while as a reporter for

the *Quincy Patriot Ledger* newspaper.

88.    In 1976, Brennan began work for the Town of Walpole doing grant writing work

and whatever else the town administrator assigned to him.

89.    From 1977 through 1982, Brennan worked at the City of Worcester, Office of

Planning and Community Development, in the Economic Development section.  After two years,

he became head of the Economic Development office.  He self-educated himself on finances,

how to obtain loans, reading balance sheets, and reading other financial information.

90.    In 1982 Brennan left employment with the City of Worcester and began Brennan

Business Consultants.  The purpose of this business was to help other businesses get commercial

and urban development loans.  He worked full time at this business for two to three years.

91.    Around 1984, Brennan to look for a profitable business to buy.  Hearing that

Northeastern Envelope Manufacturing Company was up for sale, he explored this possibility.

Brennan had no experience in envelope manufacturing.  He did figure out how to get financial

investments to buy the business.  With Gerald Mitchell and venture capitalists, he bought the

business for $5 million.

92.    Northeastern Envelope Manufacturing Company ran profitably on an annual basis

from 1985 until it was sold to Mail-Well Corporation in 1999.

11

93.     From the time he purchased the company, Brennan's typical work arrangement was to go to the plant in Braintree, Massachusetts, approximately three days a week. He did a lot of other work from home.

94.     During all of this time, Brennan was vice president of Northeastern Envelope Manufacturing Company.

95.     In late 1993, while still working full time at Northeastern Envelope Manufacturing Company, Brennan organized a food company, Boston Celery a/k/a NorEast Fresh. Brennan put together financing and got investors for the creating of Boston Celery. He remained as president until 1996.

96.     During the time he worked at Boston Celery, Brennan held two full-time jobs working approximately 100 hours a week in total.

97.     After he stopped working for Boston Celery, Brennan never ran another business operation. However, he continued working 40 or more hours a week for Northeastern Envelope, both before and after it was sold to Mail-Well in October 1999.

98.     Although he did not run another business operation, from time to time after 1996 Brennan contemplated doing so. At the time he negotiated the sale of Northeastern Envelope Manufacturing Company to Mail-Well, he was contemplating starting an investment business.

99.     Brennan did incorporate an investment business known as T. Brennan Enterprises, Inc. However, that company never actually operated.

100.    The purpose of the provision in Brennan's Employment Agreement stating that he was to work two days per week for Mail-Well, after it acquired Northeastern Envelope Manufacturing Company, was to document that Brennan would only be physically present at the

12

Braintree facility of Northeastern Envelope Manufacturing Company two days per week, rather than the three days per week he had routinely been there before the sale.

101.    Brennan knew, based on his 14 years of work experience at Northeastern Envelope Manufacturing Company before the sale of that company to Mail-Well, that he worked much more efficiently on financial matters away from the physical plant, and away from the distractions of having to deal with other employees.

102.    Brennan also wanted to have to be physically present at the plant only two days a week so as to retain flexibility for his other contemplated business activities, including the P. Brennan Enterprises investment company concept, and to leave himself maximum flexibility for when and where he had to perform the job duties as vice president of Northeastern Envelope, after its acquisition by Mail-Well.

103.    Other than reducing the minimum number of days Brennan would work at the Braintree facility from three to two, the only other significant reduction in Brennan's job duties after the acquisition of his company by Mail-Well was that he no longer had to seek out and obtain outside financing for business operations or expansions.

104.    The reduction in job responsibility by eliminating the need to raise capital for operations or expansion at the Northeastern Envelope division of Mail-Well was offset by additional internal accounting, coordination, and communication duty that arose by Northeastern Envelope becoming party of Mail-Well Corporation, a national corporation with numerous manufacturing and distribution facilities throughout the United States.

105.    Brennan was aware by May 29, 2001, when he left his job at Mail-Well on disability, that Mail-Well was considering restructuring options but he was not aware they had made any decision to close the Northeastern Division.

13

106.    Mail-Well did not announce it planned to close its Northeastern Division until June 14, 2001.

107.    The Northeastern Division did not actually close until June or July 2002.

108.    Mail-Well offered to its employees a restated Severance Plan for Non-Union Mail-Well Employees ("Severance Package") that covered all full-time employees as of May 30, 2001. It is unclear if Mail-Well offered Brennan a separate Severance Plan dated May 29, 2001; however, Brennan requested and received a Severance Package.

109.    Because of the ambiguity in Brennan's Employment Agreement concerning full-time employment, Mail-Well's Human Resources Department asked Mail-Well's Legal Department to determine Brennan's eligibility for the Severance Package.

110.    The Legal Department determined that Brennan was eligible, and he was paid severance benefits.

111.    LINA first received notice of Brennan's claim for long-term disability benefits on or about August 27, 2001.

112.    On August 31, 2001, LINA requested that Mail-Well provide eligibility information for Brennan.

113.    On September 6, 2001, Mail-Well's response was provided by a PayTech Consultant worker hired by Mail-Well to provide temporary human resources services. The temporary worker responded that Brennan was terminated on May 30, 2001, had signed a full agreement release and waiver and was not eligible for benefits.

114.    LINA asked Mail-Well of whether Brennan was working partial hours. Another PayTech Consultant temporary worker replied on September 12, 2001, that Brennan was under

{Client Files\LIT\021859\0100\PLD\00950194.DOC;4}

contract with Mail-Well to be considered a full-time employee for benefit purposes even though he worked partial days.

115.    Mail-Well did not know or keep track of how many hours Brennan worked.

116.    Deborah Flynn-Martin, now Deborah Martin, a person responsible for Human Resources at the Northeastern Division, did not know what Brennan did at his job or what he was doing when he was away from the Braintree facility.

117.    Other than Brennan, Mitchell was the only person with any knowledge of Brennan's responsibilities or the hours he spent working as the vice president of the Northeastern Division.

118.    LINA never spoke to or attempted to contact Mitchell before it determined Brennan was not eligible for benefits.

> Respectfully submitted,
> THOMAS D. BRENNAN
> By his Attorney,
>
> /s/ George A. Balko III
> George A. Balko III, Esquire, BBO # 548872
> BOWDITCH & DEWEY, LLP
> 311 Main Street, P.O. Box 15156
> Worcester, MA  01615-0156
> (508) 791-3511
> gbalko@bowditch.com

Dated:  October 15, 2007