**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
THOMAS D. BRENNAN                )
                        Plaintiff,        )
                                                    )
v.                                                  )                    Civil Action No. 05-40034-FDS
                                                    )
LIFE INSURANCE COMPANY     )
OF NORTH AMERICA               )
                        Defendant.       )
_____)

**LIFE INSURANCE COMPANY OF NORTH AMERICA'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In accordance with this Court's Order, Defendant, Life Insurance Company of North

America ("LINA"), sets forth its proposed findings of fact and conclusions of law as follows:

**I.    PROPOSED FINDINGS OF FACT**

**The Companies**

1.    "Mail-Well" refers to Mail-Well I Corporation and its parent corporation, Mail-Well

   Corporation.  Mail-Well changed its name to Cenveo Corporation in 2003.

2.    "Northeastern Envelope" refers to Northeastern Envelope Manufacturing Corporation a/k/a

   Northeastern Envelope Manufacturing, Inc.

3.    Northeastern Envelope was a wholly owned subsidiary of NHC Corporation.

4.    "Mail-Well's Braintree Plant" refers to Northeastern Envelope after it was purchased by

   Mail-Well.

**Thomas Brennan And Gerald Mitchell's Relationship With The Companies**

5.    Thomas Brennan and Gerald Mitchell owned equal shares of the stock of NHC

   Corporation.

6.    NHC Corporation purchased Northeastern Envelope in September 1985.

1

7.   Thomas Brennan was an owner and vice president of Northeastern Envelope from September 1985 through October 1999.

8.   Gerald Mitchell was an owner and president of Northeastern Envelope from September 1985 through October 1999.

9.   In October 1999, NHC Corporation sold its stock, and consequently, Northeastern Envelope, to Mail-Well (hereinafter referred to as the "Sale of Northeastern Envelope").

10.  As part of the Sale of Northeastern Envelope, Gerald Mitchell and Thomas Brennan negotiated employment agreements with Mail-Well.

11.  From October 1999 through June/July 2002, Gerald Mitchell was employed by Mail-Well as the President of Mail-Well's Braintree Plant.

12.  From October 1999 through May 29, 2001, Thomas Brennan was employed by Mail-Well as the Divisional Vice President of Mail-Well's Braintree Plant.

**During The Negotiations Surrounding the Sale of Northeastern Envelope, Thomas Brennan Stated That He Would Be Working Part Time and Contracted For a Part Time Position**

13.  In 1997, Thomas Brennan and Gerald Mitchell began negotiating the Sale of Northeastern Envelope to Mail-Well.

14.  Robert Longden, Esq., an attorney with Bowditch & Dewey, LLP., represented NHC Corporation, Thomas Brennan and Gerald Mitchell in the Sale of Northeastern Envelope to Mail-Well.

15.  In addition to representing NHC Corporation, Gerald Mitchell and Thomas Brennan in the Sale of Northeastern Envelope, Attorney Longden provided general legal and business advice to Northeastern Envelope prior to the Sale of Northeastern Envelope to Mail-Well.

16.    Attorney Longden also represented Thomas Brennan and Gerald Mitchell in the negotiation of their respective employment agreements with Mail-Well.

17.    During the course of negotiations, Thomas Brennan himself and through his attorney specifically told Mail-Well on several occasions that he was not going to be working for Mail-Well on a full-time basis.

18.    In a fax dated July 16, 1998, from Thomas Brennan to Mail-Well, Mr. Brennan specifically stated that Mail-Well "should keep in mind that **Mr. Brennan has other business interests and is not and will not be involved with Northeastern Envelope on a full time basis**" (emphasis added).

19.    By fax dated July 20, 1998, Thomas Brennan forwarded the July 16, 1998 fax to his attorney, Robert Longden, Esq.

20.    Attorney Longden's notes from the negotiation of the Sale of Northeastern Envelope and Mr. Brennan's employment agreement mirror Thomas Brennan's July 16, 1998 fax including comments such as, "Tom works 2 days a week", "2 days off would be a week off for Tom", and referring to the employment agreement - "reflect 2 days per week."

21.    Mark Zoeller, Esq. was in-house counsel for Mail-Well and was involved in the Sale of Northeastern Envelope, as well as the negotiation of all associated documents, including the employment agreements of Thomas Brennan and Gerald Mitchell.

22.    Thomas Brennan and Attorney Longden told Attorney Zoeller that Mr. Brennan was not working full time for Northeastern Envelope and would not be working full time for Mail-Well.

23.    Mail-Well, through its counsel, provided Mr. Brennan and Mr. Mitchell with drafts of their employment agreements attached to a letter dated May 3, 1999 to Bowditch & Dewey.  The

terms of the employment agreements for Mr. Brennan and Mr. Mitchell, with the exception

of their respective salaries and names, were identical and both contained the following

provisions: 1) Section 2 of the proposed drafts required that Mr. Brennan and Mr. Mitchell

"devote his best efforts and substantially all of his business and professional time, skill and

attention to the business of the Employer and the Purchasers, and shall refrain from active

involvement in any other business or professional activity except on behalf of Employer

and/or the Purchasers"; 2) Section 3(b) of the proposed drafts also stated that Mr. Brennan

and Mr. Mitchell, "will be permitted to participate in such pension, profit sharing, life

insurance, hospitalization, major medical, and other employee benefit plans of the

Employer that may be in effect from time to time, to the extent the Executive is eligible

under the terms of those plans."

24.     Thomas Brennan and Gerald Mitchell both rejected the employment agreements attached to

the May 3, 1999 letter and countered with proposed revisions provided to Mail-Well by

Bowditch & Dewey attached to a letter dated June 3, 1999. The revisions to Mr. Brennan's

and Mr. Mitchell's employment agreements were identical with two exceptions. The most

significant differences were the revisions made to Section 2 of Mr. Brennan's employment

agreement. The revisions to Section 2 of Mr. Brennan's employment agreement were as

follows: "[Mr. Brennan] will devote his best efforts to the business of the Employer, **and

will spend a maximum of two business days per week, chosen in his sole discretion,

performing his duties and responsibilities hereunder**" (emphasis added). In contrast,

Mr. Mitchell's employment agreement largely retained the language originally proposed by

Mail-Well, specifically that he "will devote his best efforts and substantially all of his

business and professional time, skill and attention to the business of the Employer [and

shall refrain from active involvement in any other business or professional activity except on behalf of Employer]."

25. Section 2 of the final employment agreement executed by Thomas Brennan on October 18, 1999, states that "**[Mr. Brennan] will be expected to devote two (2) days per week to the business of Employer during the Employment Period, which days shall be determined by the Divisional President of Northeastern, and on such days [Mr. Brennan] will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of Employer**" (emphasis added).  In contrast, the employment agreement executed by Gerald Mitchell on October 18, 1999 retained the language proposed in the June 3, 1999 draft, specifically that he "will devote his best efforts and substantially all of his business and professional time, skill and attention to the business of the Employer and shall refrain from active involvement in any other business or professional activity except on behalf of Employer."

26. Despite the fact that the drafts of the employment agreements and ultimately, the versions executed by Thomas Brennan and Gerald Mitchell on October 18, 1999, all contained a provision regarding their participation in Mail-Well's benefit plans, Thomas Brennan insisted on the inclusion of language in Section 3 of his employment agreement stating that he should be considered a full-time exempt employee for purposes of participation in the Mail-Well's employee benefit plans.

27. Specifically, Section 3(b) of both Thomas Brennan's and Gerald Mitchell's employment agreements included the following provision, "Executive will be permitted to participate in such pension, profit sharing, life insurance, hospitalization, major medical, and other

5

employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans."

28. Unlike Mr. Mitchell's agreement, Mr. Brennan's final employment agreement also included the following provision: "To the extent permitted under the terms of the Employer's benefit plans, **[Mr. Brennan] will be considered a full time exempt employee for purposes of participation in such plans**" (emphasis added).

29. Mr. Brennan insisted on the inclusion of this provision in his employment agreement because he was not going to be a full-time employee of Mail-Well and wanted to participate in Mail-Well's employee benefit plans, many of which were only available to employees working 35 hours or more per week.

30. There is nothing in Thomas Brennan's employment agreement that requires him to work beyond two days per week at Mail-Well's Braintree Plant.

31. Thomas Brennan contracted for and obtained a part time position with Mail-Well.

## Thomas Brennan Was Engaged in Other Business Interests

32. Prior to the Sale of Northeastern Envelope, Thomas Brennan, while serving as Vice President of Northeastern Envelope, was also the President of another company, Noreast Fresh, and spent a considerable amount of time dedicated to that work.

33. Thomas Brennan was an officer or director for a company/companies other than Mail-Well in 2000.

34. Thomas Brennan was an officer or director for a company/companies other than Mail-Well in 2001.

## Thomas Brennan Worked Part Time For Mail-Well from October 1999 through May 2001

35. During the time Thomas Brennan worked for Mail-Well, it was his practice to take notes.

36. The notes Thomas Brennan produced to LINA attached to the letter dated April 13, 2004 from Mr. Brennan's attorney, were made and kept on Mr. Brennan's home computer.

37. Thomas Brennan's notes are sporadic and indicate that he was working two, and sometimes one or three days per week.

38. When Thomas Brennan allegedly worked more then the two days a week provided for by his employment agreement, his notes include comments such as "Overtime." These comments would not be necessary if Thomas Brennan was actually working for Mail-Well on a full-time basis.

39. Despite Thomas Brennan's claims that he was working from home when he was not at Mail-Well's Braintree Plant, he did not have an answering machine or fax machine, nor did he have a computer that was connected to the Internet.

40. During the time he was working for Mail-Well, Thomas Brennan stated that he was working part time or that he only worked two or three days a week.

41. As reflected in an office note dated July 6, 2000 from Thomas Brennan's physician, Narendrakumar Sodha, M.D., **Mr. Brennan told his doctor that he was working part time**.

42. From October 1999 through May 29, 2001, Thomas Brennan was at the Mail-Well facility in Braintree, MA two days a week during most weeks.

43. While employed by Mail-Well, Thomas Brennan did not report the hours he worked.

44. Deborah Martin was employed by Mail-Well at Mail-Well's Braintree Plant from March 2000 through February 2002 as a Senior Accountant/Division Controller and was responsible for human resources and financial reporting for Mail-Well's Braintree Plant.

**After He Stopped Working, Thomas Brennan Told Several
People That He Had Worked Less Then 35 Hours for Mail-Well**

45.  Thomas Brennan's last day of work was May 29, 2001.

46.  After he stopped working, Thomas Brennan represented that he was working less than 35

hours per week on several occasions.

**Thomas Brennan Was Not A Member of the Classes of
Eligible Employees Eligible for Participation in the Plan**

47.  The applicable policy in this case is Policy No. LK-007945, issued by Life Insurance

Company of North America to Mail-Well Corporation (the "Policy" or "Plan").

48.  Only members of the Classes of Eligible Employees are covered under the Plan.

49.  Classes of Eligible Employees are limited to "all active, full-time union-free hourly and

salaried Employees of the Employer and affiliated companies working the regularly

scheduled full-time hours, but not less than 35 hours per week."

50.  Accordingly, to be a member of the Class of Eligible Employees, Thomas Brennan had to

have worked 35 hours or more per week.

51.  Thomas Brennan did not work 35 hours or more per week.

52.  Consequently, Thomas Brennan was not a member of the Classes of Eligible Employees.

53.  Even if Thomas Brennan did work 35 hours or more per week, which he did not, his

coverage would have terminated on or prior to May 29, 2001.

54.  Coverage for members of the Classes of Eligible Employees terminates under the terms of

the Policy in certain circumstances, including the following: 1) the date the Employee is no

longer in an eligible class; or 2) the date the Employee is no longer in Active Service.

55.  Under the terms of the Policy:

An Employee will be considered in Active Service with the Employer on a day
which is one of the Employer's scheduled work days if either of the following

8

conditions are met.
    1. He or she is actively at work.  This means the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or some location to which the Employer's business requires the Employee to travel.
    2. The day is a scheduled holiday, vacation day or period of Employer approved paid leave of absence.

56. Thomas Brennan admits that he only worked at Mail-Well's Braintree Plant two days per week.

57. Thomas Brennan alleges that he worked at home the remaining days of the week, however, Mr. Brennan's home was not one of [Mail-Well's] "usual places of business" nor was it "some location to which [Mail-Well's] business required [Mr. Brennan] to travel."

58. Consequently, even if Thomas Brennan was at some point in time a member of the Classes of Eligible Employees, which he was not, his coverage terminated on or prior to May 29, 2001 because: 1) he was no longer in an eligible class, and/or 2) he was no longer in Active Service.

## II.    PROPOSED LEGAL CONCLUSIONS

1. Thomas Brennan asserts an ERISA claim for benefits under an ERISA governed long-term disability plan issued by LINA to Mail-Well Corporation.

2. In order to maintain a claim for benefits under ERISA, Thomas Brennan bears the burden of establishing that he was a "participant" in the Plan.  29 U.S.C. §§ 1132(a)(1), 1002(7); Perry v. New England Business Service, Inc.. et al., 347 F.3d 343 (1st Cir. 2003).

3. Similarly, Thomas Brennan bears the burden of proving that he was a member of the Classes of Eligible Employees and that his coverage, if any, did not terminate on or before May 29, 2001.  See Morales-Alejandro v. Medical Card System, Inc., 486 F.3d 693, 700 (1st Cir. 2007).

4.  A "participant" is defined as an employee who, at the time the lawsuit is filed, is or may become eligible to receive benefits under the Plan. 29 U.S.C. §§ 1132(a)(1), 1002(7); Perry v. New England Business Service, Inc.. et al., 347 F.3d 343 (1st Cir. 2003).

5.  Thomas Brennan was not eligible to receive benefits under the Plan because he was not working 35 hours or more per week and, as such, was not a member of the Classes of Eligible Employees under the terms of the Plan.  Consequently, Thomas Brennan was never a participant in the Plan and cannot maintain an ERISA claim for benefits under the Plan.

6.  Even if Thomas Brennan was a member of the Classes of Eligible Employees, which he was not, his coverage would have terminated under the termination provisions in the Plan because he was: 1) no longer an eligible employee and/or 2) no longer in Active Service. Consequently, Thomas Brennan was not a participant in the Plan and cannot maintain an ERISA claim for benefits under the Plan.

7.  "Straightforward language in an ERISA-regulated insurance policy should be given its natural meaning."  Hughes v. Boston Mut. Life Ins. Co., 25 F.3d 264 (1st Cir. 2994) (internal citations omitted).

8.  Thomas Brennan filed his claim for benefits in late 2001.  Consequently, Mr. Brennan's claim is subject to the claim regulations set forth in 29 C.F.R. § 2560.503-1 (1984).[1]

9.  Under the 1984 claims regulations, Thomas Brennan's claim for benefits was "deemed denied" because LINA did not respond to Mr. Brennan's appeal within the time set forth in the claims regulations.  29 C.F.R. § 2560.503-1(e)(2) (1984).

10. Because Thomas Brennan's claim was deemed denied, there is no complete administrative record for the Court to review.  Consequently, the parties obtained discovery and have

---

[1] The current claims regulations apply only to claims filed on or subsequent to January 1, 2002. 29 C.F.R. § 2560.503-1(o) (2001).

stipulated that the Court shall review this case de novo.  Document No. 21.

Respectfully Submitted,

Defendant, Life Insurance Company of
North America,

By its Attorneys:

CREVIER & RYAN, LLP.

/s/Katherine R. Parsons
David B. Crevier, BBO# 557242
Katherine R. Parsons, BBO # 657280
1500 Main Street, Suite 2020
Springfield, MA 01115
Tel:  413-787-2400
Facsimile:  413-781-8235
Email: dcrevier@crevierandryan.com
        kparsons@crevierandryan.com

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 15th day of October, 2007.

/s/Katherine R. Parsons