**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |
|---|---|
| THOMAS D. BRENNAN | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )     Civil Action No. 05-40034-FDS |
|  | ) |
| LIFE INSURANCE COMPANY | ) |
| OF NORTH AMERICA | ) |
| Defendant. | ) |

_____)

**LIFE INSURANCE COMPANY OF NORTH AMERICA'S POST TRIAL**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant, Life Insurance Company of North America ("LINA"), sets forth its Post Trial

Proposed Findings of Fact (pages 1-21) and Proposed Conclusions of Law (pages 21-24) as

follows:

**PROPOSED FINDINGS OF FACT**

**A.  BACKGROUND INFORMATION**

    **1.  The Policy**

1.  The applicable policy in this case is Policy No. LK-007945 and was issued by Life

Insurance Company of North America to Mail-Well Corporation (the "Policy" or "Plan").

Exhibit 1.

2.  Only members of the Classes of Eligible Employees are covered under the Plan.  Exhibit 1

at 3.

3.  Classes of Eligible Employees are limited to "all active, full-time union-free hourly and

salaried Employees of the Employer and affiliated companies working the regularly

scheduled full-time hours, but not less than 35 hours per week."  Exhibit 1 at 3.

### 2.  <u>The Companies</u>

4.  "Mail-Well" refers to Mail-Well I Corporation and its parent corporation, Mail-Well

Corporation.  Mail-Well changed its name to Cenveo Corporation in 2003.  <u>May 10, 2006</u>

<u>10:00 am Dymond Deposition</u> at 22:9-13.

5.  "Northeastern Envelope" refers to Northeastern Envelope Manufacturing Corporation a/k/a

Northeastern Envelope Manufacturing, Inc.

6.  Northeastern Envelope was a wholly owned subsidiary of NHC Corporation.

7.  "Mail-Well's Braintree Plant" refers to Northeastern Envelope after it was purchased by

Mail-Well.

### 3.  <u>Thomas Brennan And Gerald Mitchell's Relationship With The Companies</u>

8.  Thomas Brennan and Gerald Mitchell owned equal shares of the stock of NHC

Corporation.  <u>Exhibit 14</u> at 323-340.

9.  NHC Corporation purchased Northeastern Envelope in September 1985.  <u>Trial Day One</u> at

25:2-3.

10.  Thomas Brennan was an owner, vice president and treasurer of Northeastern Envelope from

September 1985 through October 1999.  <u>Trial Day One</u> at 17:6-7; 25:6-8.

11.  Thomas Brennan was employed by Mail-Well as the Divisional Vice President of Mail-

Well's Braintree Plant from October 1999 through May 29, 2001.  <u>Trial Day One</u> at 17:6-7;

57:10-11.

12.  Gerald Mitchell was vice president of Northeastern Envelope from September 1985 through

1987 or 1988, president of Northeastern Envelope from 1987 or 1988 through October 1999

and president of Mail-Well's Braintree Plant from October 1999 through the time he left in

2002.  <u>Trial Day Two</u> at 35:5-36:1; 33:18-19.

13.  In October 1999, NHC Corporation sold its stock, and consequently, Northeastern

Envelope, to Mail-Well (hereinafter referred to as the "Sale of Northeastern Envelope").

Trial Day One at 43:1-2; Exhibit 14.

14.  As part of the Sale of Northeastern Envelope, Gerald Mitchell and Thomas Brennan

negotiated employment agreements with Mail-Well.  Trial Day One at 44:10-14.

**B.  CONTRARY TO MR. BRENNAN'S TESTIMONY, THE EVIDENCE
DEMONSTRATES THAT MR. BRENNAN WORKED LESS THAN
THIRTY-FIVE HOURS PER WEEK**

   **1.  There Is No Evidence, Other Then Mr. Brennan's Testimony, To Support His
   Position That He Worked Forty Hours Per Week**

15.  While employed by Mail-Well, Thomas Brennan did not report the hours he worked, nor

did he keep track of the hours he worked.  Trial Day One at 93:23-24; 134:1-11.

16.  In addition, the hours stated in the Earning Statements, Exhibit 19, do not reflect the actual

number of hours Mr. Brennan worked during any particular pay period.  May 10, 2006

10:00 am Dymond Deposition at 58:22-59:7; 59:16-60:7.

17.  Gerald Mitchell does not know how much time Mr. Brennan spent working when he was at

home.  Mr. Mitchell testified that he has no personal knowledge of what Mr. Brennan was

doing or how much time he spent working beyond the time Mr. Mitchell saw Mr. Brennan

at the plant and the conversations he had with Mr. Brennan on the phone.  Trial Day Two at

73:17-21.  Mr. Mitchell testified that his phone conversations with Mr. Brennan varied in

frequency and length, sometimes they spoke only once a day and other days they would

speak two or three times a day and the conversations could be as short as a few minutes and

as long as twenty-five.  Trial Day Two at 74:11-22.

18.  Mrs. Brennan does not know how much time Mr. Brennan spent working at home or at the

Mail-Well Braintree Plant.  Mrs. Brennan testified that she was a practicing attorney during

the time Mr. Brennan was working for Mail-Well and could not testify to how much time Mr. Brennan spent working for Mail-Well at the plant or at home. Trial Day Two at 103:2-108:7.

19. Counsel for LINA undertook an extensive search for documents and information from Northeastern Envelope and Mail-Well relating to Mr. Brennan's employment. Mary Dymond, the 30(b)(6) representative for Mail-Well, testified that the majority of the documents relating to Mr. Brennan's employment by Mail-Well and Mail-Well's acquisition of Northeastern Envelope are lost. May 10, 2006 10:00 am Dymond Deposition at 12:2-21:8; 31:22-32:23; 77:13-78:8; 78:12-79:12; 80:5-81:7. In addition, there was no one at Mail-Well that had any information with respect to Mr. Brennan's employment by Mail-Well or Mail-Well's acquisition of Northeastern Envelope. Id.

20. As such, there is no evidence, other than Mr. Brennan's testimony to support his position that he worked forty hours per week.

21. Contrary to Mr. Brennan's testimony at trial, the evidence, consisting primarily of representations made by Mr. Brennan prior to his claim for long-term disability benefits, demonstrates that Mr. Brennan was not working 35 hours or more per week as required by the Policy.

**2. After He Stopped Working, Thomas Brennan Admitted To Both Of His Long-Term Disability Insurance Carriers That He Worked Less Then 35 Hours Per Week for Mail-Well**

22. Plaintiff made claims on two separate long-term disability policies, one through Trustmark Insurance Company and the one at issue in this case, through LINA. As explained below: 1) in his application to Trustmark for long-term disability benefits, Mr. Brennan admitted in writing, under oath, that he regularly worked less then 35 hours per week for Mail-Well, see

Section B.2.a. below; and 2) when he reported his disability claim to LINA, Mr. Brennan admitted that he worked less than thirty-five hours per week, see Section B.2.b. below.

### a. Thomas Brennan Admitted To Trustmark Insurance Company, In Writing And Under Oath, That He Worked Less Then 35 Hours Per Week

23. Thomas Brennan's last day of work was May 29, 2001.  Trial Day One at 9:4; 85:22-23; 113:6-7.

24. Just after he stopped working, Thomas Brennan admitted in writing, under oath, that he regularly worked less than 35 hours per week for Mail-Well.  Exhibit 21 at 459.  He did this through an application that he submitted to another insurer, Trustmark Insurance Company, on whom he made a separate disability insurance claim then the one in dispute here.  Id.

25. Mr. Brennan signed his Trustmark Application under oath representing that, "all statements given herein in the preceding pages are true and complete to the best of my knowledge and belief."  Exhibit 21 at 462; 110:23-111:2.

26. In the section of the Trustmark Application requiring Plaintiff to state how many hours he worked in a normal workweek, Plaintiff typed in "25".  Exhibit 21 at 459.

27. Mr. Brennan admitted that Trustmark's policy had no requirement as to the number of hours that he had to work.  Trial Day One at 115:4-7.  Consequently, Mr. Brennan was candid in responding to Trustmark's inquiry.  See Exhibit 21 at 459.

28. Mr. Brennan made the representation that he worked 25 hours per week in a normal workweek just two weeks after he stopped working for Mail-Well.  See Exhibit 21 at 462; Trial Day One at 9:4; 85:22-23.

29. Mr. Brennan testified that he takes great care in reading and writing documents.  Trial Day Two at 29:10-12.

30. Mr. Brennan admitted that everything contained in the Trustmark Application, except for

the number of hours worked in a normal workweek, was correct.  <u>Trial Day Two</u> at 111:6-114:11.

31.  In response to Mr. Brennan's testimony concerning the accuracy of the Trustmark Application, Mr. Brennan's counsel argued that the Trustmark Application contained other errors.  <u>Trial Day Three</u> at 73:20-74:1  He specifically cited to Mr. Brennan's identification of Northeastern Envelope as his employer.  <u>Trial Day Three</u> at 73:20-74:1.  Contrary to Mr. Brennan's counsel's argument, Mr. Brennan consistently testified that Northeastern Envelope was his employer at the time he stopped working in May 2001.  <u>Trial Day One</u> at 15:24-25; 111:6-12.

32.  Mr. Brennan's counsel attempted to prompt Mr. Brennan to testify that identifying Northeastern Envelope as his employer in the Trustmark Application was a mistake, asking Mr. Brennan if Northeastern Envelope was his employer "at the time [he] made this Trustmark application."  <u>Trial Day Two</u> at 29:17-30:6.  Mr. Brennan responded "no" and went on to explain that he did not have an employer at the time he filled out the application.  <u>Trial Day Two</u> at 30:5-9.  This failed and desperate attempt to demonstrate that Mr. Brennan made another error in the Trustmark Application strengthens the view that Mr. Brennan's admission that he regularly worked only 25 hours per week was accurate and not a mistake.

33.  Mr. Brennan attempted to distance himself from his admission in the Trustmark Application that he only worked 25 hours in a normal workweek by testifying that it was an error.  <u>Trial Day One</u> at 111:6-114:11; <u>Trial Day Two</u> at 29:10-12.  The Court must not accept Mr. Brennan's post hoc attempt to deny the admission in the Trustmark Application because, as explained above: 1) the statement was provided in writing under oath; 2) there

was no hours requirement in the Trustmark Policy so there was no need to exaggerate the hours he was working; 3) Mr. Brennan testified that he takes great care in reading and writing documents; 4) there were no other errors in the Trustmark Application; 5) Mr. Brennan's representation in the Trustmark Application was made just two weeks after he stopped working for Mail-Well; and 6) Mr. Brennan's attempt to demonstrate error in other portions of the Trustmark Application failed.

34.    There are no errors in the Trustmark Application.

       **b.    When He First Reported His Claim For Disability Benefits to LINA, Thomas Brennan Admitted That He Worked Less Then 35 Hours Per Week for Mail-Well**

35.    In addition to admitting that he only worked 25 hours per week in the Trustmark Application, Mr. Brennan also represented that he was working less than 35 hours per week when he initially called in his long-term disability benefits claim to LINA.  Exhibit 2 at 27.

36.    Mr. Brennan admits that he called LINA by telephone to notify LINA of his claim.  Trial Day One at 71:8-18.

37.    When Mr. Brennan called LINA to report his claim on August 27, 2001, he told the intake specialist that he worked 30 hours per week.  Exhibit 2 at 27.  Mr. Brennan made his initial call to LINA on August 27, 2001, two months after he had admitted under oath to Trustmark that he regularly worked 25 hours per week.  See Exhibit 2; Exhibit 21 at 459.

38.    Mr. Brennan is the only one who could have provided the information that he was working for Mail-Well 30 hours per week during the initial phone call to LINA.  This was explained by Richard Lodi, Senior Operations Representative for LINA.  Trial Day Three at 5:15-16.

39.    Mr. Lodi has extensive experience processing long and short-term disability claims for LINA.  Trial Day Three at 5:15-7:5.

40. Mr. Lodi explained that Exhibit 2 is the Master Summary Report, a document that was produced by LINA's intake department in Dallas, Texas, printed on August 27, 2001 and reflects the intake specialist's conversation with Mr. Brennan when he called to notify LINA of his claim.  Trial Day Three at 7:10-15; 15:2-16.

41. Mr. Lodi also explained that the intake system is only available to the intake specialist and no one else can add or change the contents of the Master Summary Report.  Trial Day Three at 26:13-19.

42. Mr. Lodi further explained that the topics and headings in the Master Summary Report were provided by the system; some of the information was added by the system after the intake specialist entered particular information (i.e. when the intake specialist entered the employer's name, the system would automatically enter the employer's address and coverage type); some of the information was entered as a default by the system and could be changed by the intake specialist; the disability code was selected and entered by the intake specialist based on the disability or injury that the caller reported he had; and the remaining information came from the caller's responses to the intake specialist's questions. Trial Day Three at 8:1-27:7.

43. Mr. Brennan told the intake specialist that he worked 30 hours per week, less than the 35 hours required to be eligible to participate in the Plan.  Exhibit 2 at 27.

44. Mr. Lodi explained that the Master Summary Report provides a "Notes" section for the intake specialist to document information provided by the caller during the call that the intake specialist thinks the case manager should follow up on.  Trial Day Three at 18:15-21; Exhibit 2 at 27.

45. In the Master Summary Report of Mr. Brennan's conversation with the intake specialist

regarding his claim for benefits, the intake specialist included the following in the "Notes" section:

> THE 75,000.00 IS BASE RATE PLEASE VERIFY. WILL BE RECEIVING DISABILITY FROM A SEPARATE COMPANY, EE WOULD HAVE CERTAIN DAYS OF THE WEEK BY CONTRACT THAT HE WOULD GO INTO WORK. FOR THE PURPOSES OF BENEFITS THE EE WAS CLASSIFIED AS A FULL-TIME EE.

Exhibit 2 at 27. The information contained in the notes had to be provided by Mr. Brennan because before talking to Mr. Brennan on August 27, 2001, LINA did not know that Mr. Brennan had another long-term disability insurance policy or that he had an employment contract. Trial Day Three at 20:24-21:19.

46. Thus, Mr. Brennan admitted to LINA, during his first contact concerning the claim, that although he had certain days on which he would go to work and that he worked 30 hours per week he nevertheless was classified as a full-time employee. Exhibit 2 at 27. There would have been no reason for Mr. Brennan to provide the information regarding him being classified as a full time employee unless the other information he provided demonstrated that he was not a full-time employee.

**3. Thomas Brennan Negotiated For And Entered Into An Agreement To Work For Mail-Well For Only Two Days A Week**

47. Mr. Brennan's admissions to LINA and Trustmark that he was working less than 35 hours a week is consistent with Mr. Brennan's insistence that his contract only require him to work two days a week.

48. In 1997, Thomas Brennan and Gerald Mitchell began negotiating the Sale of Northeastern Envelope to Mail-Well. Trial Day One at 39:24-7.

49. Robert Longden, Esq., an attorney with Bowditch & Dewey, LLP., represented NHC Corporation, Thomas Brennan and Gerald Mitchell in the Sale of Northeastern Envelope to Mail-Well. <u>Trial Day One</u> at 41:5-9.

50. In a fax dated July 16, 1998, from Thomas Brennan to Mail-Well, Mr. Brennan specifically stated that Mail-Well "should keep in mind that **Mr. Brennan has other business interests and is not and will not be involved with Northeastern Envelope on a full time basis**" (emphasis added). <u>Exhibit 8</u> at 100.

51. By fax dated July 20, 1998, Thomas Brennan forwarded the July 16, 1998 fax to his attorney, Robert Longden, Esq. <u>Exhibit 9</u>.

52. Mark Zoeller, Esq. was the Assistant General Counsel for Mail-Well in 1999. <u>Zoeller Transcript</u> at 11:19-22.

53. Attorney Zoeller was involved in the Sale of Northeastern Envelope, as well as the negotiation of all associated documents, and was primarily responsible for negotiating the employment agreements of Thomas Brennan and Gerald Mitchell on behalf of Mail-Well. <u>Zoeller Transcript</u> at 14:10-15; 15:6-18; 33:6-10.

54. During the employment contract negotiations, Thomas Brennan and Gerald Mitchell told Attorney Zoeller that Mr. Brennan was not working full time for Northeastern Envelope and would not be working full time for Mail-Well. <u>Zoeller Transcript</u> at 16:8-17; 17:3-12.

55. Mail-Well, through its counsel, provided Mr. Brennan and Mr. Mitchell with drafts of their employment agreements attached to a letter dated May 3, 1999 to Bowditch & Dewey. <u>Exhibit 10</u>.

56. The terms of the employment agreements for Mr. Brennan and Mr. Mitchell attached to the May 3, 1999 letter, with the exception of their respective salaries and names, were identical.

See Exhibit 10.  Mail-Well proposed that Mr. Brennan and Mr. Mitchell both work full-time for Mail-Well, specifically requiring that Mr. Brennan and Mr. Mitchell:

> [D]evote his best efforts and substantially all of his business and professional time, skill and attention to the business of the Employer and the Purchasers, and shall refrain from active involvement in any other business or professional activity except on behalf of Employer and/or the Purchasers.

Exhibit 10 at 118, 123.

57.  In the May 3, 1999 drafts, Mail-Well also proposed that Mr. Brennan and Mr. Mitchell be permitted to participate in Mail-Well's benefit plans to the extent they were eligible under the terms of the plan, specifically stating that Mr. Brennan and Mr. Mitchell:

> [W]ill be permitted to participate in such pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans.

Exhibit 10 at 119, 124.

58.  Thomas Brennan rejected the employment agreement attached to the May 3, 1999 letter and countered with proposed revisions provided to Mail-Well by Bowditch & Dewey attached to a letter dated June 3, 1999.  Exhibit 11; Trial Day One at 54:19-55:1.  The most significant differences were the revisions made to Section 2 of Mr. Brennan's employment agreement.  See Exhibit 11 at 154.

59.  In response to Mail-Well's proposal of full-time employment, Mr. Brennan proposed that he work a maximum of two days per week.  Exhibit 11 at 154; Zoeller Transcript at 23:22-24:5; Trial Day One at 54:19-55:1.  This is clearly reflected in the revision to Section 2 of the employment agreement proposed by Mr. Brennan which states:

> [Mr. Brennan] will devote his best efforts to the business of the Employer, **and will spend a maximum of two business days per week, chosen in his sole discretion, performing his duties and responsibilities hereunder.**"

<u>Exhibit 11</u> at 154 (emphasis added).

60.    In contrast, although Mr. Mitchell requested slight modifications to the Mail-Well proposal,

his proposed agreement largely retained the language originally proposed by Mail-Well,

specifically that he:

> [W]ill devote his best efforts and substantially all of his business and
> professional time, skill and attention to the business of the Employer [and
> shall refrain from active involvement in any other business or professional
> activity except on behalf of Employer].

<u>Exhibit 11</u> at 160.

61.    Mail-Well agreed to Mr. Brennan's request that he not be required to work more than two

days per week as Section 2 of the final employment agreement executed by Thomas

Brennan and Mail-Well on October 18, 1999, states that:

> **[Mr. Brennan] will be expected to devote two (2) days per week to the
> business of Employer during the Employment Period, which days shall
> be determined by the Divisional President of Northeastern, and on such
> days [Mr. Brennan] will devote his best efforts and substantially all of
> his business and professional time, skill and attention to the business of
> Employer.**"

<u>Exhibit 12</u> at 174 (emphasis added).

62.    In contrast to Mr. Brennan's two day per week final contract, the employment agreement

executed by Gerald Mitchell on October 18, 1999 retained the language proposed in the

June 3, 1999 draft, specifically that he:

> [W]ill devote his best efforts and substantially all of his business and
> professional time, skill and attention to the business of the Employer and
> shall refrain from active involvement in any other business or professional
> activity except on behalf of Employer.

<u>Exhibit 13</u> at 180.

63.    Attorney Zoeller testified that Mr. Brennan specifically negotiated to work for Mail-Well

two days per week and further explained that he did not recall them discussing part-time

versus full-time, just Mr. Brennan's desire to work two days per week.  Zoeller Transcript
at 39:5-12.

64. Mr. Brennan was seeking a two-day per week position with Mail-Well because he intended
    to devote some portion of his time to other business interests.  Zoeller Transcript at 18:11-
    16; 19:3-12.

65. Mr. Brennan insists that this provision means that he had to work at the plant two days per
    week and would work the remaining days at home, but Attorney Zoeller testified that
    during the employment contract negotiations, Mr. Brennan never raised the issue of
    working from home.  Zoeller Transcript at 19:13-17.  Attorney Zoeller testified that it was
    his understanding that the final employment agreement between Mr. Brennan and Mail-
    Well required Mr. Brennan to work a total of two days per week for Mail-Well.  Zoeller
    Transcript at 55:7-16; 22:22-23:15.

66. In addition to the two day per week provision in Mr. Brennan's contract, Mr. Brennan also
    insisted on a provision stating that he would be "considered" a full-time employee for
    purposes of Mail-Well's benefit plans.  Although all of the preliminary and final drafts of
    Mr. Brennan's and Mr. Mitchell's employment agreements contained a provision allowing
    them to participate in Mail-Well's benefit plans to the extent they were eligible, Mr.
    Brennan insisted on the inclusion of additional language in his employment agreement
    stating that he should be considered a full-time exempt employee for purposes of
    participation in the Mail-Well's employee benefit plans.  Exhibit 10 at 119, 124; Exhibit 11
    at 155, 161; Exhibit 12 at 175; Exhibit 13 at 181.

67. Specifically, Section 3(b) of each and every version of Thomas Brennan's and Gerald
    Mitchell's employment agreements included the following provision:

> Executive will be permitted to participate in such pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans.

Exhibit 10 at 119, 124; Exhibit 11 at 155, 161; Exhibit 12 at 175; Exhibit 13 at 181.

68.   Unlike Mr. Mitchell's agreement, Mr. Brennan's final employment agreement also included the following clause (the "Considered a Full Time Employee Clause"):

> To the extent permitted under the terms of the Employer's benefit plans, **[Mr. Brennan] will be considered a full time exempt employee for purposes of participation in such plans.**

Exhibit 13 at 181 (emphasis added); compare Exhibit 12 at 175.

69.   Attorney Zoeller explained that in October 1999, Plaintiff's counsel requested the addition of a clause stating that Mr. Brennan would be considered a full-time employee for purposes of participation in Mail-Well's plans.  Zoeller Transcript at 27:13-25; 29:2-18.  Attorney Zoeller also explained that:

> The genesis of that clause, as I recall, was that **although Mr. Brennan specifically wanted to work two days a week, he wanted to be covered under our benefit programs**.  We agreed that he could, but we also agreed that we would not change or otherwise modify those plans, so that he would be eligible to the extent that he would be permitted under the terms of the plans as they existed.

Zoeller Transcript at 27:5-12 (emphasis added).

70.   There would have been no reason for Mr. Brennan to insist on the inclusion of the Considered a Full Time Employee Clause if Mr. Brennan had in fact been a full-time employee.  Zoeller Transcript at 28:13-29:1.  Conversely, the only reason for Mr. Brennan to insist on the Considered a Full Time Employee Clause is that he did not intend to be a full time employee.

71.  Mr. Mitchell's employment agreement did not contain a provision stating that he would be considered a full time exempt employee for purposes of participation in Mail-Well's benefit plans because he was, in fact, a full time employee and there was no need for such a provision.  Compare Exhibit 12 at 175 to Exhibit 13 at 181.

72.  Thomas Brennan negotiated for and entered into an agreement to work for Mail-Well for only two days per week.  Zoeller Transcript at 18:5-7; Exhibit 8 at 100; Exhibit 12.

   **4.  During His Employment With Mail-Well, Thomas Brennan Made Numerous Documented Admissions That He Was Not Working More Then Two Days Per Week**

73.  In addition to his pre-employment insistence that he only worked two days a week, and his post-employment admissions to Trustmark and LINA that he worked less than 35 hours per week, Mr. Brennan made numerous documented admissions during the course of his employment that demonstrate that he was not working at least 35 hours per week.  As explained below: 1) Mr. Brennan made four comments in what he identified as being a "detailed 'log' or synopsis . . . covering in great detail [Plaintiff's] work through October to November of 1999 and January of 2000 to May of 2001," stating that he was not working more than two days per week, Section B.4.a., below; and 2) Mr. Brennan told his doctor that he was doing part time work, Section B.4.b., below.

   **a.  Thomas Brennan's Notes Of The Work He Did While He Was Employed By Mail-Well Demonstrate That He Was Not Working 35 Hours Or More Per Week**

74.  Exhibit 6 is a set of notes that were created by Thomas Brennan.  Trial Day Two at 14:24-15:4.  These notes demonstrate that:  1) it was highly unusual for Mr. Brennan to perform work more than two days a week; 2) that when Mr. Brennan did work more than two days in a week, he noted it as being more than he usually worked or was required to work; and 3)

that for the three months prior to his stopping work, Mr. Brennan generally worked no more than one day a week.

75.  During the time Thomas Brennan worked for Mail-Well, it was his practice to take and keep extensive notes relating to his work at Mail-Well.  Trial Day Two at 15:5-10.

76.  Mr. Brennan's practice was to take handwritten notes and transfer them to a computer, generally within 48 hours of the events that they memorialize. Trial Day Two at 15:11-16:3.

77.  Mr. Brennan explained that Exhibit 6 is a "detailed 'log' or synopsis . . . covering in great detail [Plaintiff's] work through October to November of 1999 and January of 2000 to May of 2001."  Trial Day Two at 16:9-17:11.

78.  Mr. Brennan's notes are dated and demonstrate very few weeks in which there are entries for more than two days.  See Exhibit 6.

79.  When Mr. Brennan's notes reflect more than two days work, Mr. Brennan's Notes contained the comments that demonstrate that Mr. Brennan was performing more work than he ordinarily would perform for Mail-Well.  The comments are reflected in the following entries:

> Mr. Brennan's notes from Friday, October 29, 1999 state "MY THIRD DAY AT THE PLANT THIS WEEK," demonstrating that such an occurrence was unusual. Exhibit 6 at 49.
>
> Mr. Brennan's notes reflect work on February 8, 9, 10, and 11.  Exhibit 6 at 57-59.  On Thursday, February 10 and Friday, February 11, Mr. Brennan's notes reflect that he was at home and did some work.  Exhibit 6 at 59; & at 18:12-18:15.   Mr. Brennan's notes also reflect that Mr. Brennan characterized this work as being "EXTRA WORK BEYOND CONTRACT."  Exhibit 6 at 59; & at 18:16-18:20.
>
> Mr. Brennan's notes reflect that he was at a conference on Saturday February 19 through Wednesday February 23.  Exhibit 6 at 59; & at 18:16-18:20.  Mr. Brennan's notes reflect that Mr. Brennan characterized this as working "OVERTIME."  Exhibit 6 at 59.

16

Mr. Brennan's notes reflect work on February 28, February 29 and March 2. Exhibit 6 at 65-67. Mr. Brennan characterized his work in February 29 as being "EXTRA WORK." Exhibit 6 at 67.

80. Mr. Brennan's last day of work was Tuesday, May 29, 2001, and his notes reflect that he turned in materials on that date. Exhibit 6 at 93. Working back in time from this entry in Mr. Brennan's notes, Mr. Brennan's notes are dated and such dating demonstrates that Mr. Brennan only performed worked on the following days in the last three months he worked: 1) Tuesday, May 15, 2001, Exhibit 6 at 86; 2) Tuesday, May 8, 2001, Exhibit 6 at 85; 3) Tuesday, May 1, 2001, Exhibit 6 at 83; 4) Wednesday, April 25, 2001, Exhibit 6 at 81; 5) Monday, April 23, 2001, Exhibit 6 at 82; 6) Tuesday, April 17, 2001, Exhibit 6 at 81; 7) Tuesday, April 10, 2001, Exhibit 6 at 80; 8) Tuesday, April 3, Exhibit 6 at 79; 9) Tuesday, March 27, Exhibit 6 at 78; 10) Tuesday, March 20, Exhibit 6 at 77; 11) Wednesday, March 14, 2001, Exhibit 6 at 76-77; and 12) Wednesday, March 7, 2001, Exhibit 6 at 74.

81. Based on the foregoing, Mr. Brennan's notes for the last three months of his employment do not reflect any weeks in which he worked more than two days; one week in which he worked two days; eleven weeks where he worked only one day of which nine of those weeks he only worked on Tuesday.

### b. Thomas Brennan Told His Doctor He Was Now Working Part Time

82. As reflected in an office note dated July 6, 2000 from Thomas Brennan's physician, Narendrakumar Sodha, M.D., **Mr. Brennan told his doctor that he now doing part time work**. Exhibit 20 at 407.

83. Despite testifying that he suffered from mental defects and testifying that he remembers little else from the July 6, 2000 appointment with Dr. Sodha, Mr. Brennan testified that he recalls exactly what he told Dr. Sodha during his appointment more than seven years ago.

Mr. Brennan stated that he did not tell Dr. Sodha that he was now doing part time work but rather that he told Dr. Sodha that he only traveled to Northeastern Envelope three times a week.  <u>Trial Day One</u> at 134:12-137:21; <u>Trial Day One</u> at 100:14-23.  Mr. Brennan's explicit recall of a conversation more than 7 years ago is an unbelievable attempt to undermine his documented admission to Dr. Sodha that he was no longer a full time employee.

### 5.  <u>Thomas Brennan's Home Was Not Equipped For Him To Work At Home</u>

84.  Despite Thomas Brennan's claims that he was working from home when he was not at Mail-Well's Braintree Plant, he did not have an answering machine or fax machine, nor did he have a computer that was connected to Mail-Well's intranet or even to the Internet. <u>Exhibit 6</u> at 93; <u>Trial Day One</u> at 142:9-14.

### 6.  <u>Thomas Brennan Was Engaged in Other Business Interests</u>

85.  Prior to the Sale of Northeastern Envelope, Thomas Brennan, while serving as Vice President of Northeastern Envelope, was also the President of another company, Noreast Fresh, and spent a considerable amount of time dedicated to that work.  <u>Trial Day One</u> at 29:13-25; 32:21-33:17; 34:7-23.

## C.  BECAUSE THOMAS BRENNAN DID NOT WORK 35 HOURS A WEEK OR MORE, HE WAS NOT A MEMBER OF THE CLASSES OF ELIGIBLE EMPLOYEES ELIGIBLE FOR PARTICIPATION IN THE PLAN

86.  Only members of the Classes of Eligible Employees are covered under the Plan.  <u>Exhibit 1</u> at 3.

87.  Classes of Eligible Employees are limited to "all active, full-time union-free hourly and salaried Employees of the Employer and affiliated companies working the regularly scheduled full-time hours, but not less than 35 hours per week."  <u>Exhibit 1</u> at 3.

88.  Accordingly, to be a member of the Class of Eligible Employees, Thomas Brennan had to

have worked a regularly scheduled workweek of 35 hours or more per week.

89.  As explained above, Thomas Brennan did not work a regularly scheduled workweek of 35

hours or more per week.

90.  Consequently, Thomas Brennan was not a member of the Classes of Eligible Employees.

**D.  EVEN IF THOMAS BRENNAN WORKED 35 HOURS OR MORE PER WEEK,
HIS COVERAGE WOULD HAVE TERMINATED PRIOR TO MAY 29, 2001**

91.  Even if Thomas Brennan did work 35 hours or more per week, which he did not, his

coverage would have terminated on or prior to May 29, 2001.

92.  If Thomas Brennan was a member of the Class of Eligible Employees, which he was not,

his coverage would have first been effective on April 1, 2000.  Trial Day One at 139:2-4;

Exhibit 7 at 96.

93.  Coverage for members of the Classes of Eligible Employees terminates under the terms of

the Policy in certain circumstances, including the following: 1) the date the Employee is no

longer in an eligible class; or 2) the date the Employee is no longer in Active Service.

Exhibit 1 at 7.

94.  Under the terms of the Policy:

An Employee will be considered in Active Service with the Employer on a day
which is one of the Employer's scheduled work days if either of the following
conditions are met.
  1.  He or she is actively at work.  This means the Employee is performing
      his or her regular occupation for the Employer on a Full-time basis,
      either at one of the Employer's usual places of business or some
      location to which the Employer's business requires the Employee to
      travel.
  2.  The day is a scheduled holiday, vacation day or period of Employer
      approved paid leave of absence.

Exhibit 1 at 18.

95.  Mr. Brennan admitted that from October 1999 through May 29, 2001, he was at the Mail-Well facility in Braintree, MA two days a week during most weeks.  <u>Trial Day One</u> at 132:20-22; 133:14-19.

96.  Thomas Brennan alleges that he worked at home the remaining days of the week, however, both Gerald Mitchell and the corporate designee for Mail-Well testified that Mr. Brennan's home was not one of [Mail-Well's] "usual places of business" nor was it "some location to which [Mail-Well's] business required [Mr. Brennan] to travel."  <u>May 10, 2006 10:00 am Dymond Deposition</u> at 48:5-7; 48:19-49:2; <u>Trial Day Two</u> at 84:17-85:1.

97.  In addition to Mail-Well and Gerald Mitchell's testimony that Mr. Brennan's home was not one of Mail-Well's usual places of business or some location to which Mail-Well's business required Mr. Brennan to travel, Thomas Brennan identified his work location as "Mail-Well Corporation d/b/a Northeastern Envelope Mfg. Co., 1515 Washington St., #2 Braintree, MA 02184."  <u>Exhibit 5</u> at 44.  Despite the fact that Mr. Brennan copiously supplemented his LINA Application for benefits at Exhibit 5, he did not supplement his response to the request that he identify his work location to identify his home.  <u>Exhibit 4</u> at 38-40; <u>Exhibit 5</u> at 45-47; <u>Trial Day One</u> at 155:9-156:25; <u>Trial Day Two</u> at 7:8-8:11.

98.  Consequently, even if Thomas Brennan was at some point in time a member of the Classes of Eligible Employees, which he was not, his coverage terminated on or prior to May 29, 2001 because: 1) he was no longer in an eligible class, and/or 2) he was no longer in Active Service.

99.  During closing arguments, Mr. Brennan's counsel argued that even if Mr. Brennan's coverage terminated when he was not working at the plant, it reactivated when Mr. Brennan returned to the plant to work.  <u>Trial Day Three</u> at 89:3-21.

100. Assuming for the purposes of argument that Mr. Brennan's argument was correct and Mr.

Brennan's coverage terminated when he worked from home and became effective every

time he returned to the plant, Mr. Brennan would be precluded from obtaining benefits

under the Policy due to the Pre-Existing Condition Limitation. <u>Exhibit 1</u> at 11. Mr.

Brennan began his treatment for MS with Dr. Sodha on July 6, 2000. <u>Trial Day One</u> at

99:25-100:7; <u>Exhibit 20</u> at 407-408. Mr. Brennan has continuously treated with Dr. Sodha

for his MS since July 6, 2000 through the present. <u>Exhibit 20</u> at 363-456. The Pre-Existing

Condition Limitation states:

> The Insurance Company will not pay benefits for any period of Disability
> caused or contributed to by, or resulting from, a Pre-existing Condition. A
> "Pre-existing Condition" means any Injury or Sickness for which the
> Employee incurred expenses, received medical treatment, consulted with a
> health professional, or took prescribed drugs or medicines, within 3
> months immediately preceding the most recent effective date of insurance.

<u>Exhibit 1</u> at 11. As such, if Mr. Brennan's coverage terminated each time he worked at

home and became effective each time he returned to the plant, the most recent effective

date preceding Mr. Brennan's last day of work would have been his last day at the plant,

May 29, 2001. As discussed above, Mr. Brennan had been receiving treatment for MS

since July 2000 and was clearly receiving treatment within the three months prior to May

29, 2001. Consequently, even if Mr. Brennan's argument is correct and his insurance

became effective every time he returned to the plant, Mr. Brennan's claim for benefits

would be precluded by the Pre-Existing Condition Limitation.

## <u>PROPOSED LEGAL CONCLUSIONS</u>

1.  Thomas Brennan asserts an ERISA claim for benefits under an ERISA governed long-term disability plan issued by LINA to Mail-Well Corporation.

2.  Thomas Brennan filed his claim for benefits in late 2001. Consequently, Mr. Brennan's claim is subject to the claim regulations set forth in 29 C.F.R. § 2560.503-1 (1984).[1]

3.  Under the 1984 claims regulations, Thomas Brennan's claim for benefits was "deemed denied" because LINA did not respond to Mr. Brennan's appeal within the time set forth in the claims regulations. 29 C.F.R. § 2560.503-1(e)(2) (1984).

4.  Because Thomas Brennan's claim was deemed denied, there is no complete administrative record for the Court to review. Consequently, the parties obtained discovery and have stipulated that the Court shall review this case de novo. <u>Document No.</u> 21.

5.  "Straightforward language in an ERISA-regulated insurance policy should be given its natural meaning." <u>Hughes v. Boston Mut. Life Ins. Co.</u>, 25 F.3d 264 (1st Cir. 2994) (internal citations omitted).

6.  In order to maintain a claim for benefits under ERISA, Thomas Brennan bears the burden of establishing that he was a "participant" in the Plan. 29 U.S.C. §§ 1132(a)(1), 1002(7); <u>Perry v. New England Business Service, Inc.. et al.</u>, 347 F.3d 343 (1st Cir. 2003).

7.  Similarly, Thomas Brennan bears the burden of proving that he was a member of the Classes of Eligible Employees and that his coverage, if any, did not terminate on or before May 29, 2001. <u>See Morales-Alejandro v. Medical Card System, Inc.</u>, 486 F.3d 693, 700 (1st Cir. 2007).

8.  A "participant" is defined as an employee who, at the time the lawsuit is filed, is or may

---

[1] The current claims regulations apply only to claims filed on or subsequent to January 1, 2002. 29 C.F.R. § 2560.503-1(o) (2001).

become eligible to receive benefits under the Plan.  29 U.S.C. §§ 1132(a)(1), 1002(7); <u>Perry v. New England Business Service, Inc.. et al.</u>, 347 F.3d 343 (1st Cir. 2003).

9.   Only members of the Classes of Eligible Employees are covered under the Plan.  <u>Exhibit 1</u> at 3.

10.   Classes of Eligible Employees are limited to "all active, full-time union-free hourly and salaried Employees of the Employer and affiliated companies working the regularly scheduled full-time hours, but not less than 35 hours per week."  <u>Exhibit 1</u> at 3.

11.   As explained above in Paragraphs 15-90, Thomas Brennan was not eligible to receive benefits under the Plan because he was not working 35 hours or more per week and, as such, was not a member of the Classes of Eligible Employees under the terms of the Plan. Consequently, Thomas Brennan was never a participant in the Plan and cannot maintain an ERISA claim for benefits under the Plan.

12.   Under the terms of the Policy:

An Employee will be considered in Active Service with the Employer on a day which is one of the Employer's scheduled work days if either of the following conditions are met.

   3.   He or she is actively at work.  This means the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or some location to which the Employer's business requires the Employee to travel.

   4.   The day is a scheduled holiday, vacation day or period of Employer approved paid leave of absence.

<u>Exhibit 1</u> at 18.

13.   As explained above in Paragraphs 91-100, even if Thomas Brennan was a member of the Classes of Eligible Employees, which he was not, his coverage would have terminated under the termination provisions in the Plan because he was: 1) no longer an eligible employee and/or 2) no longer in Active Service.  Consequently, Thomas Brennan was not a

participant in the Plan and cannot maintain an ERISA claim for benefits under the Plan.

Respectfully Submitted,

Defendant, Life Insurance Company of
North America,

By its Attorneys:

CREVIER & RYAN, LLP.

/s/Katherine R. Parsons
David B. Crevier, BBO# 557242
Katherine R. Parsons, BBO # 657280
1500 Main Street, Suite 2020
Springfield, MA 01115
Tel:  413-787-2400
Facsimile:  413-781-8235
Email: dcrevier@crevierandryan.com
            kparsons@crevierandryan.com

## CERTIFICATE OF SERVICE

I certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 21st day of December, 2007.

/s/Katherine R. Parsons