UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS D. BRENNAN,           )
                             )
         Plaintiff,          )
v.                           )      Civil Action No. 05-40034-FDS
                             )      George A. Balko III
LIFE INSURANCE COMPANY       )      BBO No. 548872
OF NORTH AMERICA,            )
                             )
         Defendant.          )

**PLAINTIFF'S POST-TRIAL BRIEF**

NOW COMES Plaintiff Thomas D. Brennan ("Brennan") and respectfully submits the following and requests this Honorable Court to consider the following Post-Trial Brief as a supplemental complement to his closing argument at trial. The Post-Trial Brief addresses two issues raised at trial by Defendant Life Insurance Company of North America ("LINA"), and provides this Court with a brief synopsis of key trial points.

**I.   Defendant admitted during its opening statement that the only issue at trial was whether Mr. Brennan worked 35 hours a week.**

In Defendant's opening statement to the Court, defense counsel stated "This case will primarily involve the simple issue of whether or not Mr. Brennan was working a regularly scheduled work week of at least 35 hours a week from Mail-Well. That's the issue in the case." Transcript I, 11:11-14. A clear and unambiguous admission of fact made by defendant's attorney in an opening statement in civil or criminal cases is binding upon party. United States v. Blood, 806 F. 2d 1218 (4th Cir. 1986); see McMahon v. Lynn & B.R. Co., 191 Mass. 295 (1906)(Although an attorney's opening statements are not admissible as evidence, admissions contained therein are binding on the party he or she represents.), see also Kolas v. Larochelle,

270 Mass. 49 (1930). An admission of material fact during the course of the trial by a party's counsel is binding on the party. See Graustein v. H.P. Hood & Sons, 293 Mass. 207 (1936).

Defense counsel's statement is a judicial admission, and as such the Court should limit Defendant's scope of defense to the one issue defined by counsel. The admission is of a material fact because it directly addresses the key contested fact in the case, whether Mr. Brennan worked 35 hours a week as required by the insurance policy. The 35 hour per week component of the insurance policy is the heart of the dispute between the parties.

Defense counsel's limitation of the case to one issue in his opening statement is reinforced in the Objections to deposition testimony he filed with the court. In those Objections, Defendant repeats for every objection: "Relevance. This testimony is not relevant to whether Plaintiff was working for Mail-Well thirty-five hours or more per week." The implication is clear. Defendant is only attacking the 35 hour per week issue. Because of this, the limiting statement Defendant made in his opening remarks should be enforced by the Court.

In addition to defense counsel's opening remarks and his filing of objections with the court, Defendant itself also testified, through designee Richard Lodi, that the only reason Mr. Brennan was denied coverage was because he did not meet the 35 hr per week component of the policy. Transcript, Day III, 40: 22-41: 2. This testimony further reinforces the point that the only issue in the case is whether Mr. Brennan worked 35 hours a week. The decision at LINA was based on this one factor; that theme was unequivocally restated by defense counsel in his opening remarks. Defendant should not be allowed to expand the scope of its defense to include other issues when it has made a judicial admission to the contrary. Defendant should be limited by the judicial admission uttered during its opening statement that the only issue to be decided in the case is whether Mr. Brennan worked 35 hours per week.

2

While defense counsel argued in his closing remarks that his opening statement did not limit the case because the defendant had raised other issues in its pre-trial Findings of Fact and Rulings of Law, thereby creating an unambiguous intent to raise other issues and defenses, his argument is without merit. To the contrary, Defendant changed its defense posture several times prior to trial, including concession of the disability component two months prior to trial. Therefore, a filing made two weeks before the trial cannot be given the same weight as the actual remarks made by defendant counsel in open court. Defendant was entitled to change its strategy up to the start of trial, and by its opening remarks and actions it appears to have done exactly that. Defendant's subsequent desire to rebroaden its net of defenses should be constrained by defense counsel's judicial admission, his filing of Objections, and the testimony of Mr. Lodi as designee of LINA. Therefore, because defense counsel admitted in his opening remarks that the 35 hour per week component was the sole issue in the case, the Court should limit Defendant to that issue.

II. **The termination provision of the insurance policy does not deprive Brennan of coverage.**

Notwithstanding the arguments above, if the Court is inclined to give consideration to Defendant's argument that the policy terminated, the Court should find that Brennan's insurance coverage did not terminate before he left work because of his disability on 29 May 2001.

In his closing argument, counsel for Defendant essentially argued that Brennan's policy terminated, under the termination provision found on page 7 of Exhibit 1, because Brennan was not in "Active Service." Counsel went on to argue that "Active Service" is defined, on page 18 of Exhibit 1, as being that "the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or at some location to which the Employer's business requires the Employee to travel." Counsel for

{Client Files\LIT\021859\0100\PLD\01058104.DOC;1}

Defendant argued that the testimony of Mary Stoik Dymond and Gerald Mitchell, to the effect that Brennan's home was not a "usual place of business" for Mail-Well, is conclusive on this point. It is not.

It is important to note that the term "usual place of business" is not defined in the insurance policy. Therefore, common usage of the term must be applied.

"[I]nsurance contracts must be liberally construed in favor of a policyholder or beneficiary…and strictly construed against the insurer in order to afford the protection which the insured was endeavoring to secure when he applied for the insurance." 13 Appleman, *Insurance Law and Practice,* section 7401 at 197 (1976). *See* State Farm Mutual v. Nissen, 851 P.2d 165, 166 (Colo. 1993); Rezendes v. Prudential Ins. Co. of America, 285 Mass. 505 (1934). To use Defendant's proffered interpretation of "usual place of business" would mean that Brennan's coverage under the policy terminated the first day he worked from home, if one accepts Defendant's argument that Brennan was not "required" by Mail-Well to work from home. However, there was trial testimony that Mitchell, Brennan's superior and supervisor, not only authorized Brennan to work from home, but also directed him to work wherever Brennan thought it was necessary to be most efficient in making the company as profitable as possible (both when it was an independent company and when it was a division of Mail-Well). Under the terms of Brennan's employment, Mitchell and, by his delegation to Brennan, Brennan himself, were authorized to decide that Brennan should and must work from home if that was the most effective way to work when he was not needed at the plant.

The testimony is undisputed that Brennan had worked from home regularly, from the very beginning of his employment at Northeastern as an independent company in 1985, up to the sale to the Mail-Well, and after the acquisition of Mail-Well until the time he became disabled

from work in May 2001. Thus, Brennan was usually working from home, as the term "usually" is commonly understood. (See Merriam-Webster's Collegiate Dictionary, 11th ed. 2005.) The business of Mail-Well was being performed by Brennan at his home, as Brennan testified. It was a usual place of business for Mail-Well's benefit. It was a usual place where the work of Mail-Well Northeastern Division, and thus of Mail-Well, was conducted. Thus, it was a usual place of business for Mail-Well. This interpretation should be adopted by the court.

To accept Defendant's interpretation of "usual place of business" would lead to shockingly unreasonable results. Any time a covered employee decided not to go to the plant and work from home, the policy would terminate. Thus, if on the day of a snow storm an employee decided for safety's sake not to go to the plant but work from home, and this was approved but not required by the employer, his disability policy would terminate. Any employee allowed to telecommute would have his policy terminate. Any covered employee who wanted to work at a third party location as a matter of convenience, rather than a matter of compulsion (for example, on an optional trip to a customer's location not "required by the Employer" as called for in the definition of "Active Service,") would find his coverage under the policy terminated.

Even if such detours from working at the plant involved only an hour or two, the coverage would terminate because that employee would not be working "Full-Time" (the number of hours set by the Employer as a regular workday) at the "usual place of business." Even if such an event only occurred once, the policy would be terminated, and terminated without any meaningful notice to the employee.

Such an unconscionable result should not be tolerated by this Court. It should find that Defendant's proffered interpretation of the term "usual place of business" can lead to an unreasonable and unfair result, and in the case of Brennan, it would. Brennan applied for

coverage when his work pattern already involved working from home regularly, with authority and at least an implied directive to do so by Mitchell. Coverage was extended in April 2000, and the coverage was renewed with the issuance of the subject policy effective 1 January 2001. Brennan paid for coverage during the entire time the policy, and its predecessor, were in effect. He expected coverage.

Nothing material changed in Brennan's work from when coverage was first extended until he left work because of his disability on 29 May 2001. He should be provided the benefits he applied for, paid for, and expected.

### III. Summary of central points from the trial for the Court's review

- From his acquisition of Northeastern Envelope in 1985 until going out of work on disability in May 2001, Brennan was the Vice President of Northeastern Envelope/Northeastern Envelope Division of Mail-Well. With some exceptions after the Mail-Well acquisition, the scope of his duties, activities, and work product remained consistent throughout those 16 years.

- From the purchase of Northeastern in 1985 until the sale to Mail-Well in 1999, Brennan worked some days each week at the manufacturing plant, and some days at home. This involved a routine of at least three days per week at the plant in Braintree and the rest of the time at home.

- Mitchell knew of and approved this routine, because it was effective at accomplishing the central point of any business: do whatever is necessary to achieve profitability for the business.

- At the time of the acquisition by Mail-Well, the goal of Mitchell, Brennan, and of Mail-Well was for operations at the plant in Braintree to continue as

6

they had before. The only significant exceptions were to be (1) that Mail-Well would now own Northeastern Envelope, and (2) that Brennan would have to be at the plant only two days per week.

- Those modified operations continued essentially unchanged from the Mail-Well acquisition in October 1999 until Brennan left because of his disability in May 2001.

- During Brennan's employment with Mail-Well, it offered disability insurance provided by LINA. That coverage was elected and paid for by Brennan, commencing with a policy effective 1 April 2000, and then continued by the current policy, effective 1 January 2001.

- Brennan's work practices and work performance were consistent during the Mail-Well ownership of Northeastern, both before and after Mail-Well's disability coverage (through LINA) was in place. Brennan continued to perform his tasks in all the usual ways and at all the usual locations, as he had since 1985, and certainly since the 1999 Mail-Well acquisition. The only material change was his decreased ability to perform his job due to the effects of Multiple Sclerosis.

- Defendant has produced no evidence as to any specific week, month, or stretch of time that Brennan actually worked less than the 35 hour weeks required by the insurance policy. To the contrary, Brennan has produced evidence that during that time he worked well in excess of 35 hours per week, consistently and constantly.

- Viewed in its entirety, and not in the dot-to-dot fashion urged by Defendant, the evidence supports Brennan's claim that he was eligible for coverage under the insurance policy, and that coverage was in effect when he became disabled and, therefore, he is entitled to the benefits specified in the policy.

Respectfully submitted,

THOMAS D. BRENNAN
By his attorneys,

/S/ George A. Balko III
George A. Balko III (BBO #548872)
Colleen E. Cushing (BBO #663498)
Bowditch & Dewey, LLP
311 Main Street, P.O. Box 15156
Worcester, MA 01615-0156
(508) 791-3511

Dated:   21 December 2007

## CERTIFICATE OF SERVICE

I, George A. Balko III, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on December 21, 2007.

/S/ George A. Balko III
George A. Balko III, Esquire