UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

THOMAS D. BRENNAN,                                     )
                                                       )
          Plaintiff,                                   )
                                                       )
     v.                                                )          Civil No.
                                                       )          05-40034-FDS
LIFE INSURANCE COMPANY                                 )
OF NORTH AMERICA,                                      )
                                                       )
          Defendant.                                   )
_____)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAYLOR, J.

This is an action to recover long-term disability benefits pursuant to the Employee

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*.  Plaintiff Thomas

D. Brennan is a former employee of Mail-Well Corporation who suffers from multiple sclerosis.

Full-time employees at Mail-Well were insured by a group long-term disability policy issued by

defendant Life Insurance Company of North America ("LINA").  LINA declined to award

Brennan disability benefits on the grounds that, although admittedly disabled, he was only a part-

time employee who was not in "active service" with Mail-Well.  Brennan has brought suit to

recover both retroactive and future benefits.

The case was tried to the Court without a jury over three days in October and November

2007.  There is no dispute that Brennan is disabled, or that he was an employee; the only disputed

issue is whether he was a "full-time" employee in "active service" within the meaning of the

policy.  Whether he was a "full-time" employee turns on whether he worked "regularly scheduled

full-time hours . . . [of] not less than 35 hours per week."

The Court is strongly sympathetic to Brennan's struggle with multiple sclerosis and the challenges associated with that illness, and reluctant to deny insurance coverage that would undoubtedly assist him and his wife in that struggle. There is, however, substantial evidence—virtually all of it from Brennan himself, in his own words—supporting the conclusion that he did not regularly work more than 35 hours per week for Mail-Well. At various times, Brennan himself characterized his work as "part-time," "25 hours per week," or "30 hours per week." Notwithstanding the Court's natural sympathies, the weight of the evidence clearly indicates that Brennan was not a regularly-scheduled full-time employee. Accordingly, and for the reasons stated below, the Court will enter judgment for the defendant.

## Findings of Fact

### A.     The Parties

1.     Plaintiff Thomas D. Brennan is an individual who resides in Holden, Massachusetts. (Tr. I: 15).

2.     LINA is a Pennsylvania corporation with a principal place of business in Philadelphia, Pennsylvania. (Complaint, ¶ 2).

### B.     The Insurance Policy

3.     From October 1999 to May 2001, Brennan was an employee of Mail-Well Corporation.

4.      LINA issued a group disability policy to Mail-Well, Policy No. LK-007945. The policy was in force at all relevant times. (Stipulation, Docket # 42; Ex. 1).

5.     Mail-Well serves as the Plan Administrator. (Ex. 1).

6.     The policy provides long-term disability benefits to an employee who, because of injury or sickness, is unable to perform all the material duties of his or her occupation. (Ex. 1 at 4).

2

7.      Brennan was diagnosed with multiple sclerosis in September 2000.   He became disabled within the meaning of the policy by May 2001, and ceased employment at that time.

8.      Under the policy, only members of the "Classes of Eligible Employees" are entitled to long-term disability benefits.  (Ex. 1 at 3).

9.      "Classes of Eligible Employees" are defined under the policy as "[a]ll active, full-time union-free hourly and salaried Employees of the Employer and affiliated companies working the regularly scheduled full-time hours, but not less than 35 hours per week."  (Ex. 1 at 3).

10.     Under the policy, "[f]ull-time means the number of hours set by the Employer as a regular work day for Employees in the Employee's eligibility class."  (Ex. 1 at 18).

11.     The "Termination of Insurance" provision states that, among other reasons, an employee's coverage will end on "the date the Employee is no longer in Active Service."  (Ex. 1 at 7).

12.     The policy also states that "[a]n Employee will be considered in Active Service with the Employer on a day which is one of the Employer's scheduled work days if . . . [h]e or she is actively at work.  This means the Employee is performing his or her regular occupation for the Employer on a Full-time basis, either at one of the Employer's usual places of business or at some location to which the Employer's business requires the Employee to travel."  (Ex. 1 at 18).

13.     Brennan was an active, union-free, salaried employee of Mail-Well within the meaning of the "Classes of Eligible Employees" clause of the policy.

14.     The parties dispute whether Brennan was a full-time employee, working 35 hours a week

3

or more for Mail-Well, who performed his regular occupation for Mail-Well either at one of its usual places of business or at some location to which its business required Brennan to travel.

**C.    Employment by NHC/Northeastern/Noreast Fresh**

15.    Brennan worked in the envelope business for approximately 16 years, from 1985 to 2001. (Tr. I: 17-23).

16.    In 1985, Brennan was the president of NHC Corporation, which was a holding company. (Ex. 14 at 323-40; Tr. I: 16, 25).  NHC was created in 1985 as a vehicle with which to acquire two envelope manufacturing companies, Northeastern Envelope Manufacturing Corporation and North American Envelope Company.  (Tr. I: 16).

17.    Brennan and Gerald Mitchell owned equal shares of the stock of NHC.  (Ex. 14 at 323-40).

18.    In September 1985, NHC acquired the Northeastern Envelope Manufacturing Corporation.  (Tr. I: 16, 25).  Following the acquisition, Northeastern became a subsidiary of NHC.  (*Id.* at 25).

19.    At the time of NHC's acquisition of Northeastern's stock, Mitchell was already a vice president of Northeastern.  Brennan became a vice president and treasurer of Northeastern at the time of the acquisition.  (Tr. I: 24-25).

20.    Mitchell became president of Northeastern in 1987 or 1988 while Brennan remained vice president of the company.  (Tr. II: 35-36).

21.    As vice president of Northeastern, Brennan acted as the chief financial officer of the company.  (Tr. I: 25).  He handled a wide range of financial issues and coordinated legal,

real estate, and human resource matters for Northeastern.  (*Id.*).

22.    In 1993, while vice president of NHC and Northeastern, Mr. Brennan, with additional

investors, acquired Noreast Fresh, Inc., which was a company that sold bags of fresh

vegetables to food stores.  (Tr. I: 29).  Brennan became the president of Noreast Fresh at

the time of the acquisition.  (*Id.*).

23.    Brennan worked for both Northeastern and Noreast Fresh from 1993 until February 1996.

(Tr. I: 32).  While working for both companies, Brennan would typically split the work

day between the two companies and would work from approximately 2:30 a.m. until 8:00

or 8:30 p.m.  (*Id.* at 33).

24.    Brennan continued to work at Northeastern after ending his employment with Noreast

Fresh in February 1996.  (Tr. I: 35).

25.    In or about 1997, the Northeastern shareholders began soliciting companies, including

Mail-Well Corporation, to buy Northeastern.   (Tr. I: 39-41).

26.    Prior to the sale of Northeastern and NHC to Mail-Well, Brennan's base annual salary,

exclusive of any bonus, was approximately $66,000.  (Tr. I: 95).  In 1988, Brennan earned

$128,051.41, including salary and bonuses.  (Ex. 15).

27.    Brennan testified that in the years just prior to Mail-Well's acquisition of Northeastern and

NHC, he worked at least 40 hours a week for Northeastern, but that he usually worked

more than that.  (Tr. I: 36).  He also testified to having worked at the Northeastern

manufacturing facility in Braintree, Massachusetts, at least three days a week and many

times working there as often as five days a week.  (*Id.*).

    **D.    Negotiating Employment Agreement with Mail-Well**

5

28.     On June 29, 1998, Mail-Well forwarded a Letter of Intent to purchase the stock of NHC and Northeastern.  (Ex. 9).

29.     In 1997, Thomas Brennan and Gerald Mitchell began negotiating the sale of Northeastern to Mail-Well.  (Tr. I: 39-40).

30.     In a fax dated July 16, 1998, from Brennan to Mail-Well, Brennan specifically stated that Mail-Well "should keep in mind that Mr. Brennan has other business interests and is not and will not be involved with Northeastern Envelope on a full time basis."  (Ex. 8 at 100).

31.     Mark Zoeller, Esq., was the Assistant General Counsel for Mail-Well in 1999.  (Zoeller Dep. at 11).  Zoeller was involved in the sale of Northeastern, as well as the negotiation of all associated documents, and was primarily responsible for negotiating the employment agreements of Brennan and Mitchell on behalf of Mail-Well.  (*Id.* at 14-15, 33).

32.     Zoeller testified that during the employment contract negotiations, Brennan and Mitchell told him that Brennan was not working full-time for Northeastern and would not be working full-time for Mail-Well.  (Zoeller Dep. at 16-17).

33.     Mail-Well, through its counsel, provided Brennan and Mitchell with initial drafts of their employment agreements.  (Ex. 10).  The terms of these initial drafts for Brennan and Mitchell were identical with the exception of their respective salaries and names.  (*See id.*).

34.     Mail-Well proposed that Brennan and Mitchell both work full-time for Mail-Well, specifically requiring that Brennan and Mitchell each

> devote his best efforts and substantially all of his business and professional time, skill and attention to the business of [Mail-Well] and the Purchasers, and shall refrain from active involvement in any other business or

6

professional activity except on behalf of [Mail-Well] and/or the Purchasers.

(Ex. 10 at 118, 123).

35.     Mail-Well also proposed that Brennan and Mitchell be permitted to participate in

Mail-Well's benefit plans to the extent they were eligible under the terms of the plan,

specifically stating that Brennan and Mitchell

> will be permitted to participate in such pension, profit sharing, life
> insurance, hospitalization, major medical, and other employee benefit plans
> of [Mail-Well] that may be in effect from time to time, to the extent the
> Executive is eligible under the terms of those plans.

(Ex. 10 at 119, 124).

36.     In response to Mail-Well's proposal, Brennan submitted a counter-proposal that stated, in

substance, that he would work a maximum of two days per week.  (Ex. 11 at 154; Zoeller

Dep. at 23-24; Tr. I: 54-55).   This revision proposed by Brennan states

> [Brennan] will devote his best efforts to the business of [Mail-Well], and
> will spend a maximum of two business days per week, chosen in his sole
> discretion, performing his duties and responsibilities hereunder.

(Ex. 11 at 154).

37.     Mail-Well agreed in substance to Brennan's counter-proposal.  Section 2 of the final

employment agreement, executed on October 18, 1999, states

> [Brennan] will be expected to devote two (2) days per week to the business
> of [Mail-Well] during the Employment Period, which days shall be
> determined by the Divisional President of Northeastern, and on such days
> [Brennan] will devote his best efforts and substantially all of his business
> and professional time, skill and attention to the business of [Mail-Well].

(Ex. 12 at 174).

38.     Zoeller testified that Brennan specifically negotiated to work for Mail-Well two days per

week and further explained that he did not recall them discussing part-time versus full-time employment, just Brennan's desire to work two days per week. (Zoeller Dep. at 39).

39.   Brennan testified that he believed that he was obligated to continue working at least 40 hours per week, working two days per week at the manufacturing facility and working the remaining days at home. (Tr. I: 49-50, 53, 56).

40.   Zoeller, however, testified that, during the employment contract negotiations, Brennan never raised the issue of working from home. (Zoeller Dep. at 19). Zoeller further stated that it was his understanding that the final employment agreement between Brennan and Mail-Well required Brennan to work a total of two days per week for Mail-Well. (*Id.* at 22-23, 55).

41.   While the exact meaning of the "two-days-per-week" clause is in dispute, the parties appear to agree that Brennan wanted to include an agreement clause regarding working two days a week because he intended to devote some portion of his time to other business interests. (Zoeller Dep. at 18-19; Tr. I: 52-53, 90, 118).

42.   Although all of the preliminary and final drafts of Brennan's and Mitchell's employment agreements contained a provision allowing them to participate in Mail-Well's benefit plans to the extent they were eligible, Brennan requested the inclusion of additional language in his employment agreement that stated that he should be considered a full-time exempt employee for purposes of participation in Mail-Well's employee benefit plans. (Ex. 10 at 119, 124; Ex. 11 at 155, 161; Ex. 12 at 175; Ex. 13 at 181).

43.   Specifically, Section 3(b) of each version of Brennan's and Mitchell's employment agreements included the following provision:

> Executive will be permitted to participate in such pension, profit sharing, life insurance, hospitalization, major medical, and other employee benefit plans of the Employer that may be in effect from time to time, to the extent the Executive is eligible under the terms of those plans.

(Ex. 10 at 119, 124; Ex. 11 at 155, 161; Ex. 12 at 175; Ex. 13 at 181).

44.    Brennan's final employment agreement also included the following clause:

> To the extent permitted under the terms of [Mail-Well's] benefit plans, [Brennan] will be considered a full-time exempt employee for purposes of participation in such plans.

Mitchell's agreement, however, did not. (*Compare* Ex. 13 at 181 *with* Ex. 12 at 175).

45.    Zoeller testified that in October 1999 Brennan's counsel requested the addition of a clause stating that Brennan would be considered a full-time employee for purposes of participation in Mail-Well's employee benefit plans. (Zoeller Dep. at 27, 29). Zoeller also stated that

> [t]he genesis of that clause, as I recall, was that although Mr. Brennan specifically wanted to work two days a week, he wanted to be covered under our benefit programs. We agreed that he could, but we also agreed that we would not change or otherwise modify those plans, so that he would be eligible to the extent that he would be permitted under the terms of the plans as they existed.

(*Id.* at 27).

## E.    Employment by Mail-Well

46.    Brennan, Mitchell, and Mail-Well signed a Stock Purchase Agreement and the Mail-Well buyout of NHC and Northeastern was completed in October 1999. (Tr. I: 40-41, 121).

47.    After the buyout of NHC and Northeastern, Mitchell became the divisional president of Mail-Well's Northeastern Division and Brennan became the divisional vice president. (Tr.

9

I: 57).

48. Mitchell continued as a divisional president of Mail-Well until he ended his employment with the company in 2002. (Tr. II: 33, 35). Similarly, Brennan continued as a divisional vice president of Mail-Well until he ended his employment with the company on May 29, 2001. (Tr. I: 17, 57).

49. Brennan's job responsibilities at Mail-Well were not significantly different from his responsibilities for Northeastern. His duties while at Mail-Well included the oversight of accounting, human resources, benefits, safety committee, selected personnel, banking, insurance, and tax matters; the coordination of these matters with corporate headquarters; business strategy; and special projects. (Ex. 21 at 463-65; Tr. I: 64-66; Tr. II: 44-45).

50. Pursuant to the terms of Brennan's employment agreement with Mail-Well, he was expected to devote two days per week to the business of Mail-Well. (Ex. 12 at 174). Brennan's agreement, however, did not explicitly restrict the number of hours per week he could work for Mail-Well. (Ex. 12; Zoeller Dep. at 42).

51. Pursuant to the employment agreement, Mitchell, as the divisional president, was to determine which two days per week Brennan devoted to Mail-Well's business. (Ex. 12 at 174). Also, on those two days, Brennan was to devote his best efforts and substantially all of his business and professional time, skill, and attention to the business of Mail-Well. (*Id.*).

52. The agreement further specified that Brennan was to be employed at Mail-Well's Braintree facility. (Ex. 12 at 174).

53. Mitchell's base salary as president of Mail-Well's Northeastern Division was $171,600

annually.  (Ex. 13 at 180).

54.   Brennan's base salary as vice president of Mail-Well's Northeastern Division was $75,000
      annually.  (Ex. 12 at 174).

55.   Brennan testified that during his time with Mail-Well, he never worked fewer than two
      days at the Braintree facility and often worked there as many as four or five times a week.
      (Tr. I: 58, 133).  During his deposition in April 2006, however, Brennan testified that
      most weeks he worked at the Braintree facility only two days a week.  (Tr. I: 133-34).[1]

56.   Brennan was a salaried employee who was not eligible for overtime pay from Mail-Well.
      (Tr. I: 35, 88).

57.   During the time Brennan worked for Mail-Well, it was his practice to keep a detailed log
      relating to his work.  (Tr. II: 15).  A review of Brennan's log from October 1999 and
      January 2000 through May 2001 indicates that there were few weeks when Brennan made
      log entries for more than two days in any one week.  (*See* Ex. 6).

58.   Further, when the log reflects more than two days of work in a week, certain entries state
      that Brennan was performing more work than he was required to.  Specifically, Brennan's
      log includes the following entries:

      a.    Brennan's notes from Friday, October 29, 1999, state "MY THIRD DAY AT
            THE PLANT THIS WEEK."  (*Id.* at 49).

      b.    Brennan's notes reflect he worked on February 8, 9, 10, and 11, 2000.  (*Id.* at 57-
            59).  On Thursday, February 10, and Friday, February 11, Brennan's notes reflect

_____

[1] To the extent that Brennan's deposition testimony includes prior inconsistent statements, those
statements are not hearsay and may be considered for their truth.  *See* Fed. R. Evid. 801(d)(1)(A).

that he did some work at home and that work was "EXTRA WORK BEYOND
CONTRACT." (*Id.* at 59).

    c.    Brennan's notes reflect that he was at a conference on Saturday, February 19,
2000 through Wednesday, February 23, 2000, and that he characterized this as
working "OVERTIME." (*Id.*).

    d.    Brennan's notes reflect he worked on February 28 and 29, 2000, and March 2,
2000, and that he described his work on February 29 as being "EXTRA WORK."
(*Id.* at 67).

59.    When asked about the log, Brennan testified that the log was not intended to be
comprehensive and that he did not make entries for every day that he did work for Mail-
Well. (Tr. I: 85-86). Further, he testified that he was just joking when he included notes
in the log to the effect that he was working overtime, or working more than was required
by his contract. (*Id.* at 87-88).

60.    Brennan testified that he worked at least 40 hours each week that he worked for Mail-
Well. (Tr. I: 58).

61.    Brennan testified that typically when he worked at the Braintree facility he left his home in
Holden between 6:00 and 6:30 a.m. and would return home between 6:30 and 8:30 p.m.
(Tr. I: 59).

62.    The Court takes judicial notice that Holden is approximately 64 miles from Braintree, and
that a trip between the two towns typically involves substantially more than an hour of
driving.

63.    Brennan testified that when he worked from home, he usually worked from 8:00 a.m. until

12

6:30 or 7:30 p.m.  (Tr. I: 59).

64.    Brennan also testified that he worked a couple of Saturdays a month.  (Tr. I: 61).

65.    Brennan, however, did not report the number of hours he worked and, other than his log, Brennan did not keep track of his hours himself.  (Tr. I: 93, 134).

66.    Mail-Well did not maintain and does not possess any documentation or information related to how many days or hours per week Brennan worked.  (Mail-Well 30(b)(6) May 10, 2006 10:00 a.m. Dep. at 43, 50-51).

67.    Brennan's earning statements indicate that he worked exactly 40 hours every week.  (Tr. II: 80; Ex. 19 at 352-58).  However, according to Mail-Well, the hours reflected in his earnings statements do not reflect the actual number of hours Brennan worked during any particular pay period.  (Mail-Well 30(b)(6) May 10, 2006 10:00 a.m. Dep. at 58-60).

68.    While employed for Mail-Well, Brennan was subject to the control and supervision of the Chief Executive Officer of Mail-Well, or such other individual or individuals designated by the CEO or Mail-Well Board of Directors.  (Ex. 12 at 174; Tr. I: 91).  Mail-Well's CEOs, however, never directly controlled or supervised Brennan's work.  Instead, Brennan reported solely to Mitchell, who directed all of his work activities.  (Tr. I: 91-92).

69.    No one besides Mitchell supervised Brennan's duties, performance, or hours worked for Mail-Well.  (Tr. I: 92, Tr. II: 39-40).

70.    During Brennan's employment at Mail-Well, Mitchell had the authority to direct both his work and where he performed that work.  (Ex. 12 at 174; Tr. I: 91-92).

71.    Mitchell authorized Brennan to work wherever he was most efficient, including at his home.  (Tr. II: 40-41).

13

72.    Brennan testified that he worked more efficiently on financial matters when he worked at home, as opposed to the Braintree facility, because he was away from the distractions of the manufacturing facility. (Tr. I: 27). Brennan was, however, fairly disconnected from Mail-Well when he was working at home. For example, he did not have a fax machine, nor did he have access to Mail-Well's intranet from home. (Tr. I: 140, 142; *see* Ex. 6 at 93). There is no evidence that Brennan ever sent or received an e-mail from Mail-Well while at home.

73.    Mitchell testified that Brennan worked from home several days a week. (Tr. II: 40-41, 48-49). Mitchell also acknowledged that Brennan was not required to work from home and that his home was not a usual place of business for Mail-Well. (*Id.* at 84).

74.    Mitchell believed that Brennan was working at least 40 hours per week for Mail-Well. This belief was based on Mitchell's knowledge regarding the time and effort involved in producing the work product Brennan completed each week. (Tr. II: 51-52).

75.    Mitchell testified that he had daily in-person interactions with Brennan when he was at the Braintree facility and spoke with him at least once a day when Brennan was working at home. (Tr. II: 49-50). Mitchell, however, testified that with the exception of the times he saw Brennan at the Braintree facility and spoke with him on the phone, Mitchell had no personal knowledge of how much Brennan was working. (*Id.* at 73).

76.    Lucille Brennan, Thomas Brennan's wife, testified that when Brennan worked for Mail-Well, he generally worked between three and five days at the Braintree facility and worked other days (including Saturday mornings) from their home. (Tr. II: 105). Mrs. Brennan also testified that she left to commute to her full-time job between 7:30 and 8:15 a.m. (*Id.*

14

at 106).  Mrs. Brennan could not testify as to the time Brennan spent working at home between Monday and Friday because she was not at home during those days.

77.    Brennan never sought reimbursement for the use of his home for Mail-Well business.  (Tr. I: 142).  Brennan did not list his home address or telephone number on his Mail-Well business card.  (*Id.* at 142-43).

F.    **Brennan's Disability and Termination from Mail-Well**

78.    In 1997, Brennan began displaying the first symptoms of multiple sclerosis.  (Tr. I: 66).

79.    Brennan testified that as a result of the onset of multiple sclerosis symptoms, he had to work longer hours in order to complete his work for Mail-Well.  (Tr. I: 67).

80.    On March 28, 2000, Mail-Well accepted Brennan's application for enrollment in long-term disability benefits offered by Mail-Well for coverage beginning on April 1, 2000.  (Ex. 7 at 96).

81.    Brennan's symptoms progressed, and on July 6, 2000, he met with Dr. Narendrakumar Sodha, M.D., concerning his symptoms.  (Ex. 20 at 407).

82.    In a letter summarizing his consultation with Brennan, Dr. Sodha wrote that Brennan was "now doing part time work."  (Ex. 20 at 407).

83.    Brennan testified that he did not tell Dr. Sodha that he was working part-time, but instead told him that he only commuted to work in Braintree three times a week.  (Tr. I: 100).

84.    In September 2000, Dr. Sodha diagnosed Brennan as having multiple sclerosis.  (Tr. I: 75).

85.    On November 14, 2000, Mail-Well accepted Brennan's application for re-enrollment in its long-term disability policy plan, which became effective on January 1, 2001.  (Ex. 7 at 97).

15

86.    Brennan's condition continued to worsen to the point where he was considered disabled, as defined by the policy, in May 2001.  (Stipulation, Docket #42, at 1).

87.    Brennan's last day of work at Mail-Well was May 29, 2001.  (Tr. I: 85).

**G.    Submitting Claims for Disability Benefits**

**1.    Trustmark Claim**

88.    Just after he stopped working, Brennan submitted a long-term disability claim request to Trustmark Insurance Company, another insurance provider with whom Brennan had long-term disability coverage.  (Ex. 21).

89.    In the section of the Trustmark application requiring Brennan to state how many hours he worked in a normal week, he entered "25."  (Ex. 21 at 459).

90.    Trustmark's policy had no requirement as to the number of hours that an insured had to work in order to qualify for benefits.  (Tr. I: 115).

91.    Brennan testified that he takes great care in reading documents like the Trustmark application, but that his statement on that application that he worked only 25 hours in a typical week was an error.  (Tr. I: 111-14; Tr. II: 29).

92.    Brennan also testified that everything contained in the Trustmark application was correct except for the number of hours he worked in a typical work week.  (Tr. I: 111-14).

**2.    LINA Claim**

93.    Brennan submitted a claim for benefits to LINA by telephone on August 27, 2001.  (Exs. 2 & 3; Tr. I: 71).

94.    Richard Lodi, Senior Operations Representative for LINA, testified that the Master

Summary Report is a document produced by LINA's intake department in Dallas, Texas. (Tr. III: 7). The Master Summary Report reflects a LINA intake specialist's conversation with a potential benefits recipient when he or she calls LINA to submit a claim request. (*Id.* at 7, 15). The intake system is only available to the intake specialist and no one else can add or change the contents of the Master Summary Report. (*Id.* at 26).

95.     Lodi also testified that the "Notes" section of the Master Summary Report is an area of the document where the intake specialist enters information provided by the caller that the intake specialist thinks the case manager should follow up on. (Tr. III: 18).

96.     Brennan telephoned LINA on August 27, 2001, to notify LINA of his claim for long-term disability benefits. (Exs. 2 & 3; Tr. I: 71).

97.     The Master Summary Report for the call between Brennan and the intake specialist states that Brennan worked a total of 30 hours in a regular week for Mail-Well. (Ex. 2 at 27).

98.     Lodi testified that this information regarding total hours worked per week would have been provided by the caller, Brennan. (Tr. III: 8).

99.     Brennan, however, testified that he is sure that he did not tell the LINA intake specialist that he worked 30 hours in a regular week, but that he cannot remember if he told her how many hours he was working for Mail-Well. (Tr. I: 76).

100.   The "Notes" section from the Master Summary Report for Brennan's call with the intake specialist states as follows:

> THE 75,000.00 IS BASE RATE PLEASE VERIFY. WILL BE RECEIVING DISABILITY FROM A SEPARATE COMPANY, EE WOULD HAVE CERTAIN DAYS OF THE WEEK BY CONTRACT THAT HE WOULD GO INTO WORK. FOR THE PURPOSES OF BENEFITS THE EE WAS CLASSIFIED AS A FULL-TIME EE.

(Ex. 2 at 27).

101. Lodi testified that this information in the "Notes" section, like the number of hours worked per week, would have been provided by Brennan. (Tr. III: 20-21).

102. With respect to this "Notes" entry, Brennan testified that he does not remember whether or not he told the LINA intake specialist about "receiving disability from a separate company." (Tr. I: 151). Also, Brennan testified that he did not tell her that he would have "certain days of the week by contract that he would go into work." (*Id.*). Finally, he testified he thought that the sentence regarding him be classified as a full-time employee came from someone at Mail-Well, not from him. (*Id.*).

103. LINA denied Brennan's claim for benefits by letter on April 23, 2004. (Complaint, ¶ 13). When asked about the reason(s) for LINA's denial of Brennan's benefits, Lodi testified that the only reason provided was that Brennan was not working 35 hours per week. (Tr. III: 40-41).

**H.    Summary of Evidence and Further Conclusions**

104.  The following is a summary of the evidence tending to prove that Brennan did not work a regular schedule of at least 35 hours per week for Mail-Well:

a.    When he was negotiating to work for Mail-Well in July 1998, Brennan wrote to the company that it "should keep in mind that [he] has other business interests and is not and will not be involved with Northeastern Envelope on a full time basis."

b.    During those negotiations in 1998 and 1999, Brennan proposed a clause stating that he would "devote his best efforts to the business of [Mail-Well], and will spend a maximum of two business days per week, chosen in his sole discretion,

performing his duties and responsibilities hereunder."

c.   The final version of the employment agreement, executed in October 1999, stated that Brennan would "be expected to devote two (2) days per week to the business of [Mail-Well] during the Employment Period . . . ."

d.   Brennan also requested the inclusion of contractual language stating that he should be considered a full-time exempt employee for purposes of participation in Mail-Well's employee benefit plans. That language would have been redundant if Brennan had been a full-time employee.

e.   Brennan testified at his deposition in April 2006 that while working for Mail-Well, most weeks he worked at the Braintree facility only two days a week.

f.   Brennan had no fax machine at his home, and did not have access to the Mail-Well intranet. There is no evidence that he ever sent an e-mail while working at home.

g.   Brennan kept a detailed log of his activities for Mail-Well. While incomplete, the log reflect that he rarely worked more than two days a week.

h.   Brennan's work log indicates that working more than two days in a week was an unusual event worth commenting upon. Brennan made four entries to that effect in 1999 and 2000: "MY THIRD DAY AT THE PLANT THIS WEEK," "EXTRA WORK BEYOND CONTRACT," "OVERTIME," and "EXTRA WORK."

i.   Brennan did not have a regular schedule—that is, he did not work the same two days each week at Braintree, or a set number of hours or days when he worked at home.

19

j.      Brennan's base salary of $75,000 at Mail-Well is consistent, in context, with part-
time executive work. Brennan had earned a base salary of $66,000 in his last year
at Northeastern as a part-time executive. Mitchell earned a base salary of
$171,600 at Mail-Well as a full-time divisional president.

k.      Brennan's physician, Dr. Sodha, wrote in his medical notes in 2000 that Brennan
was working "part time." Although Brennan denies using the phrase, Dr. Sodha's
notes likely reflect either Brennan's actual words or a reasonable inference from
those words.

l.      On Brennan's application to Trustmark in 2001 for long-term disability benefits,
Brennan stated that he worked 25 hours in a normal work week. Brennan filled
out and signed the form.

m.      The Master Summary Report for Brennan's claim submission to LINA, prepared
by a telephone intake specialist while speaking to Brennan in August 2001, states
that he worked a total of 30 hours in a regular week for Mail-Well. Although
Brennan denies having given that information, the report likely reflects either his
actual words or a reasonable inference from those words.

105.    The following is a summary of the evidence tending to prove that Brennan worked more
than 35 hours a week for Mail-Well:

a.      Brennan testified that he worked at least 40 hours each week that he worked for
Mail-Well. Brennan also testified that as a result of the onset of multiple sclerosis
symptoms, he had to work longer hours in order to complete his work.

b.      Brennan testified at trial that during the time he worked at Mail-Well, he never

worked fewer than two days a week at the Braintree facility and often worked there as many as four or five times a week.

c.   Brennan testified that typically when he worked at the Braintree facility he left his home in Holden between 6:00 and 6:30 a.m and would return home between 6:30 and 8:30 p.m.  When he worked from home Brennan said that he usually worked from 8:00 a.m until 6:30 or 7:30 p.m.  Brennan also testified that he worked a couple of Saturdays a month.

d.   Mitchell testified that it was his belief that Brennan worked at least 40 hours a week for Mail-Well.  That belief was based on Brennan's output of work. However, with the exception of the times he saw Brennan at the Braintree facility and spoke with him on the phone when he was out of the office, Mitchell had no personal knowledge of how many hours Brennan was working.

e.   Mrs. Brennan testified that Brennan generally worked between three and five days a week at the Braintree facility and worked other days from their home, including Saturdays.  However, Mrs. Brennan was working full-time when Brennan worked at Mail-Well, so she could not testify as to the time that Brennan worked at home when she was not home on weekdays.

f.   Brennan's earnings statements indicate that he worked exactly 40 hours every week.  However, the statements are not an accurate reflection of his hours.

106.   There is at least a potential conflict between Brennan's trial testimony (that he never worked fewer than two days a week at Braintree, and "often" worked there as many as four or five times a week) and his deposition testimony (that "most" weeks he worked at

Braintree only two days a week).  To the extent there is a conflict, the Court credits

Brennan's deposition testimony that "most" weeks he worked at the Braintree facility only

two days a week (which, among other things, is consistent with his work log).

107.    The evidence tending to support the conclusion that Brennan did not work a regular

schedule of at least 35 hours per week consists almost exclusively of his own words, or his

own words as recorded or interpreted by others.  While Brennan characterizes various of

those statements as errors (Dr. Sodha's records, the Trustmark application, the LINA

telephone intake form) or incomplete or a joke (his work log), the cumulative weight of

the evidence is substantial.  Moreover, all of that evidence was created

contemporaneously, whereas all of the contrary evidence (with the exception of his

earnings statements) consists of testimony given after the fact.

108.    Mitchell did not witness or record Brennan's actual hours.  Furthermore, his estimate of

hours based on Brennan's work output is at best a crude measure; it would be difficult, for

example, for Mitchell to determine whether Brennan was working 30 or 35 hours per

week based on output alone.

109.    Mrs. Brennan likewise did not witness Brennan's actual work hours on a regular basis.

Mrs. Brennan was able to testify concerning how often Brennan worked at the Braintree

facility, but because she worked full-time as an attorney during Brennan's employment

with Mail-Well, she was not home during the week to observe the hours he put in at

home.

110.    Under the circumstances, the Court concludes by a preponderance of the evidence that

Brennan did not work "regularly scheduled full-time hours" of "not less than 35 hours per

22

week."

111.    The Court accordingly concludes that Brennan was not in the "Classes of Eligible
        Employees" under the group disability policy issued by LINA to Mail-Well, and is
        therefore not eligible to receive long-term disability benefits under that policy.

112.    The Court does not reach the issue whether Brennan was in "Active Service" under the
        policy, that is, whether he was "performing his or her regular occupation for [Mail-Well]
        on a Full-time basis, either at one of [Mail-Well's] usual places of business or at some
        location to which [Mail-Well's] business requires [Brennan] to travel."

## Conclusions of Law

1.    The Court has jurisdiction over this matter pursuant to ERISA, 29 U.S.C. §§ 1001 *et seq.*

2.    Because Brennan filed his claim for benefits from LINA in August 2001, his claim is
      subject to the claim regulations set forth in 29 C.F.R. § 2560.503-1 (1984).[2]

3.    Under the applicable regulations, Brennan's claim for benefits was "deemed denied"
      because LINA did not respond to Brennan's appeal within the time set forth in the
      regulations.  29 C.F.R. § 2560.503-1(e)(2).

4.    A denial of ERISA benefits, challenged under 29 U.S.C. § 1132(a)(1), must be reviewed
      under a *de novo* standard unless the benefit plan expressly gives the plan administrator or
      fiduciary discretionary authority to determine benefits eligibility.  *Firestone Tire and
      Rubber Co., v. Bruch*, 489 U.S. 101, 115 (1989).  The parties have stipulated that the *de
      novo* standard of review applies in this case.  (Stipulation, Docket #21).

5.    In order to have standing to pursue a claim for benefits under ERISA, Brennan bears the

[2] The current claims regulations apply only to claims filed on or after January 1, 2002.

23

burden of establishing by the preponderance of the evidence that he was a "participant" in the LINA long-term disability policy. *See* 29 U.S.C. §§ 1002(7), 1132(a)(1). The definition of "participant" includes one who has "a colorable claim" to vested benefits. *Firestone*, 489 U.S. at 117-18.

6.     Brennan has standing to pursue his claim for long-term disability benefits in this Court because he had a colorable claim to vested benefits.

7.     In order to be successful in his claim for benefits, Brennan bears the burden of proving by the preponderance of the evidence that he was a member of the "Classes of Eligible Employees" and that his coverage, if any, did not terminate on or before May 29, 2001. *See Morales-Alejandro v. Medical Card Sys., Inc.*, 486 F.3d 693, 700 (1st Cir. 2007); *Wickman v. Northwestern Nat. Life Ins. Co.,* No. 86-1895-WF, 1989 WL 129240, at *2 (D. Mass. Oct. 23, 1989), *aff'd* 908 F.2d 1077 (1st Cir. 1990).

8.     As a general matter, insurance contracts must be liberally construed in favor of a policyholder. 13 John A. Appleman & Jean Appleman, INSURANCE LAW AND PRACTICE, § 7401 at 197 (1976); *see also State Farm Mut. v. Nissen*, 851 P.2d 165, 166-67 (Colo. 1993). However, there is no need to construe the policy in this case, as the policy terms are not in dispute, nor are they ambiguous.

9.     For the reasons detailed in the Court's Findings of Fact, Brennan has failed to prove by a preponderance of the evidence that he was in the "Classes of Eligible Employees" under the group disability policy issued by LINA to Mail-Well.

10.     Accordingly, Brennan is not eligible to receive long-term disability benefits under the group disability policy.

**<u>Conclusion</u>**

For the foregoing reasons, judgment will enter in favor of defendant Life Insurance

Company of North America.

**So ordered.**


                                       /s/ F. Dennis Saylor

                                       F. Dennis Saylor IV

Dated: February 14, 2008           United States District Judge